IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.   08-3282 |
| | ) | |
| IRVING COHEN, THE WINDSOR | ) | |
| ORGANIZATION, INC., and 3-B | ) | |
| STORES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Pending before the Court is the motion for summary judgment filed by Defendant, The Windsor Organization, Inc.

## I. INTRODUCTION

This action is brought pursuant to 28 U.S.C. §§ 1340 & 1345 and 26 U.S.C. §§ 7401 & 7403.  Plaintiff United States of America seeks to foreclose upon commercial real property located at 709 (also known as 719) West Jefferson, Springfield, Sangamon County, Illinois ("the Property"). The Plaintiff is attempting to attach a federal tax lien for penalties assessed

against the Defendant, Irving Cohen, against the Property which Defendants allege is owned by The Windsor Organization, Inc. ("Windsor II"), another Defendant, claiming that Windsor II holds property as the alter ego/nominee of Cohen. Windsor II contends that Plaintiff's claim is unfounded and cannot be proven as a matter of law. It seeks summary judgment against the Plaintiff that it cannot attach a lien to the Property.

The Plaintiff asserts that Windsor II does not exist apart from Irving Cohen. It moves at his direction, while Cohen makes every decision. The Plaintiff claims that Cohen has maintained and exerted control over the Property long after he decided to title it in Windsor's name. Accordingly, the Plaintiff contends the evidence establishes that Windsor is Cohen's nominee and alter ego.

## II. BACKGROUND

### A. History of the Springfield, Illinois Property

In its Complaint, the Plaintiff claims that Windsor II holds the real estate which is subject to this suit as the nominee of Irving Cohen. On June 1, 1976, Tolly's Market, Inc. and National Super Markets, Inc., a Michigan

corporation ("National"), entered into a Lease Agreement for property situated at 709 West Jefferson, Springfield, Illinois, legally described as:

> Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, except the East 80 feet of Lot 10 all in Block 1 of Henry Davis', Jr. Addition to the City of Springfield, Illinois situated in the County of Sangamon and State of Illinois and all improvements thereon including a building of approximately 16,608 square feet in size (hereinafter referred to as "Lots 1-10").

On May 4, 1981, The Windsor Organization, Inc. was incorporated in Nevada ("Windsor I"), and purchased National's interest in the Property including its leasehold interest in Lots 1-10, title to the remaining portion of the Property and the buildings and improvements located on the Property.

On or about August 20, 1981, Windsor I transferred its interest in the buildings and improvements located on the Property and its leasehold interest in Lots 1-10 to American National Bank and Trust Company of Chicago, Trustee of Land Trust No. 53586, for the benefit of Windsor Income Properties, a New York limited partnership. On or about December 10, 1981, American National Bank and Trust Company of Chicago executed a mortgage to Windsor I to secure two junior promissory notes in

the amount of $1,525,500.00 and $2,560,000.00, respectively, issued by Windsor Income Properties to Windsor I to purchase the property from Windsor I.

Windsor II alleges that sometime in 2000 or 2001, Windsor Income Properties defaulted on its obligations under the second mortgage note ($2,500,000 principal) held by Windsor I and a Windsor Income Representative advised Irving Cohen that it had no ability to operate the Property as a result of the departure of the grocery store tenant. The Plaintiff alleges that this misrepresents the extent of Windsor Income Properties' default on its obligations to Windsor I and suggests that it may have defaulted on both notes.

Windsor II claims that in 2001, Irving Cohen was acting as President of Windsor I and continues in that capacity. The Plaintiff disputes this allegation and claims that Cohen has for some time acted as President and Manager of Windsor II. Moreover, the allegation is immaterial because Cohen's connection to Windsor I does not explain his continued conduct on behalf of Windsor II.

Windsor II alleges that Irving Cohen sought an investor to provide capital for needed improvements to attract tenants to the Property left vacant by the departure of the previous grocery store tenant. Cohen contacted Dr. Markus Kolzoff, which resulted in the commitment of T. I&M. Services Ltd. (TI&M) to invest funds in the Property. Cohen then arranged for the formation of Windsor II to own the Property with TI&M as its sole shareholder. The Plaintiff disputes that Windsor II contacted Dr. Kolzoff. Moreover, Cohen knew very little about TI&M and lacked authority to represent that entity. The Plaintiff questions how Cohen could set up Windsor II on behalf of TI&M.

Windsor II alleges that, shortly before January 1, 2002, Windsor I entered into an agreement with Windsor II whereby Windsor I would loan Windsor II additional funds and cause title of Windsor I's interest in the Property to transfer to Windsor II in exchange for Windsor II assuming the outstanding liability on the underlying second mortgage note secured by the Windsor II mortgage, to be increased by the new loan funds. The Plaintiff denies these allegations, claiming that no agreement between Windsor I and

Windsor II has ever been reduced to writing. Moreover, any such agreement would be a sham because it would have been negotiated by the same person, Irving Cohen, on both sides of the transaction.

Windsor II alleges that Windsor I caused $449,534.34 to be loaned to Windsor II from 2002 through 2004 pursuant to agreement with Dr. Kolzoff acting for TI&M, Windsor II's sole shareholder, to provide funds along with TI&M's capital contribution of up to $400,000.00 for necessary capital improvements and working capital. The Plaintiff disputes this allegation, noting that Kolzoff stated he did not become a member of TI&M until April 4, 2008. Moreover, there is no written document formalizing any agreement with TI&M. The Plaintiff further asserts that Irving Cohen diverted hundreds of thousands of dollars from funds purported to be from TI&M to his own pocket.

LaSalle Bank National Association, successor Trustee of Land Trust No. 53586, and Windsor Income Properties, beneficiary of said Land Trust, transferred its leasehold interest and the building and improvements on the Property to Windsor II pursuant to a Settlement and Deed in Lieu

Agreement dated as of January 1, 2002 between Windsor I, LaSalle Bank National Association, and Windsor Income Properties.

Windsor II alleges that the outstanding mortgage owed to Windsor I was not released as a result of the Deed in Lieu of Agreement and the underlying second mortgage note due to Windsor I remains unsatisfied to date. The Plaintiff denies this allegation, claiming that although Windsor I once held a mortgage against the Property, on May 3, 2005, Windsor I executed a Release of Second Mortgage and Assignment of Rents. The release was unambiguous and signed by Irving Cohen. Accordingly, the Plaintiff claims that Windsor I no longer holds a mortgage against the Property.

Windsor II claims that a renegotiated mortgage debt in the amount of $1,400,000 on the Property owed to Windsor I by Windsor II has been reported on Windsor II's Form 1120, Corporate Tax Return, since 2002, the year Windsor II was incorporated. The Plaintiff disputes the allegation. Although the Plaintiff acknowledges that Windsor II has reported a mortgage on the company's corporate federal tax returns, it notes that the

amount of the mortgage changed on Windsor's tax returns between 2004 and 2010 due to the execution of a legitimate mortgage held by 3-B Stores. The Plaintiff further asserts that the purported agreement to lower to $1.4 million the outstanding mortgage held by Windsor I was not reduced to writing. It claims that Windsor II made no payments on the supposed $1.4 million mortgage, and the agreement was not negotiated in good faith and at arm's length.

Windsor II claims it purchased Lots 1-10 from Defendant, 3-B Stores, Inc., successor in interest to Tolly's Market, Inc., on May 19, 2005, pursuant to Real Estate Sale Agreement, which provided that a new mortgage be given to 3-B Stores, Inc. to secure a purchase money note, and with the Windsor I note to be made subordinate thereto. The Plaintiff disputes this allegation, noting that Exhibit B to the Real Estate Agreement did not describe or identify any first mortgage on the property. Section 3.7 of the Mortgage and Security Agreement between 3-B Stores and Windsor II specified that "any current mortgage on the property may remain provided it is subordinated to the lien of the [3-B Stores] mortgage."

Windsor II was permitted to place an additional mortgage on the property "provided it is expressly subordinate to the rights of 3-B Stores, Inc." The Plaintiff further claims that, on the same day that Windsor II executed this new mortgage with 3-B Stores, Irving Cohen released Windsor I's mortgage on the property. Windsor II executed a Mortgage and Security Agreement for the benefit of 3-B Stores, Inc. on May 3, 2005.

B. Incorporation and operation of Windsor II

Windsor II was incorporated in the State of Nevada on February 8, 2002. According to Windsor II, the corporation was incorporated using the name "The Windsor Organization, Inc." at the suggestion of Robert Fernandez, counsel for Windsor II at Sonnenschein, Bath & Rosenthal in Chicago, Illinois. The Plaintiff denies this allegation, pointing to Irving Cohen's deposition testimony which is inconsistent with it.

Windsor II claims to have issued 100 registered shares to TI&M, its sole shareholder, on February 9, 2002. Accordingly, Windsor II states that it is wholly owned by TI&M. The Plaintiff disputes these allegations, alleging that Windsor II never reported on its federal tax returns between

2002 and 2010 that it was foreign-owned, as Windsor II would have been required to do. Windsor II disputes the Plaintiff's suggestion that the fact it failed to report its foreign ownership on its federal tax returns somehow invalidates the stock certificate it issued to TI&M on February 9, 2002.

Windsor II alleges that William Reed was the sole corporate officer and director of Windsor II from February 8, 2002, to January 16, 2007. The Plaintiff contends that Reed served in that capacity in name only, pointing to Irving Cohen's testimony that Reed was a "nominee president" and that Cohen ran the day-to-day operations of the company. The Plaintiff further notes that during this period, Cohen often signed legal documents such as leases and construction documents as "President" of Windsor. Cohen testified that it was "not necessarily" a false statement that he was Windsor's President as of October 15, 2002. Moreover, William Reed's testimony suggested that he did not know much about Windsor II.

Windsor II alleges that Kelly Neely was its President from January 16, 2007, through her resignation on July 26, 2008, and Treasurer, Secretary

and sole director of Windsor II from sometime in 2006 through July 27, 2008. The Plaintiff denies these allegations for the same reasons, claiming that Neely was another nominee president of Windsor II. Neely testified that although she occasionally signed checks or documents, she was told that Irving Cohen "would take care of everything."

Windsor II alleges that Robert Gold is now the sole corporate officer and director of Windsor II and has been since his appointment on July 16, 2008, when he agreed to serve in such capacity at the request of Irving Cohen. The Plaintiff denies this allegation for the same reasons and claims that Cohen's attorney, Herman Schwartzman, asked Gold to become President of Windsor II. Gold testified that he did not know there was a Windsor II until this litigation commenced. He thought he was President of Windsor I.

Windsor II claims that corporate formalities were followed from time to time including the filing of articles of incorporation, adoption of by-laws, issuance of stock certificate to its sole shareholder, filing of annual reports with the State of Nevada Secretary of State, filing of annual federal and

state tax returns, maintenance of separate checking accounts in its corporate name, and no commingling of corporate funds with other parties. The Plaintiff denies this assertion and claims there are a number of instances where Windsor II failed to observe corporate formalities, citing as examples the failure to hold board meetings, record minutes, hold officer or director elections, or issue meaningful resolutions of any kind. The Plaintiff further asserts there are instances where Windsor II failed to follow its own corporate bylaws.

Windsor II notes that Harry Stern has served as the local property manager since 2002 and handles the day-to-day management of the Property. He has paid the property taxes and maintenance costs and some mortgage payments to 3-B Stores, Inc. from Windsor II's bank accounts, but never issued any payments to Irving Cohen. Although the Plaintiff does not deny these assertions, it states that they are immaterial. Moreover, Cohen acted as President and Managing Director of Windsor II and handled its day-to-day operations.

Windsor II claims that TI&M has provided in excess of $750,000 in

capital to Windsor II. The Plaintiff disputes this assertion and claims TI&M invested only $275,000 in capital on March 14, 2003. Moreover, Irving Cohen diverted hundreds of thousands of dollars from funds purported to be from TI&M to his own pocket. In response, Windsor II points to the Scott & Scott, P.C., attorneys' trust account statements, and the Schwartzman, Garelik, Walker and Troy trust account statements which are attached to its motion in support of its assertion that TI&M has provided funds to defend this lawsuit, which is additional paid in capital. Thus, Windsor II states that Plaintiff has admitted that TI&M has provided in excess of $750,000.

Windsor II alleges that the beneficiary of TI&M is a Swiss citizen domiciled in Switzerland. The Plaintiff notes that Windsor II's sole support for this assertion is Markus Kolzoff, who has refused to testify in this case. The Plaintiff claims that it is fundamentally unfair to allow Windsor II to rely on Kolzoff's affidavits when he refused to testify pursuant to the Court's Order.[1] Windsor II further claims that Irving

_____

[1]On October 4, 2010, the Court ordered the issuance of a letter of request to the principality of Liechtenstein for the testimony of Markus Kolzoff. On December

13

Cohen is not and has never been a director, officer, shareholder, partner or member of TI&M. The Plaintiff disputes this assertion on the basis that it is supported only by Kolzoff's affidavit. Windsor II states that it is supported by the transcript received from the Court of Justice in the Principality of Liechtenstein by the Court pursuant to its Letter of Request. The transcript reveals that for the most part, Kolzoff exercised his right as an attorney and trustee to refuse to testify. Kolzoff did say that the beneficiary of TI&M is an unnamed Swiss citizen domiciled in Switzerland. He further said that he has been a member of TI&M since April 4, 2008, and thus is not able to contribute to many questions from personal experience. Kolzoff further said that Cohen is not and has not been a director, member, secretary, partner or shareholder of TI&M.

Windsor II claims that its bank accounts maintained at Bank of America, Bank of Springfield, Wachovia Bank and TD Bank from 2002 to present show disbursements only for operations of the Property, payment of property taxes, insurance, rent and mortgage payments to 3-B Stores,

---

17, 2010, Kolzoff refused to testify in this matter.

Inc., registered agent fees, improvement construction costs, legal fees, appraisal, annual report filing fees, management fees to Harry Stern and Robert Gold, but no payments to Irving Cohen. The Plaintiff disputes this allegation and claims that Cohen diverted hundreds of thousands of dollars from funds purported to be from TI&M to his own pocket. In response, Windsor II states that Plaintiff has failed respond to the assertion or properly support its purported denial.

Windsor II next alleges that Irving Cohen has never deposited any money into bank accounts owned by TI&M. The Plaintiff denies this allegation and claims that Cohen directed funds to be deposited into American Equities Holding Corporation's ("AEHC") bank accounts from Schwartzman Garelik's escrow account. TI&M is purportedly the shareholder of AEHC. Thus, the Plaintiff claims that Cohen has deposited money into bank accounts that are, according to Windsor II, owned by TI&M. Citing <u>Main Bank of Chicago v. Baker</u>, 86 Ill.2d 188, 204 (1981), Windsor II states that a corporation is separate and distinct from its shareholder, directors and officers and, generally from other corporations

with which it may be affiliated.  A shareholder does not have title to a corporation's bank accounts.  See id.  Accordingly, the Plaintiff's denial of Windsor II's assertion or its contention that TI&M jointly held an account with Windsor II or AEHC is contrary to law.

Windsor II next asserts that Irving Cohen has never been a signatory on bank accounts owned by TI&M.  The Plaintiff denies the assertion and claims that on December 2, 2005, Cohen signed an ACH Direct Credit Authorization Form for the Bank of Springfield, one of several banks that Windsor II used in the ordinary course of business after it was purportedly owned by TI&M.  Moreover, the Plaintiff claims Cohen issued checks at will from bank accounts that Windsor contends were owned by TI&M.  Additionally, Bill Reed set up bank accounts for Windsor II and pre-signed books of checks for Cohen to use.  Cohen issued these checks at his discretion and without Reed's prior authorization.  In response, Windsor II states that Plaintiff cites no basis in law or fact to support the assertion that Cohen is a signatory on a TI&M account by virtue of the fact that he wrote checks from Windsor II's checking account on Windsor II's behalf

to pay for operating expenses of Windsor II. As noted above a corporation's accounts are separate and distinct from those of its shareholders. See Baker, 86 Ill.2d at 204. Therefore, Windsor II asserts that Plaintiff is deemed to have admitted that Cohen has not been a signatory on accounts owned by TI&M.

### C. Lillian Rosen Trusts

Windsor II alleges that Irving Cohen is presently the trustee of three trusts: (1) the Lillian Rosen Trust for the benefit of Hal S. Cohen; (2) the Lillian Rosen Trust for the benefit of Laurence S. Cohen; and (3) the Lillian Rosen Trust for the benefit of Jennifer P. Cohen. The trusts were established on October 14, 1983. The Plaintiff disputes that Cohen is the trustee, noting that he denied being the Trustee of the Lillian Rosen Trusts during a post-judgment discovery deposition taken on May 16, 2000. Cohen testified that he stopped being the trustee in 1989 and Mark Virag was the trustee at that time. Virag is listed as Trustee for the Lillian Rosen Trusts on the trusts' federal tax returns for tax years 2000 and 2001.

Windsor II claims that on November 1, 1983, the Lillian Rosen

Trusts purchased the Windsor Holding Corp. of which Windsor I is a wholly owned subsidiary, from the Hal S. Cohen Trust No. 2, Laurence S. Cohen Trust No. 2, and Jennifer P. Cohen Trust No. 2 ("Cohen No. 2 Trusts"), three trusts created by Trust Agreements dated April 5, 1978. The Plaintiff denies this allegation and states that on November 1, 1983, shares for Windsor Holding Corp., The Monroe Anthology, Inc., and the Madison Library, Inc. were purportedly transferred to the Lillian Rosen Trusts from the Cohen No. 2 Trusts. However, the December 27, 2007 "Accord and Release" between the beneficiaries of the Cohen No. 2 Trusts (Irving Cohen's children) and the Trustee of the Cohen No. 2 Trusts do not substantiate the transfer. The Plaintiff further claims that the Cohen No. 2 Trusts show the date of sale for Madison and Monroe to be April 3, 1985. In the final accounting, the Trustee for the Cohen No. 2 Trusts does not indicate that the trust ever owned Windsor Holding Corporation. In any event, the Plaintiff claims that Windsor II's allegations are immaterial because Windsor I executed a Release of the Second Mortgage on May 3, 2005. After that date, Windsor I no longer held a legal or equitable

mortgage on the Property. Therefore, Lillian Rosen Trust's ultimate ownership of Windsor I is immaterial to the issue of Windsor I's current interest in the Property. It does not have any remaining interest.

The Cohen No. 2 Trusts filed Fiduciary Income Tax returns until their respective terminations and made final distributions to the trust beneficiaries pursuant to the Trust Agreements. The beneficiaries of the Cohen No. 2 Trusts, the children of Irving Cohen, received substantial financial benefits when they reached prescribed ages under the Trusts and at final termination. However, no benefits were paid to Irving Cohen. Windsor I filed tax returns as part of consolidated tax returns with several entities including the Windsor Holding Corp. The Lillian Rosen Trusts filed Fiduciary Income Tax Returns until at least 2005. The Plaintiff claims that these facts are immaterial. Windsor I executed a Release of Second Mortgage and Assignment of Rents on May 3, 2005. After that date, Windsor I no longer held a legal or equitable mortgage on the Property. Therefore, the Lillian Rosen Trust's ultimate ownership of Windsor I is immaterial to the issue of Windsor I's current interest in the Property. It

does not have any remaining interest.

### D. Irving Cohen's involvement with the Property

Windsor II alleges that Irving Cohen has not received cash or other direct financial or indirect economic benefits from the Property owned by Windsor II. The Plaintiff disputes this allegation and claims that Cohen diverted hundreds of thousands of dollars from funds purported to be from TI&M to his own pocket.

Windsor II asserts that Irving Cohen will receive no funds if the Property is sold. The Plaintiff disputes this assertion as an improper conclusion regarding the ultimate issue at contention.

Windsor II claims that Cohen was authorized by William Reed, while President of Windsor II, to take all necessary actions in the operation of the Property and on behalf of Windsor II. Citing Reed's deposition testimony wherein he denied ever authorizing Cohen to act on Windsor II's behalf, the Plaintiff disputes the assertion. Windsor II further asserts that, following Reed's authorization, Cohen arranged and executed construction contracts for improvement of the premises and commercial leases to provide

rental funding. The Plaintiff denies the assertion on the same basis and also cites Reed's testimony wherein he denied have any knowledge of contracts or leases entered into on Windsor II's behalf.

Windsor II claims that William Reed authorized Irving Cohen to arrange and execute construction contracts for improvements of the premises and commercial leases to provide rental funding. The Plaintiff disputes this assertion and points to Reed's testimony that he had no knowledge of the leases and contracts Cohen signed on behalf of Windsor II. Moreover, Reed testified that he never authorized Cohen to act on Windsor II's behalf.

Windsor II further alleges that after William Reed's resignation as sole director and officer of Windsor II, Kelly Neely, as President, authorized Cohen to take all necessary actions in the operation of the Property and Windsor II. The Plaintiff denies that Neely authorized Cohen to act on behalf of Windsor II. The Plaintiff points to Neely's testimony that Cohen would "take care of everything."

### III. DISCUSSION

Windsor II moves for summary judgment on all claims, asserting there is no genuine dispute as to the material facts in this case and that Defendants are entitled to judgment as a matter of law because Windsor II is not the alter ego/nominee of Irving Cohen, such that the Plaintiff cannot foreclose upon real property owned by Windsor II. The Plaintiff alleges there remain genuine issues of material fact for trial. Therefore, the motion for summary judgment should be denied.

A. Summary judgment standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(a); <u>see also</u> <u>Sellers v. Zurich American ins. Co.</u>, 627 F.3d 627, 631 (7th Cir. 2010). The Court construes all inferences in favor of the non-moving party. <u>See</u> <u>Sellers</u>, 627 F.3d at 631.

B. Windsor II as Irving Cohen's Nominee

"A nominee is one who holds bare legal title to property for the benefit of another." <u>Scoville United States</u>, 250 F.3d 1198, 1203 (8th Cir. 2001) (citing <u>Black's Law Dictionary</u> (7th ed. 1999)). An "alter ego" is "[a]

corporation used by an individual in conducting personal business, the result being that a court may impose liability on the individual by piercing the corporate veil when fraud has been perpetrated on someone dealing with the corporation." Black's Law Dictionary (7th ed. 1999).

The doctrines overlap to some extent and "nominee" and "alter ego" are sometimes used interchangeably throughout the case law when the government attempts to attach a tax lien of a taxpayer against property owned by a corporation. See United States v. Swan, 467 F.3d 655, 658 (7th Cir. 2006).

According to Windsor II, the states' laws applicable to whether Irving Cohen had a property interest in property owned by Windsor II is the Nevada alter ego law, the State of Incorporation of Windsor II; New York trust law, the State wherein the Lillian Rosen Trusts were established; and Illinois real estate law, where the Property is located.

The Property at issue is located in Springfield, Illinois. Therefore, the Plaintiff claims that Illinois law applies to the determination of nominee possession. See United States v. Northern States Investments, Inc., 670 F.

Supp.2d 778, 785 (N.D. Ill. 2009) ("The property rights of the taxpayer are determined by state law, because the federal tax lien statute does not define property rights, 'but merely attaches consequences, federally defined, to rights created under state law,'" quoting <u>Swan</u>, 467 F.3d at 656). "Illinois law does not provide a clear standard for whether the nominal property holder is merely a nominee of another, but Illinois courts employ a 'realistic approach' to property ownership that is consistent with the nominee doctrine.'" <u>Northern States Investments</u>, 670 F. Supp.2d at 788 (quoting <u>Chi. Patrolmen's Ass'n v. Dep't of Rev.</u>, 664 N.E.2d 52, 57 (1996)). The court in <u>Northern States</u> observed that because Illinois law does not adequately explain the nominee test, it would follow "the federal common law to the extent that federal law adds flesh to the state law bones." <u>Id.</u>

In assessing whether a property owner is in reality a taxpayer's nominee, a court may look to the degree of control the taxpayer exercises over the property. <u>See</u> <u>United States v. Wesselman</u>, 2010 WL 1654899, at *3 (S.D. Ill. Apr. 22, 2010). Factors that may be considered include:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the

24

nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

Id. at *4. The Northern District has employed an almost identical test in determining whether a titleholder is a nominee. See United States v. Towne, 406 F. Supp.2d 928, 937 (N.D. Ill. 2005).

Applying these factors, the Plaintiff first contends that Windsor II did not give any consideration for the Property. The Plaintiff asserts that Irving Cohen negotiated with himself–he represented both Windsor I, as purported President, and Windsor II, as the true beneficial owner. The Plaintiff asserts that the only consideration received by Cohen was a handshake.

Next, the Plaintiff alleges that Irving Cohen placed the Property in Windsor's name to evade his tax debt of almost $3.7 million, which was assessed by the IRS in 1986. The Plaintiff contends that since then, Cohen has hired nominee service companies and formed complicated corporate

structures to disguise his ownership interest in various properties and companies.

The Plaintiff further contends that Irving Cohen is Windsor II. Windsor II acted through Cohen and he ran the day-to-day operations. The Plaintiff notes that the record establishes that Cohen signed leases and construction contracts on behalf of Windsor II. Cohen negotiated the 3-B Stores deal and signed the sale and mortgage documents that were filed with the Sangamon county clerk. Moreover, as Presidents of Windsor II, Bill Reed and Kelly Neely served at Cohen's direction. Robert Gold, who is the current the sole corporate officer and director of Windsor II, did not know there was a distinction between Windsor I and Windsor II until this litigation commenced. The Plaintiff contends that until Gold signed an employment contract in 2008, Windsor II had no employees. Moreover, it did not act as a corporation without Cohen's action or authorization.

Next, the Plaintiff alleges that Irving Cohen failed to record purported interests in the Property. Although it acknowledges that transfer of title to the Property to Windsor II was recorded with the Clerk of Sangamon

County, the Plaintiff claims that Windsor II did not document or record any other interest in the Property. For example, there are no documents related to Windsor II's assumption of the second mortgage held by Windsor I. The Plaintiff contends that the only plausible inference is that Cohen is both Windsor I and Windsor II. Thus, no documents were necessary.

The Plaintiff next contends that Irving Cohen exerted more control over the Property after Windsor Income Properties defaulted on its mortgage. The Plaintiff claims that Cohen flew to Springfield to inspect the Property to determine what renovations would be necessary in order to get a new tenant. Cohen approached friends, banks, and purportedly Markus Kolzoff, to arrange financing for the Property. Between 2002 and 2004, Cohen negotiated and signed several leases relating to the Property and contributed funds to the restoration effort through Windsor I. Moreover, Cohen negotiated the purchase of a parcel of land from 3-B Stores and signed the sale and mortgage documents relating to that transaction. According to the Plaintiff, only Cohen exerted control over the Property.

Additionally, the Plaintiff claims that but for the federal liens, Irving Cohen would continue to enjoy the benefits of the Property, which has generated over $150,000 per year in rental income and appreciated significantly since it was transferred to Windsor II's name in 2002.

Although Windsor II alleges that many of the facts relied on by the Plaintiff are immaterial, the Court concludes that there is sufficient information in the record to create a genuine issue of material fact as to whether Windsor II is Irving Cohen's nominee. A reasonable inference from the record is that Cohen controlled the actions of Presidents of Windsor II, including William Reed and Kelly Neely. Cohen himself testified that it was "not necessarily" a false statement that he was Windsor II's President, even if someone else held the position. Moreover, Cohen signed documents wherein he was listed as president. Certainly, a plausible inference is that there is no distinction between Cohen and Windsor II.

It is also fairly significant that although Irving Cohen was willing to sign contracts on behalf of Windsor II, no written contract exists pertaining to the relationship between Windsor II and TI&M with respect to the

Property. At most, there was a "moral business and ethical obligation" or handshake.

Given all of these factors, there are genuine disputes over material facts pertaining to whether Irving Cohen is Windsor II's nominee.

## C. Windsor II as Irving Cohen's alter ego

The "nominee" and "alter ego" doctrines are alternate theories. Having determined that there is a factual dispute as to whether Irving Cohen is Windsor II's nominee, the Court need not engage in a lengthy analysis as to alter ego.

The parties agree that Nevada law governs. To establish that the alter ego doctrine should be applied, a plaintiff must establish:

> (1) the corporation must be influenced and governed by the person asserted to be its alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the fiction of a separate entity would, under the circumstances, sanction a fraud or promote injustice.

Rowland v. Lepire, 99 Nev. 308, 316-17 (1983). "There is no litmus test for determining whether the corporate fiction should be disregarded; the result depends on the circumstances of each case." Polaris Industrial Corp.

v. Kaplan, 103 Nev. 598, 602 (1987).

Applying the factors, the Court concludes that when the evidence is viewed in a light most favorable to the Plaintiff, the first factor is easily met. Irving Cohen's alleged control over Windsor II's Presidents and his negotiation of contracts and leases on behalf of Windsor II are sufficient to create a factual dispute as to the Plaintiff's assertion that Windsor II was influenced and governed by Cohen.

Next, the inquiry is whether there is a unity of interest and ownership to such a degree that the two are inseparable. "In determining whether a unity of interest exists between the individual and the corporation, courts have looked to factors like co-mingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities." Polaris, 103 Nev. at 601.

Windsor II claims all funds were maintained in bank accounts under its name, not Irving Cohen's. Cohen provided no personal funds for investment into Windsor II or its Property in Springfield. Moreover

TI&M, as the sole shareholder of Windsor II, has backed its ownership position with sizeable capital contributions in excess of $750,000. Although all corporate formalities may not have been followed, some were.

This factor is relatively close. The Plaintiff notes that the absence of corporate ownership is not automatically controlling. See LFC Marketing Group, Inc. v. Loomis, 116 Nev. 896, 905. The court further observed:

> In this case, there was evidence that William acted as the ultimate authority for all of LFC Marketing's dealings, had negotiated the marketing agreement with NLRC personally, and did not distinguish his interest from the various Lange entities. Further, there was evidence that William considered himself to be the "president and CEO" and the "primary owner" of LFC Marketing. Additionally, there was evidence that LFC Communications paid LFC Marketing's bills and that a common account was used among the LFC entities. Finally, there was testimony that William alone negotiated a settlement agreement with NLRC over a billing dispute and determined which of the LFC entities received the proceeds. We conclude that this evidence is adequate to support the district court's conclusion that there was a unity of interest and ownership.

Id. When the evidence here is viewed in a light most favorable to the Plaintiff, a fact-finder could conclude there was a unity of interest and ownership. There is evidence that Irving Cohen acted as the ultimate authority for Windsor II. Cohen testified it was "not necessarily" a false

statement that he was President of Windsor II, even when other individuals held that title.

The next issue is whether maintaining the separate existence of Windsor II would serve to sanction a fraud or promote injustice. Windsor II notes that Plaintiff has not instituted this case as a creditor. The corporation was adequately capitalized. There is no basis for arguing that the creditors of Windsor II have been deceived as a result of Irving Cohen's action to help establish and continue the existence and funding of Windsor II.

The Plaintiff notes that Irving Cohen has owed the government millions of dollars in tax-related penalties since 1986. The judgment obtained by the government against Cohen in 1999 remains unsatisfied. The Plaintiff contends the record establishes that Cohen has a long-standing history of using complex corporate structures to evade payment of his tax liabilities. The Plaintiff asserts that it would sanction fraud against the United States if Cohen were allowed to continue to abuse these corporate structures. Moreover, it would be unjust to allow him to dodge

his debt by placing his assets in the name of his alter egos.

The Court concludes that there is a genuine dispute as to whether the existence of the corporate form sanctions fraud or promotes injustice in this case. Accordingly, upon viewing the facts and construing all reasonable inferences in favor of the Plaintiff, there is a genuine factual dispute as to whether Windsor II is Irving Cohen's alter ego.

## IV. CONCLUSION

After reviewing the record, the Court concludes there are genuine disputes which preclude the entry of summary judgment in favor of Windsor II on the Plaintiff's two theories of liability.

<u>Ergo</u>, the motion for summary judgment filed by Defendant The Windsor Organization, Inc. [d/e 123] is DENIED.

ENTER: October 17, 2011

      FOR THE COURT:

                                              s/Richard Mills
                                              United States District Judge