IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.   08-3282 |
| | ) | |
| IRVING COHEN, THE WINDSOR | ) | |
| ORGANIZATION, INC., and 3-B | ) | |
| STORES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

The Court now considers the following motions in limine: the Plaintiff's motion for judicial notice of the alleged fact that Liechtenstein and the British Virgin Islands are widely regarded as tax havens [d/e 182]; the Plaintiff's motion for judicial notice of certain matters of public record [d/e 183]; Defendant Windsor Organization's motion for judicial notice of various State Department documents [d/e 188]; and the Plaintiff's motion for judicial notice of the Schengen Agreement of 1985 [d/e 195].

## I. Motion for Judicial Notice of Fact that Countries are Tax Havens

### (A)

Plaintiff United States of America has filed a motion for judicial notice of the fact that Liechtenstein and the British Virgin Islands are widely regarded as tax havens.  It notes that Defendant The Windsor Organization, Inc. claims that it is wholly-owned by a British Virgin Islands corporation, TI&M Services, LTD.  Moreover, Defendant Irving Cohen and Windsor both allege that Cohen had in-person meetings with Markus Kolzoff, a citizen of Liechtenstein and alleged member of TI&M's Board of Directors.  The Plaintiff claims that, because Kolzoff refused to be deposed and refused to produce any documents at the hearing before the Principality of Liechtenstein's Princely Court of Justice, the United States was unable to take any discovery from TI&M or Kolzoff.  The Plaintiff thus requests that the Court take judicial notice at trial of the fact that both the Principality of Liechtenstein and the British Virgin Islands are widely regarded as "tax havens."

The Federal Rules of Evidence require that the Court take judicial

notice of an adjudicative fact "if a party requests it and the court is supplied with the necessary information." See Fed. R. Evid. 201(c)(2). A court may take judicial notice of a fact not subject to reasonable dispute in that it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice may be taken at any stage of the proceeding. See Fed. R. Evid. 201(d).

In support of its motion, the Plaintiff notes that the Organisation for Economic Co-Operation and Development ("OECD") has defined "tax haven" as follows:

> [A] tax haven is a jurisdiction that imposes no or only nominal taxes itself and offers itself as a place to be used by non-residents to escape taxes in their country of residence. A tax haven can offer this service because it has laws or administrative practices that prevent the effective exchange of information on taxpayers benefitting from the low-tax jurisdiction.

See Slemrod & Wilson, Tax Competition with Parasitic Tax Havens, NBER Working Paper Series (May 2006), p.2 (available here: http://www.nber.org/papers/w12225). The Plaintiff asserts that the OECD published criteria that qualified a country as a "tax haven" in its 1998

report, Harmful Tax Competition: An Emerging Global Issue. <u>See</u> http://www.oecd.org/dataoecd/33/0/1904176.pdf. In 2000, the OECD published a list of 41 tax haven countries that met the 1998 criteria: the list identified both Liechtenstein and the British Virgin Islands as tax havens. <u>See</u> Towards Global Tax Co-Operation: Report to the 2000 Ministerial Council Meeting and Recommendations by the Committee on Fiscal Affairs, OECD 2000 (available here: http://www.oecd.org/dataoecd/9/61/2090192.pdf).

The Plaintiff further asserts that the National Bureau of Economic Research ("NBER") has noted that Liechtenstein and the British Virgin Islands are tax havens as defined by the OECD, as well as under the more narrowly-tailored Hines-Rice text. <u>See</u> Dharmapala & Hines, Which Countries Become Tax Havens?, NBER Working Paper Series (December 2006), p. 34 (available here: http://www.nber.org/papers/w12802). Moreover, the Tax Justice Network has identified Liechtenstein and the British Virgin Islands as tax havens. <u>See</u> Identifying Tax Havens and Offshore Finance Centres, Tax Justice Network, (July 8, 2007), p. 8

( a v a i l a b l e  h e r e :
http://www.taxjustice.net/cms/upload/pdf/Identifying_Tax_Havens_Jul_0
7.pdf).

The Plaintiff contends that even William Reed, the former president of Asset Protection Group, Inc.–the entity Cohen hired to incorporate Windsor in Nevada–recognized Liechtenstein and the British Virgin Islands as tax havens.  In his book, <u>Bulletproof A$$et Protection</u>, Reed wrote, "The BVI has a good infrastructure and would always make my short list of best offshore havens."  <u>See</u> William S. Reed, <u>Bulletproof A$$et Protection</u>, p. 145.  As for Liechtenstein, Reed states, "Liechtenstein still has some of the best bank secrecy laws in the world," and "[i]n spite of this waiver, Liechtenstein is still one of the best offshore havens in the world."  <u>See</u> <u>id.</u> at 153-54.

The Plaintiff contends that Defendants put the countries of Liechtenstein and the British Virgin Islands at issue by virtue of the defense they have asserted: that Cohen met with a citizen of Liechtenstein to discuss investing in the property, and that the purported owner of Windsor

is TI&M, a British Virgin Islands corporation.  The Plaintiff further asserts that, because of Windsor's and Cohen's defense and because the United States was unable to take any discovery about Kolzoff's or TI&M's actual interest in the Springfield property, the issue of Liechtenstein's and British Virgin Islands' status as a tax haven is relevant.

Based on the foregoing, the Plaintiff claims there can be no reasonable dispute that Liechtenstein and the British Virgin Islands are widely-regarded as tax havens.  Accordingly, it asks the Court to take judicial notice.

(B)

In its response, Windsor asserts that the parties had reached an agreement as to a possible protective order and a potential location of Markus Kolzoff's deposition (Switzerland), when the Plaintiff filed its motion for issuance of Letters Rogatory to the Principality of Liechtenstein, which ended the possibility of obtaining Kolzoff's voluntary deposition. Windsor questions the Plaintiff's assertion that it has been foreclosed from obtaining discovery from TI&M, the sole shareholder of Windsor, when the

Plaintiff did not, either through a Letter of Request through this Court or the Liechtenstein Court, pursue the matter further and did not seek an appeal of the Regional Court's ruling that "[t]he refusal to give testimony of witness, Dr. Markus Kolzoff, is legitimate."

Windsor further asserts that Plaintiff's assertion is subject to reasonable dispute and is not known within the territorial jurisdiction of this Court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Windsor notes that, in support of the Plaintiff's motion, it has cited persuasive authority consisting of William Reed's book, <u>Bulletproof A$$et Protection</u>, in addition to Committee Reports of an international organization, a national non-profit research organization and a research and advocacy committee launched in the British Parliamentary.  According to Windsor, these documents are not proper subjects of judicial notice and fail to satisfy the standard of Rule 201.  Moreover, Windsor has objected to the admissibility of Reed's book and other marketing tools in its first motion in limine.  Additionally, Windsor contends that some of the documents that Plaintiff

has relied on were not properly disclosed.

Windsor further alleges that Plaintiff has not explained NBER's and OECD's connection to their role with the federal government and their role in obtaining the information cited by the Plaintiff. Moreover, Windsor claims that much of the information cited is purported expert opinion which was not disclosed, and hearsay. Additionally, Windsor asserts that Plaintiff has not established foundation for admission of the contents of the documents.

(C)

Windsor has raised a number of issues pertaining to the admissibility of the documents on which the Plaintiff relies. The status of Liechtenstein and the British Virgin Islands as alleged tax havens appears to be relevant. However, "[j]udicial notice merits the traditional caution it is given, and courts should strictly adhere to the criteria by the Federal Rules of Evidence before taking judicial notice of pertinent facts." <u>Doss v. Clearwater Title Co.</u>, 551 F.3d 634, 640 (7th Cir. 2008).

The language of the rule makes it clear that courts must use caution

in taking judicial notice of adjudicative facts. "In order for a court fact to be judicially noticed, indisputability is a prerequisite." See Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1354 (7th Cir. 1995).

Because it is unable to determine that the issue is beyond "reasonable dispute," the Court declines at this time to take judicial notice of the alleged fact that Liechtenstein and the British Virgin Islands are widely regarded as tax havens. The parties may litigate the issue through the introduction of any admissible evidence at trial.

Therefore, the Court will Deny the Plaintiff's motion in limine. The motion may be renewed at an appropriate time. See Fed. R. Evid. 201(d).

## II. Motion for Judicial Notice of Public Records

Plaintiff United States has filed a motion for judicial notice of matters of public record relating to William Reed and the Asset Protection Group, Inc. This includes two civil cases against Reed and Asset Protection Group. See FTC v. Neiswonger, Civil No. 96-2225-SNL (E.D. Mo. Nov. 13, 1996); United States v. Reed, Civil No. 07-1471 (E.D. Mo. Aug. 20, 2007). It also includes the recent criminal indictment against William Reed and Wendell

Waite, CPA.  See United States v. Reed et al., 11-cr-00247 (D. Nev. July 5, 2011).  The Plaintiff further asks the Court to take judicial notice of the lawsuit against Defendant Irving Cohen, Marvin Rosenbaum, and Herman Schwartzman in Morley v. Cohen, 610 F. Supp. 798, 804 (D. Md. 1985), as well as the jury verdict entered against Cohen in that case.  See Morley v. Cohen, 888 F.2d 1006, 1008 (4th Cir. 1989).

(A)

In support of the motion as to William Reed and the Asset Protection Group (APG), the Plaintiff states that Irving Cohen hired Reed's company, APG, to incorporate Defendant The Windsor Organization, Inc. in Nevada. Reed served as the nominee President of Windsor, which meant that APG served as the registered agent.  The Nevada Secretary of State would see Reed's name as officer and director.  The Plaintiff notes that Reed testified that he sold "privacy" as one of the benefits of a Nevada corporation, and that clients who wanted "total privacy" would ask Reed to serve as the nominee.  Based on the foregoing, the Plaintiff asserts that the services provided by Reed and APG are relevant to the question of whether Cohen

created Windsor to hold the Springfield Property as his nominee.

The Plaintiff further claims that, starting in 2006, Reed and APG came under scrutiny for its involvement with Reed's business partner, Richard Neiswonger. In April of 2007, the Eastern District of Missouri found Reed and APG in contempt for violating a 1997 permanent injunction against Neiswonger. See FTC v. Neiswonger, 494 F. Supp.2d 1067 (E.D. Mo. 2007). Subsequently, the Department of Justice sued to permanently enjoin Reed from promoting fraudulent tax schemes. See United States v. Reed, Civil No. 07-1471 (E.D. Mo. Aug. 20, 2007). In October of 2007, Reed consented to the entry of a permanent injunction against him. See id., Docket No. 5.

Although Windsor does not dispute these matters, Windsor asserts that these cases and their holdings are irrelevant under Rules 402, 403 and 404 of the Federal Rules of Evidence. Thus, it alleges these are not proper subjects of judicial notice. Windsor contends the fact that Neiswonger, Reed and APG were found to have violated an injunction entered in 1997 (five years before the incorporation of Windsor) in a case brought by the

11

Federal Trade Commission is completely irrelevant to whether Windsor is holding property in Springfield as the nominee or alter ego of Irving Cohen. Moreover, Reed's alleged misleading marketing of business opportunities sold by APG in no way helps establish what Cohen's motive, opportunity or intent was when he used APG to incorporate Windsor.

Windsor further asserts that the allegations made by the Plaintiff in a prior suit against Reed, such as  that "Reed has established thousands of Nevada Corporations for customers to use as nominees to hide their income and assets," are subject to reasonable dispute, which Reed did dispute and would dispute if named as a party in this case.  Windsor states that those allegations were not admitted by Reed and were never proven by the Plaintiff in that case.  <u>See</u> <u>Reed</u>, 07-1471, Stipulated Order of Permanent Injunction (E.D. Mo. Oct. 11, 2007) (stating "Defendant, without admitting any of the allegations in the complaint except as to jurisdiction, waives the entry of findings of fact and conclusions of law.").

The Plaintiff further notes that Reed, along with Neiswonger and Windsor's CPA, Wendell Waite, were indicted by a federal grand jury in

Nevada for crimes arising from their participation in APG.  See Reed, et al., 11-cr-00247.  Windsor states that this criminal matter is set for trial on May 8, 2012.  Accordingly, Windsor claims that the unproven allegations made against these Defendants are contested and are not the proper subject of judicial notice.

Windsor contends that factual assertions made in other cases are not proper subjects of judicial notice because they are subject to reasonable dispute.  It further asserts that some of these matters are irrelevant and admissible and are the subject of Windsor's motions in limine.  Windsor alleges that Plaintiff cannot circumvent the Rules of Evidence by having this Court take judicial notice of evidence which is not admissible.

(B)

The Plaintiff further alleges that David Morley and several other plaintiffs filed suit against Cohen and over one dozen co-defendants for their promotion of a tax shelter scheme in the 1970s that failed to yield the tax advantages promised.  See Morley, 610 F. Supp. at 803.  The plaintiffs named Herman Schwartzman, Windsor's purported expert on New York

trust law, as one of Cohen's co-defendants in that case due to his law firm's preparation of promotional materials for the tax shelter scheme. See id. at 804. Marvin Rosenbaum, the accountant who issued a tax opinion for the tax shelter scheme, was also named as a defendant. See id. Cohen successfully quashed the subpoena to compel his attendance at trial and was tried in absentia. See Morley v. Cohen, 888 F.2d 1006, 1009 (4th Cir. 1989). The Plaintiff notes that the jury entered a verdict against Cohen for Civil RICO, common law fraud, breach of contract, conversion, and breach of fiduciary duty. See id. Pursuant to Cohen's motion, the court modified the damages to $265,940, trebled under the Civil RICO statute only. See id.

The Plaintiff contends that this background is relevant to the allegations in this case. Because it has alleged that Cohen hid his property interest in the Springfield Property to avoid detection and collection by the IRS, the Plaintiff claims the fact that Cohen had other outstanding judgments against him is relevant as evidence of additional motive for Cohen to hide assets. It further asserts that Cohen's promotion of other tax

shelters–in addition to the shelter that gave rise to the I.R.C. § 6700 penalties in this case–is relevant to Cohen's sophistication and familiarity with complex corporate transactions and structures.

Windsor alleges that, for the reasons provided in its second motion in limine, <u>Morley</u> is inadmissible because the evidence related to <u>Morley</u> is irrelevant and improper character evidence to prove Cohen, Herman Schwartzman and Marvin Rosenbaum's conformity therewith. All counts against Schwartzman and Rosenbaum were dismissed. Windsor asserts it is improper for the Court to take judicial notice of facts of a case in which no verdict was entered against those defendants. Moreover, it is wholly irrelevant to the determination of the issues in this case that "disgruntled" plaintiffs filed a civil case against Schwartzman and Rosenbaum, which was dismissed.

(C)

To the extent that Windsor argues that the Court cannot take judicial notice of allegations in another lawsuit simply because they were disputed, the Court disagrees. In <u>Pirelli Armstrong Tire Corp. Retiree Medical</u>

Benefits Trust v. Walgreen Co., 631 F.3d 436 (7th Cir. 2011), the United States Court of Appeals for the Seventh Circuit took judicial notice of a complaint in another lawsuit.  See id. at 443.  This Court did the same thing in Floyd v. Excel Corp., 51 F. Supp.2d 931, 934 n.3 (C.D. Ill. 1999).  However, the existence of public records such as court documents cannot be used to establish any disputed facts.  See Independent Trust Corp. v. Stewart Information Services Corp., __ F.3d __, 2012 WL 32066 (7th Cir. Jan. 6, 2012), at *11.  The Seventh Circuit explained:

> The district court was reciting the long procedural history of this case.  The Hargrove indictment, the Capriotti plea agreement, and Fidelity v. Intercounty are documents in the public domain that further that procedural narrative.  The district court took judicial notice of the indisputable facts that those documents exist, they say what they say, and they have had legal consequences.  The district court did not rely on the documents as proof of disputed facts in any other sense.

Id.

Some of the information which is the subject of the Plaintiff's judicial notice request appears to potentially be relevant.  The Plaintiff asks the Court to take judicial notice of the following alleged facts:

(1) On November 13, 1996 the Federal Trade Commission filed

suit against Richard Neiswonger for falsely promoting training and business opportunity programs. In 1997, Neiswonger stipulated to the entry of a permanent injunction against him.

(2) On April 23, 2007, the Eastern District of Missouri found Reed and APG in contempt for acting in concert and participating with Neiswonger in violation of the 1997 permanent injunction against Neiswonger.

(3) On August 20, 2007, the Department of Justice sued to enjoin Reed from promoting fraudulent tax schemes that helped his customers evade the assessment and collection of federal tax liens.

(4) On October 11, 2007, Reed stipulated to an order of permanent injunction barring him from promoting tax-fraud schemes.

(5) On July 15, 2011, a grand jury in the District of Nevada indicted Reed, Neiswonger, and Waite for their involvement in the "APG scheme" to conceal assets and income through

disguised corporate ownership services. The indictment contains thirty-two counts, including Conspiracy to Defraud the United States, Attempt to Evade or Defeat Tax, and Money Laundering Conspiracy.

The Plaintiff also requests that the Court take judicial notice of the following alleged facts pertaining to <u>Morley v. Cohen</u>:

(1) Morley and other plaintiffs filed suit against Cohen and other defendants regarding their promotion of a tax shelter involving mining rights in Kentucky.

(2) Cohen, Schwartzman and Marvin Rosenbaum were all named as individual defendants in the suit.

(3) The jury returned a verdict against Cohen on counts of Civil RICO, common law fraud, breach of contract, conversion, and breach of fiduciary duty. The Court modified the damages to $265,940 trebled under Civil RICO statute only.

The fact that some of this information appears to be relevant does not necessarily mean it is admissible. In determining whether to take judicial

notice of a fact under Rule 201, the Court will have to consider any other applicable Federal Rules of Evidence in determining admissibility. <u>See</u> <u>Doss</u>, 551 F.3d at 640. Some of the rules which may be applicable include, but are not limited to, Rule 401, Rule 402, Rule 403 and Rule 404. Until some evidence is presented, however, it is difficult for the Court to determine whether the information which is the subject of the motion is admissible. The Court notes that judicial notice may be taken at any stage of the proceeding. <u>See</u> Fed. R. Evid. 201(d).

The Court will defer ruling on the motion for judicial notice of public records.

### III. Motion for Judicial Notice of Documents

Windsor has filed a motion requesting that the Court take judicial notice of the United States Department of State ("Department") documents evidencing that Switzerland and Liechtenstein extend visa-free entry and exit to United States citizens staying in Switzerland and Liechtenstein for up to 90 days. The Department advises United States citizens to "make sure you obtain a stamp in your passport from the police

office in Buchs" if you wish to stay in Liechtenstein for a longer period of time.

In support of the motion, Windsor alleges that the information is capable of accurate and ready determination by resort to the Department's website providing information to United States citizens regarding travel abroad. See http://travel.state.gov/travel/cis_pa_tw/cis/cis1034.html. Windsor claims that the Department maintains the website for the benefit of American citizens and the information therein cannot reasonably be questioned for accuracy.

The Plaintiff claims that the issue of whether Irving Cohen actually traveled to Liechtenstein in late 2001 or early 2002 is relevant to whether TI&M invested in the Property, and to Cohen's credibility generally. The Plaintiff notes that Cohen produced a copy of his passport during discovery. It has several stamps that show Cohen entered Spain, England, and Switzerland. However, Cohen's passport does not show any entry stamps anywhere in Europe in late 2001 or early 2002.

Although the Plaintiff does not object to the Court's taking judicial

notice of a printout from a Department of State website that discusses entry and exit requirements for U.S. citizens traveling to Switzerland, the Plaintiff contends that Windsor is citing the document to mislead the Court to accept Windsor's conclusion that Cohen's passport should not contain a stamp from his late 2001 or early 2002 visit to Liechtenstein. The Plaintiff claims that the Court should reject Windsor's "specious conclusion."

The Court will take judicial notice of the requested documents. At this time, the Court is not drawing any conclusions based on the documents.

IV. Motion for Judicial Notice of Schengen Agreement of 1985

The Plaintiff has filed a motion for judicial notice of the Schengen Agreement of 1985 and the 1990 Convention implementing the Schengen Agreement as they have been adopted and implemented by the European Commission.

(A)

The Schengen Agreement was a treaty signed on June 14, 1985,

between Belgium, France, Luxembourg, the Netherlands, and West Germany. <u>See</u> Regulation (EC) No. 562 of 2006, Official Journal of April 3, 2006, L 105, p. 1. On June 19, 1990, the same five countries signed a Convention implementing the Schengen Agreement, which created the "Schengen Area." <u>See</u> European Commission Official Website, Schengen: Europe without internal borders (available here: http://ec.europa.eu/home-affairs/policies/borders/borders_schengen_en.htm). The Convention abolished border controls for travel within the Schengen Area, and provided common rules on entry from outside the Schengen Area. <u>See</u> <u>id.</u>

The Plaintiff states that the Schengen Agreement and the implementing Convention were incorporated into the main body of European Union law (the "acquis communautaire") as part of the October 1997 Treaty of Amsterdam. <u>See</u> Treaty of Amsterdam, October 2, 1997, Official Journal of November 10, 1997, C 340, p. 1, 37 I.L.M. 56. The Plaintiff alleges that, on May 20, 1999, the Council of the European Union adopted the "Common Manual," which was established to execute the provisions of the implementing Convention to the Schengen Agreement.

Twenty-five European countries are now included in the Schengen Area.  <u>See</u> European Commission Official Website, Schengen: Europe without internal borders (available here: http://ec.europa.eu/homeaffairs/policies/borders/borders_schengen_en.htm). The Plaintiff notes that Switzerland is a party to the Schengen Agreement, even though it is not a member of the European Union.  <u>See</u> <u>id.</u>  The United Kingdom and Ireland are not parties to the Schengen Agreement.  <u>See</u> <u>id.</u>

The Schengen Agreement "allows for free travel within a multi-country zone of Europe."  <u>See</u> Docket No. 153-6.  "Within the Schengen area, you do not show your passport when crossing country borders."  <u>See</u> <u>id.</u>  However, the Plaintiff claims that the purpose of the Schengen Agreement was to abolish border controls within the Schengen Area, while strengthening border control for entry into the Schengen Area from outside. <u>See</u> European Commission Official Website, Home Affairs, Crossing Borders (available here: http://ec.europa.eu/home-affairs/policies/borders/borders_crossing_en.htm).

The Plaintiff claims that the European Commission maintains a strict policy of stamping the travel documents of all third-country nationals (travelers from outside the Schengen Area countries):

Article 10: Stamping of the travel documents of third-country nationals

1.  The travel documents of third-country nationals shall be systematically stamped on entry and exit. In particular an entry or exit stamp shall be affixed to:

    (a) the documents, bearing a valid visa, enabling third-country nationals to cross the border;
    (b) the documents enabling third-country nationals to whom a visa is issued at the border by a Member State to cross the border;
    (c) the documents enabling third-country nationals not subject to a visa requirement to cross the border.

See Regulation (EC) No. 562 of 2006, Official Journal of April 3, 2006, L 105, p. 1. The Plaintiff alleges that the Common Manual, which member states established to execute the provisions of the implementing Convention to the Schengen Agreement, contains an almost identical directive. See Common Manual No. 313 of 2002, Part II, Point 2.1.1, Official Journal of December 16, 2002, C 313 pp. 97, 107. The relevant portion, Point 2.1.1: Practical procedures for checks, Affixing Stamps, was not modified until December 13, 2004. See Regulation (EC) No. 2133 of 2004, Official

Journal of December 16, 2004, L 369, p. 5.

The Plaintiff contends that the strict policy of stamping the passports of foreign travelers has been in place since at least May 20, 1999, which is when the European Commission formally adopted the Common Manual. See Decision No. 1999/435/EC, OJ L 176L, p.1 of 10.7.1999.

Based on the foregoing, the Plaintiff asks the Court to take judicial notice of the Schengen Agreement of 1985, and the 1990 Convention implementing the Schengen Agreement, as they have been adopted and implemented by the European Commission. Specifically, the Government asks the Court to take notice of the European Commission's strict regulations regarding the systematic stamping of travel documents of foreign nationals, which have been in place since at least May 20, 1999.

(B)

Windsor claims that Switzerland did not implement the Schengen Agreement until December 12, 2008, and Liechtenstein has not yet acceded to the Schengen Agreement. See http://www.eda.admin/ch/eda/en/home/reps/nameri/vusa/ref_visinf/visusa.

html; Europa, Press Release, European Commission Welcomes Switzerland to the Schengen Area, http://europa.eu/rapid/pressReleasesAction.do?reference=IP/081955; Greek Embassy, Schengen Countries, http://www.greekembassy.org.uk/Contact/SchengenCountries.aspx; see also Docket No. 195, p. 3 (text within the map states, "Liechtenstein is expected to join by the end of 2011"); European Commission, Home Affairs – Policies – Boarders & Visas – Schengen, http://ec.europa.eu/home-affairs/policies/borders/borders_schengen_en.htm.

Windsor further alleges that travelers to Liechtenstein who arrive by air must fly into Zurich, Switzerland, as Liechtenstein does not have any airports. See Liechtenstein Travel Guide, http://wikitravel.org/en/Liechtenstein. Moreover, until at least the time of Switzerland's accession to the Schengen Agreement, there were no border controls on the forty-one kilometer border separating Switzerland and Liechtenstein. See Border Controls with Liechtenstein to cost Switzerland millions, http://www.swissinfo.ch/eng/politicsSchengen_arrangements_for

_Liechtenstein_agreed.html?cid=6945042.

Windsor contends that, because many Member States of the Schengen Agreement were failing to systematically stamp passports of third-country nationals, the Council of the European Union passed Council Regulation (EC) No 2133/2004 on December 13, 2004. <u>See</u> Council Regulation (EC) No. 2133/2004, Official Journal L 369, 1 (16/12/2004). It asserts that the Convention was necessary because the lack of clarity of the E.U. Convention Implementing the Schengen Agreement resulted in divergent practices in the Member States and made it difficult to check whether the conditions related to duration of stay of short-term travelers were fulfilled. <u>See</u> <u>id.</u> Moreover, the Convention created an obligation on Member States to "stamp systematically third-country nationals' travel documents on entry and exit at external border crossings." <u>Id.</u> "Although European Union regulations require that non-E.U. visitors obtain a stamp in their passport upon initial entry to a Schengen country, many borders are not staffed with officers carrying out this function." Craig Hemberger, <u>Global Entry & Exit Requirements: U.S. Department of State Citizen</u>

Travel Information, (2008), available at http://travelogue.travelvice.com/postfiles/2008-06-01_global-entry-exit-requirements.pdf.

Windsor contends that Rule 201 of the Federal Rules of Evidence only governs judicial notice of adjudicative facts and the law of foreign nation is not a proper subject of judicial notice. "Judicial notice of matters of foreign law is treated in Rule 44.1 of the Federal Rules of Civil Procedure." <u>See</u> Fed. R. Evid. 201, Adv. Comm. Note, Subdivision (a). Rule 44.1 provides:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1. The Advisory Committee Note provides in part:

> The new rule refrains from imposing an obligation on the court to take "judicial notice" of foreign law because this would put an extreme burden on the court in many cases; and it avoids use of the concept of "judicial notice" in any form because of the uncertain meaning of that concept as applied to foreign law. . . . Rather the rule provides flexible procedures for presenting

28

and utilizing material on issues of foreign law by which a sound
result can be achieved with fairness to the parties.

Fed. R. Civ. P. 44.1, Note 1966 Adoption.

Windsor claims that the Court should not make a determination of

foreign law as the Plaintiff presents it because the Plaintiff has inadequately

researched Liechtenstein and Switzerland's accession to the Schengen

Agreement.  Specifically, it alleges that Plaintiff "presented the Agreement

in such a partisan manner that Plaintiff failed to state that neither

Liechtenstein nor Switzerland were signatories to the Schengen Agreement

on the years in question, namely in 2001 or 2002, or 2004 when Cohen

testified he traveled to Liechtenstein, via Switzerland, to meet Kolzoff."

Windsor notes that Cohen's passport does contain 2009 Swiss entry and

exit stamps, after Switzerland's accession to the Schengen Agreement.

Windsor claims this corroborates Cohen's testimony regarding his visits to

Liechtenstein to meet with Kolzoff after the Plaintiff filed its lien.

Windsor further alleges that, even if the Schengen Agreement is a fact

of which the Court can take judicial notice, a fact must first be admissible.

Windsor contends that the Schengen Agreement of 1985 is irrelevant to the

issues because, at the relevant times, in 2001, 2002 and 2004, Liechtenstein and Switzerland were not members to the agreement. Thus, it asserts that evidence of the Schengen Agreement does not make any matter before the Court more or less probable, including the factual issue of whether Cohen traveled to Liechtenstein to meet Kolzoff. Windsor claims the Plaintiff cannot dispute that Cohen's passport contains a stamp evidencing his visit to Switzerland in 2009 which corroborates Cohen's testimony that he met with Kolzoff at such time. It alleges that evidence of Switzerland's application of the Schengen Agreement after 2008 is needless presentation of cumulative evidence.

(C)

At this time, the Court will Deny the Plaintiff's motion for judicial notice of the Schengen Agreement of 1985. Of course, the Plaintiff may renew its request at any time during the trial. <u>See</u> Fed. R. Evid. 201(d). Consistent with Rule 44.1 of the Federal Rules of Civil Procedure, the Court concludes that Plaintiff has provided notice of its intent to raise an issue of foreign law.

Windsor has raised certain issues pertaining to the relevance of the evidence which is the subject of the Plaintiff's motion. Therefore, the Court is unable at this time to take judicial notice of the Schengen Agreement of 1985.

## V. CONCLUSION

For the foregoing reasons, the Plaintiff's motion for judicial notice of the alleged fact that Liechtenstein and the British Virgin Islands are widely regarded as tax havens will be denied.

The Court will defer ruling on the Plaintiff's motion for judicial notice of public records pertaining to notice of the two civil cases against William Reed and Asset Protection Group; the recent criminal indictment against Reed and William Waite; the lawsuit against Cohen, Marvin Rosenbaum, and Herman Schwartzman; as well as the jury verdict against Cohen in that case.

The Court will allow Windsor's motion for judicial notice of United States Department of State documents. However, the Court draws no conclusions from those documents at this time.

The Plaintiff's motion for judicial notice of the Schengen Agreement of 1985 will be Denied.

The parties may renew any motions for judicial notice after a proper evidentiary showing is made. The Court must take judicial notice in such circumstances if a party requests it. See Fed. R. Evid. 201(c)(2). Moreover, the Court is authorized to take judicial notice on its own. See Fed. R. Evid. 201(c)(1).

Ergo, the Plaintiff's Motion for judicial notice of the fact that Liechtenstein and the British Virgin Islands are widely regarded as tax havens [d/e 182] is DENIED.

The Court hereby DEFERS ruling on the Plaintiff's Motion for judicial records [d/e 183], until such time as the Court determines whether the records are admissible.

The Motion of Defendant Windsor Organization for judicial notice of certain United States Department of State documents [d/e 188] is ALLOWED, to the extent provided in this Order.

The Motion for judicial notice of the Schengen Agreement of 1985

[d/e 195] is DENIED.

ENTER: February 15, 2012

FOR THE COURT:

s/Richard Mills
United States District Judge