## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.   08-3282 |
| | ) | |
| IRVING COHEN, THE WINDSOR | ) | |
| ORGANIZATION, INC., and 3-B | ) | |
| STORES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

The Court now considers the Plaintiff's Motion in limine to admit evidence regarding Defendant Irving Cohen's alleged tax shelter penalties [d/e 161]; the Plaintiff's Motion in limine to exclude expert testimony by Paul Presney, Jr. [d/e 162]; Defendant The Windsor Organization, Inc.'s first Motion in limine [d/e 175]; Defendant Windsor's second Motion in limine [d/e 185]; and Defendant Windsor's third Motion in limine [d/e 204].

## I. Motion to Exclude the Expert Testimony of Paul Presney, Jr.

Plaintiff United States has moved to exclude the proposed expert testimony of Paul Presney, Jr., who Defendant The Windsor Organization, Inc. (Windsor II) has disclosed as an expert on Illinois property law. The Plaintiff claims that Presney's proposed expert testimony usurps the Court's role of resolving questions of law. Moreover, Presney divines the "intent" of Defendants Irving Cohen, Windsor, and 3-B Stores solely from his review of contracts, deeds, and other recorded instruments. The Plaintiff further asserts that Presney's method for interpreting the May 3, 2005, Release of Second Mortgage and Assignment of Rents is unreliable and inconsistent with the well-established tenets of the parol evidence rule.

Windsor II claims that Presney's proposed testimony does not interpret the law and is based on admissible evidence. Moreover, the proposed testimony is the product of reliable methods and principles applied to the facts of this case.

(A)

Rule 702 of the Federal Rules of Evidence provides:

2

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   Testimony which interprets the law is subject to exclusion.  See United States v. Lupton, 620 F.3d 790, 799 (7th Cir. 2010).  "[T]he meaning of statutes, regulations, and contract terms is 'a subject for the court, not for testimonial experts.  The only legal expert in a federal courtroom is the judge.'"  Id. at 799-800 (quoting United States v. Caputo, 517 F.3d 935, 942 (7th Cir. 2008)).  The Plaintiff contends that Presney's testimony should be excluded because it interprets the law.

The Plaintiff asserts that the first two paragraphs of Presney's Rule 26(a)(2)(B) Report consist of interpretations of Illinois property law without reference to any facts.   The Plaintiff requests that the interpretations be excluded because the task of interpreting Illinois title law

3

is a function reserved for the Court.

Windsor II claims while Presney is an expert in title insurance, his opinion does not interpret the law. Windsor II states that instead of interpreting a contract, Presney's opinion pertains to the effect Windsor Income Properties' (Windsor I) recorded and asserted interest in the Property has upon the title of the Property to persons–including Windsor II, Windsor I and the United States–with actual knowledge of such interests. As a proffered expert in title insurance and record searches, Presney opines that insomuch any confusion exists, the title should be cleared. Moreover, he says that his opinion is based on the information he has learned outside of the recorded title records by review of the Nevada Secretary of State's corporate records for the two separate entities–Windsor I and Windsor II–and the Purchase Agreement between Windsor II and 3-B Stores, Inc., all information of which the Plaintiff is aware.

(B)

Next, the Plaintiff alleges that Presney's proposed testimony about the Release of Second Mortgage should be excluded as parol evidence

because the Release is an unambiguous document. The Plaintiff alleges that on December 10, 1981, Windsor I and Cohen executed a "Second Mortgage and Assignment of Rents" ("the Second Mortgage"), which secured two "Junior Notes" in the amount of $1,525,500.00 and $2,560,000.00, respectively, against the Property. The Second Mortgage was recorded as Document No. 890224 with the Clerk of Sangamon County. According to Cohen and Windsor II, when Cohen transferred the property, Windsor I took the property subject to the Second Mortgage.

The Plaintiff contends, however, that on April 31, 2005, Windsor II and 3-B Stores entered into a real estate purchase agreement whereby Windsor II purchased 3-B Stores' interest in the Springfield property. As part of that transaction, Cohen signed three documents on May 3, 2005. On behalf of Windsor II, Cohen signed: (1) a "Mortgage and Security Agreement;" (2) an "Assignment of Rents and Leases;" and (3) a "Release of Second Mortgage and Assignment of Rents" ("the Release").

The Plaintiff claims Windsor II wants Presney to testify that – in this purportedly expert opinion – the Release was executed mistakenly. His

5

Rule 26(a)(2)(B) Report provides in part, "Based on facts now disclosed to me when coupled with the inconsistency between the Real Estate Sale Agreement (which expressly states that the current mortgage at the time of the Agreement would be subordinated to 3-B Stores, Inc.'s first mortgage), it appears that the Release of Second Mortgage and Assignment of Rents dated May 3, 2005, and recorded with the Sangamon County Recorder's Office as document no. 2005-R-19835, was issued in error." See Rule 26(a)(2)(B) Report of Paul Presney, Jr., at 3.

Citing In re Krueger, 192 F.3d 733, 736 (7th Cir. 1999), the Plaintiff asserts that Illinois law governs the meaning of the Release. "Where a [release] is clear and explicit, a court must enforce the agreement as written." See Rakowski v. Lucente, 104 Ill.2d 317, 323 (1984). If the Court determines that the release of a mortgage is ambiguous, then "parol evidence is admissible to explain and ascertain what the parties intended." Farm Credit Bank of St. Louis v. Whitlock, 144 Ill.2d 440, 447 (1991) ("The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity

6

exists is a matter of law").  Pursuant to the "four corners" rule, an

ambiguity exists only if the language within the document is subject to

more than one interpretation.  See Air Safety, Inc. v. Teachers Realty Corp.,

185 Ill.2d 457, 462-63 (1999).

The Plaintiff contends that the Release is unambiguous.  It identifies

the Second Mortgage and Assignment of Rents by name, date, and

document number and provides:

### RELEASE OF SECOND MORTGAGE
### AND ASSIGNMENT OF RENTS

Know all men by these presents, that THE WINDSOR
ORGANIZATION, INC. a corporation organized and doing
business under the laws of the State of Nevada, of the County
of Sangamon and State of Illinois, does hereby certify that a
certain Mortgage and Assignment of Rents bearing date the
10th day of December, A.D. 1981, made and executed by
AMERICAN NATIONAL BANK AND TRUST COMPANY OF
CHICAGO, AS TRUSTEE UNDER TRUST AGREEMENT
DATED AUGUST 20, 1981 AND KNOWN AS TRUST NO.
53586, and recorded in the Recorder's Office of Sangamon
County, Illinois, as Document No. 890224, is hereby released,
relative to the following described property.

The Plaintiff contends that the introduction of parol evidence to construe

this unambiguous release, including Presney's expert testimony, is barred

under Illinois law.

Windsor II claims that the document entitled "Release of Second Mortgage and Assignment of Rents" is a "release deed," which "is a written instrument which surrenders full title to a piece of property upon payment or performance of specified conditions." Black's Law Dictionary, 446 (8th ed. 2004).  It further alleges that the specific conditions under which this Release was to be recorded is set forth in the Purchase Agreement between Windsor II and 3-B Stores.  Moreover, the extrinsic evidence to the Purchase Agreement is the Mortgage Release.

Windsor II further asserts that Plaintiff's reliance upon Farm Credit to argue that the Mortgage Release recorded with the Sangamon County Recorder's Office is a contract to be construed is misplaced.  That case involved a transfer of land to a bank in order to avoid foreclosure, pursuant to a release agreement known as a "Deed in Lieu of Foreclosure and Mutual Release of Liability."  See Farm Credit, 144 Ill.2d at 444.  Windsor II claims that the controlling contract in this case is the Purchase Agreement containing the subornation clause, not the Release of Mortgage recorded in

8

Sangamon County.

Windsor II further asserts that, even if the recorded Release constitutes a contract as the Plaintiff alleges, the Court must enforce a release in a settlement as written.  The primary objective "is to give effect to the intent of the parties."  See Gallagher v. Lenart, 226 Ill.2d 208, 232 (2007).  Gallagher, on which the Plaintiff relies, cites Farm Credit for the proposition that a release is a contract.  Id. at 233 (citation omitted).

Windsor II states it will present evidence that it was the intent of it and 3-B Stores, the parties to the Purchase Agreement, that the mortgage existing on the Property at the time of the sale of Lots 1-10 from 3-B Stores to Windsor II be subordinate to 3-B Stores' first mortgage.  Windsor II contends that such intent is evidenced in the language of the Purchase Agreement.  Presney opines that if such was the intent of the parties, then any error that occurred at closing on May 9, 2005, should be corrected as to persons with actual knowledge, specifically Windsor I and Windsor II, but also the Plaintiff who was aware of the interest of Windsor I in no later than May of 2010, when it deposed Irving Cohen, because the Plaintiff is

not a purchaser who would be acting in reliance on the Release as it is aware that there is a claim that the outstanding Windsor I mortgage was released in error. Windsor II asserts it is Presney's opinion as a title insurer and examiner that persons with actual knowledge of the Windsor I mortgage must take subject to that claim or cause the correction and modification of the Release pursuant to the intent of Windsor I, Windsor II, and 3-B Stores in 2005. Specifically, the Plaintiff has had actual knowledge of the claims against the Property, prior to any requested attachment of its lien thereto.

### (C)

Next, the Plaintiff asserts that Presney's proposed expert testimony violates Rule 702 because it is not "the product of reliable principles and methods . . . applied to the facts of the case." This is because an expert cannot apply "any reliable principles and methods" to read the minds of the parties. Moreover, the objective manifestations of intent will be as apparent to the Court as they are to any expert. Therefore, the Plaintiff contends that the proposed expert testimony should be barred. See e.g.,

CMI-Trading, Inc. v. Quantum Air, Inc., 98 F.3d 887, 890 (6th Cir. 1996) ("The intent of the parties is an issue within the competence of the jury and expert opinion testimony will not assist the jury, within the meaning of Federal Rule of Evidence 702, in determining the factual issue of intent.").

The Plaintiff claims that Presney has simply examined the two documents–the April 31, 2005 Real Estate Sale Agreement and the May 3, 2005 Release of Second Mortgage–and concludes that the latter is in error. According to the Plaintiff, Presney relies on no "reliable principles and methods" upon which to base his conclusion.  The Plaintiff contends that, based on a plain reading of the words contained in the Release, it is more likely that the Release was intended to supersede the earlier Sale Agreement.

"Rule 702 requires the district court to perform a "gatekeeping" function before admitting expert scientific testimony in order to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Happel v. Walmart Stores, Inc., 602 F.3d 820, 824 (7th Cir. 2010) (internal quotations and citation omitted).  The Plaintiff asserts that

11

because Presney fails to explain why his interpretation of the contracts is correct and does not support his conclusion with "reliable principles and methods," the testimony should be excluded.

Finally, the Plaintiff claims that Presney's proposed testimony is inadmissible under Rule 702 on the basis that it does nothing more than construe the legal significance of documents. The Plaintiff notes Presney states that paragraphs three through six of his written report are "[b]ased on information provided to me and my review of certain public records." Presney did not conduct any additional research or undertake any special analysis that makes his testimony helpful. In addition to Presney's interpretation of the Real Estate Sales Agreement and Release of Second Mortgage, the Plaintiff asserts his proposed testimony includes (1) his opinion as to the legal significance of what Presney asserts is a lack of Illinois land record documentation about the dissolution of Windsor I and the creation of Windsor II; and (2) his interpretation of the remaining records provided to him.

The Plaintiff contends that the opinions expressed in paragraphs three

12

though eight and ten though eleven of Presney's Report solely construe the legal significance of documents and should thus be excluded.

Windsor II alleges that Presney's opinion testimony is admissible because he has a "reliable basis in the knowledge and experience" of a title examiner/insurer.  Moreover, a title examiner would typically review the applicable real estate law, title records and similar information related to the subject information when rendering an opinion regarding title.

Windsor II further claims Presney's opinion is not a subjective belief or unsupported speculation.  Rather, it is based on the contents of the Purchase Agreement, review of title records, and review of Nevada Secretary of State corporate records of Windsor I and II, in addition to his knowledge, training and experience as a title examiner.  Windsor II notes Presney was provided with information outside of the searchable chain of title that Windsor I does claim an interest in the Property.  Thus, Windsor II claims there are questions regarding the equitable interests which it and Windsor I have in the Property which should be resolved, and he is qualified as an expert.

13

(D)

Because this is a bench trial, there is no concern about a jury hearing evidence that is inadmissible.  Accordingly, although it has some concerns about the admissibility of Presney's proposed expert testimony, the Court will defer ruling on the Plaintiff's motion in limine until after he testifies.

Although the Plaintiff objects to the first two paragraphs of Presney's Rule 26(a)(2)(B) Report as doing nothing more than interpreting Illinois property law without reference to any facts, it appears to the Court that the information may have been included simply to set out certain alleged general principles as background information so that the reader is familiar with terms that are used in the Report.

However, the Court is inclined to conclude that the parol evidence rule bars Presney's testimony about the Release.  A release is a contract. See Farm Credit, 144 Ill.2d at 447.  There does not appear to be any ambiguity in the Release of Second Mortgage and Assignment of Rents. Unless there is some ambiguity, any extrinsic evidence construing the document--such as Presney's proposed testimony--is not permitted.  See

14

Gallagher, 226 Ill.2d at 233.

It is also not apparent whether Presney's proposed testimony is the product of reliable principles and methods applied to the facts. Although Presney may have extensive knowledge regarding title insurance, he still must base his opinion on reliable principles and methods. It cannot simply be based on speculation as to the intent of contracting parties.

Based on the foregoing, the Court will consider the Plaintiff's motion in limine following Presney's testimony.

## II. Motion as to Admissibility of Evidence of Tax Shelter Penalties

The Plaintiff has filed a motion in limine regarding the admissibility of evidence pertaining to Irving Cohen's alleged tax shelter penalties. The Plaintiff states this is important background evidence to its claims. Thus, the Plaintiff moves preliminarily for an order permitting the use of evidence regarding Cohen's tax shelter penalties and the "scheme that gave rise to those penalties."

### (A)

In its Complaint, the Plaintiff seeks a determination that Defendant,

The Windsor Organization, Inc. (Windsor II), "is holding certain property as the nominee of Irving Cohen, and to foreclose federal tax liens upon the subject property." See Compl. ¶ 1. The case was brought pursuant to 28 U.S.C. §§ 1340 and 1345 (relating to the Court's jurisdiction over actions brought by the United States as Plaintiff under the Internal Revenue Code) and 26 U.S.C. §§ 7401 and 7403 (relating to the authorization for civil actions to collect tax penalties and the action to enforce a lien on property to collect payment for tax penalties). See Compl. ¶ 3. In its Complaint, the Plaintiff alleges that it assessed penalties against Cohen in 1986 and it obtained a judgment against Cohen related to the Internal Revenue Code § 6700 penalties (26 U.S.C. § 6700). See Compl. ¶¶ 9-12. The Plaintiff makes certain allegations pertaining to the Asset Protection Group, Inc. See Compl. ¶¶ 14-20. The Plaintiff further asserts that The Windsor Organization, Inc., a Nevada corporation incorporated in 1981 (Windsor I), "has served as Irving Cohen's nominee, since at least 1981" and that "Windsor I acquired the Property [address: 709, a/k/a 719, West Jefferson Street, Springfield, Illinois] on June 11, 1981." See Compl. ¶¶ 21, 24. The

16

Plaintiff alleges that Windsor I conveyed its interest in the Property to an Illinois Land Trust which subsequently conveyed its interest to Windsor II. See Compl. ¶¶ 24-26.

Windsor II notes that Plaintiff did not name Windsor I as a party despite the allegations in the Complaint, and objected to Windsor I's joinder. See Dkt. 100. It asserts that Plaintiff is attempting to amend its Complaint pursuant to a "reverse" motion in limine to admit evidence regarding a claim it never made. Windsor II asserts that Plaintiff has not shown good cause to amend its Complaint. Moreover, it would be prejudiced if amendment were allowed on the eve of trial.

The Plaintiff's allegations as to Windsor II are that it filed an application for authority to transact business in the State of Illinois, purchased a portion of the Property from Defendant 3-B Stores, Inc., and that "Windsor II holds bare legal title to the Property as the nominee or alter ego of Irving Cohen." See Compl. ¶¶ 27-29, 30. In its prayer for relief, the Plaintiff seeks a determination "that Windsor II holds the Property for Irving Cohen as his nominee, and [a] hold[ing] that the federal

17

tax liens described herein attach to the Property."  <u>See</u> Compl. ¶ a.

The Plaintiff claims that this case is about Irving Cohen, who it alleges owes the government millions of dollars.  It seeks to foreclose upon a shopping center in Springfield in order to satisfy a portion of that debt.

At trial, the Plaintiff will have to prove Windsor II holds the Springfield Property as Cohen's nominee, or that Windsor II is Cohen's alter ego.  To meet its burden, the Plaintiff states it will have to explain how Cohen came to owe over four million dollars to the United States.  Accordingly, the Plaintiff alleges it should be permitted to introduce evidence regarding the tax shelter penalties assessed against Cohen that gave rise to his debt.

The Plaintiff further claims that during discovery, Cohen and Windsor II "have tested various defense theories against the United States' claims."  If the Defendants offer proof in support of the theories, the Plaintiff is entitled to present evidence to rebut such theories.  The Plaintiff claims, for example, that if Cohen asserts there is an outstanding mortgage with priority over the Government's lien held by Windsor II, which is in

18

turn owned by trusts for the benefit of Cohen's children, then the Plaintiff should be allowed to introduce evidence that Cohen had previously used companies held by trusts for the benefit of his children to in order to evade payment of federal income taxes.  Additionally, the Plaintiff alleges that if Windsor II contends that it obtained the Springfield Property through an arms-length negotiation with Cohen, then it should be allowed to show that a district court in Florida found that similar deals in Florida were not arms-length transactions.

(B)

The Plaintiff alleges that evidence regarding the assessment of tax shelter penalties is relevant to the reason the Plaintiff seeks foreclosure against the Springfield Property.  The Plaintiff states that in 1996, the Southern District of Florida found that Cohen promoted abusive tax shelters and was liable for penalties under I.R.C. § 6700.  Judgment was eventually entered in favor of the United States in the amount of $2,921,508, plus interest from the date of assessment.  The Plaintiff alleges that as of June 28, 2011, Cohen owes the IRS $4,324,306.38 for I.R.C. §

6700 penalties for tax years 1982 and 1983, and interest continues to accrue.

The Plaintiff states that the tax shelter penalty is the reason for this suit, which is essentially a collection action.  Moreover, the Plaintiff asserts that the assessment of those penalties and Cohen's knowledge of that assessment may explain why Cohen placed the Springfield Property in possession of one of Cohen's nominees in order to avoid tax debt.  Thus, it claims that evidence of tax shelter penalties is relevant and admissible.

Windsor II alleges that evidence regarding Cohen's § 6700 penalties is inadmissible character evidence and the Plaintiff seeks to prove Cohen's conformity therewith.  Moreover, it claims that Plaintiff's motion is obviously in anticipation of Windsor II's motion in limine to exclude certain evidence.

The Plaintiff further asserts that pattern evidence regarding Cohen's tax shelter scheme is relevant to rebut Cohen's and Windsor II's likely defenses at trial.  According to the magistrate judge's report and recommendation in the Southern District of Florida case, Cohen served as

President, CEO and director of Madison Library, Inc., Geoffrey Townsend, Ltd., and Universal Publishing Resources, Ltd.  The report and recommendation found that the shares of stock in Madison Library were owned by a trust that had been set up by Cohen for the benefit of his children.  Cohen was the trustee and had decision-making authority over the trust.  The three corporate entities noted above which were held by that trust were operated under the unfettered discretion and control of Cohen.

According to the report and recommendation, as of February 28, 1985, Cohen had taken a total of $28,058,107 in advances from Madison Library, Townsend, and Universal Publishing.  Cohen was President and CEO of the companies when the advances were made.

The Plaintiff notes that in the 1999 report and recommendation, the magistrate judge concluded:

> The preponderance of the evidence outlined in the Findings of Fact above reveals [Irving Cohen] did not genuinely expect to repay his corporate entities and those entities in turn did not expect repayment.  This evidence included 1) the substantial amount of money taken by [Irving Cohen] from the corporate entities; 2) [Irving Cohen's] use of demand notes that specified no specific date of repayment for either the interest or the principal; 3) the failure of the corporate entities to accrue

> interest on their books until 1985, years after the advances were made; 4) the interest that accrued did not even equal the interest that accrued only in 1985; 5) the "re-borrowing" of $33 million dollars immediately after repayments were made; 6) the lack of ceilings on the amounts that could be advanced; 7) the fact that the interest appearing on the notes was on average 3 points below the prime rate for that same period; 8) the failure to record the security agreements; and 9) the lack of a repayment schedule. These findings support this Court's ruling that these advances were constructive income to [Irving Cohen] rather than bona fide loans.

See Dkt. No. 141-4, at 104-05.

The Plaintiff further asserts that the facts from the tax shelter case cast doubt over Cohen's claim that his children's trusts hold a valid mortgage against the Springfield Property. As was determined that case, the Plaintiff claims Cohen did not record any purported lien or secured interest against the Property on behalf of the trusts. Moreover, Windsor II made no payments on the purported mortgage and no interest has accrued on the purported loan during the last ten years.

Based on the foregoing, the Plaintiff contends that the prior case is relevant pattern evidence. Moreover, it is admissible pursuant to Rule 404(b) of the Federal Rules of Evidence. It may also be relevant pursuant

to Rule 404(b), based on potential defenses that may be asserted. Windsor II claims that the evidence is inadmissible character evidence pursuant to Rule 404(a)(1).

Windsor II further claims that Plaintiff has not alleged that it promoted a tax shelter under § 6700 of the Internal Revenue Code or that Windsor II is a tax shelter. Moreover, the Plaintiff has not presented evidence of a connection between the litigation involving the "book properties" partnerships and companies which were the subject of the 1986 litigation and the operation of the Springfield Property by Windsor II. Windsor II further contends that Plaintiff has failed to establish there is any similarity or proximity in time of the formation and operation of Windsor II and the acquisition and operation of its Springfield Property more than 15 years later.

Windsor II asserts that unsubstantiated allegations should not result in the admission of character evidence to prove an alleged propensity of Irving Cohen to establish tax shelters, particularly where no allegations have been made until the Plaintiff's motion that Windsor II is a tax shelter in

23

violation of the Internal Revenue Code.  It further alleges that the previous tax litigation involving Cohen referenced by the Plaintiff resulted in no findings that Windsor II or Windsor I is a tax shelter.  Windsor II was not even incorporated until 2002.  Moreover, Windsor I was not named as a party to the litigation which commenced in 1986 or to this litigation and no allegations or findings have ever been made that Windsor I was or is a tax shelter.

Windsor II contends that Plaintiff has not established that the facts alleged in the previous case are similar enough and close enough in time to be relevant to the issue of whether Windsor II is the nominee of Cohen. The Southern District of Florida case concerns Cohen's activities in 1982 and 1983, which was 20 years before the incorporation of Windsor II, and which is totally unrelated to its incorporation and the operation of the Springfield Property.

Windsor II further asserts that Plaintiff has presented no facts that Cohen received direct economic or financial benefit from Windsor II or the operation of its Springfield Property.  Moreover, the Plaintiff has not shown

that the actions which were the subject of the suit regarding the § 6700 penalties assessed for tax years 1982 and 1983 are close in time to be relevant to the incorporation of Windsor II in 2002, and its operation of the Property from 2002 to the present date.

Windsor II also claims the evidence is inadmissible under Rule 403, in that the probative value of such evidence is substantially outweighed by its prejudicial effect.

Finally, Windsor II claims that the findings of the Eastern District of New York and the Southern District of Florida in the § 6700 cases are inadmissible character evidence under Rule 608 because they are not evidence which refer to Cohen's character for truthfulness or untruthfulness, are not in the form of opinion or reputation, and may not be proved by extrinsic evidence.

(C)

The Court will defer ruling on the admissibility of evidence regarding Cohen's alleged tax shelter penalties, and the scheme that gave rise to those penalties.   Given the nature of the claim, the evidence is potentially

relevant. Because the Plaintiff has the burden of proving that Windsor II holds the Property as Cohen's nominee or is his alter ego, it may be relevant background evidence. The admissibility of such evidence will depend in part on other evidence that is presented.

### III. Windsor II's First Motion in Limine

Windsor II moves for an Order in limine determining that:

(1) Plaintiff's proposed evidence regarding facts and argument related to Irving Cohen's 1986 tax refund litigation is inadmissible because it is irrelevant  and, in the alternative, is inadmissible character evidence with minimal probative value which is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the trier of fact;

(2) Plaintiff's proposed evidence related to Aeromet, American Equities, R&Y Industries and Wainright, companies not involved with Windsor II, including the 2010 deposition testimony of Randy Youngswick, is inadmissible because it is irrelevant and, in the alternative, is inadmissible because its minimal probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the trier

26

of fact;

(3) Plaintiff's proposed evidence related to Asset Protection Group, Inc.'s various marketing tools, including the book, <u>Bullet Proof A$$et Protection</u>, APGI consultant manual, brochure and DVD entitled "The Litigation Explosion," are inadmissible because they are irrelevant and, in the alternative, because the minimal probative value of such evidence is outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the trier of fact; and

(4) Plaintiff's proposed introduction of the 2000 deposition testimony of Randy Youngswick is inadmissible under Federal Rule of Civil Procedure 32 because Windsor II was not a party to the lawsuit, was not present or represented at the taking of the deposition, had no notice of the deposition and the testimony is irrelevant and, in the alternative, any probative value of the testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the fact finder.

(A)

In support of its motion, Windsor II notes that federal tax liens do

27

not attach to property in which a taxpayer has no interest under state law. See United States v. Swan, 467 F.3d 655, 656 (7th Cir. 2006). The laws applicable to whether Cohen has a beneficial interest in the real estate owned by Windsor II are the Nevada alter ego law, New York trust law, and Illinois real estate and property law. Windsor II contends that Plaintiff has no basis under Illinois, Nevada or New York state law to establish that Cohen has a beneficial interest in Windsor II's real property.

Windsor II notes that Plaintiff's only claim is that it is the nominee or alter ego of Cohen. Windsor II has never contested the existence of the outstanding tax penalty assessed against Cohen. It asserts that details and argument related to the long past tax refund litigation do not bear on whether: (1) a close personal relationship existed between Windsor Income Properties, Windsor I and Windsor II; (2) Windsor II paid consideration for the Property; (3) title to the Property was placed in the name of Windsor II in anticipation of collection activity; (4) the deed and mortgage were recorded; (5) Cohen continues to exercise control over the Property; (6) Cohen was acting as Trustee of the Lillian Rosen Trusts; (7) Cohen

28

commingled personal funds with Windsor II corporate funds; (8) Cohen diverted Windsor II funds to himself; (9) Windsor II observed corporate formalities; (10) Windsor II's innocent shareholder will be harmed by the reverse pierce; or (11) Windsor II is adequately capitalized.

The Plaintiff contends that although it has no interest in re-litigating the specific facts of Cohen's alleged abusive tax shelter at trial in this case, the fact that he was found liable and I.R.C. § 6700 penalties assessed were upheld by a federal court is the reason the Plaintiff brought this case. It further asserts the district court's general description of the scheme is relevant to Cohen's level of sophistication, which the Plaintiff claims is also evident in this case in his structuring of related entities and financing arrangements in order to evade detection of his property and the collection of the penalties. The Plaintiff also contends that Cohen's alleged abusive tax shelter penalties are relevant based on Windsor II's purported defenses.

For the reasons noted in the discussion of the Plaintiff's motion in limine, the Court will defer ruling on the admissibility of Cohen's alleged tax shelter penalties until an appropriate time at trial. At this time, the

Court is unable to properly balance the evidence under Rule 403, determine if it is improper character evidence pursuant to Rule 404(a), or consider its admissibility under Rule 404(b).  Moreover, it is premature to determine whether Windsor II puts Cohen's abusive tax shelter penalties at issue with its defense.

(B)

Windsor II next asserts that evidence relating to Aeromet Supply, Inc., Wainright Marketing and Management, Inc., and R&Y Industries, Inc., including the 2010 deposition testimony of Randy Youngswick, is inadmissible because it is irrelevant and, in the alternative, any probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the fact finder.  It asserts that the evidence relating to these entities has no tendency to make the existence of a fact required to be proved by the Plaintiff under the alter ego or nominee doctrines more or less probable than it would be without the evidence. Alternatively, the probative value of irrelevant documents related to intercompany transactions between American Equities, Aeromet, R&Y and

30

Wainright, but never involving Windsor II, is de minimus and substantially outweighed by the danger of unfair prejudice to Windsor II.

Windsor II asserts that Plaintiff has never alleged it is a conduit for "laundered" funds and has produced no evidence that Cohen somehow laundered money though TI&M, the sole shareholder of Windsor II.  It further contends that Plaintiff has failed to produce evidence of any connection between Windsor II and TI&M's capitalization of American Equities and transfers to Aeromet.  Moreover, the Plaintiff has not shown there is any similarity in the operations of Aeromet and American Equities with the operations of Windsor II and the acquisition and operation of its Springfield Property.

The Plaintiff contends that Irving Cohen's alleged serial use of nominee entities is relevant to its claim that Windsor II is his nominee. Moreover, the Court has previously determined that evidence regarding Cohen's alleged diversion of funds from TI&M to himself through a series of intermediaries is "potentially relevant pursuant to the Rules of Evidence."  See Dkt. No. 179, p.2.  The Plaintiff asserts that at trial,

31

evidence regarding Cohen's alleged involvement with TI&M, American Equities, Aeromet, R&Y Industries, and Wainright should be admitted on a number of grounds.

Windsor II alleges that Plaintiff's unsubstantiated assertions in its motions and responses to motions in this case should not result in the admission of character evidence presented in an effort to prove an alleged propensity of Cohen to use nominees and shell companies to garner funds to himself when no allegations were made, until the filing of the Plaintiff's Opposition to Windsor II's Motion to Strike Christine A. Footit's Declaration [Dkt. No. 152], that non-parties Aeromet and American Equities are nominees or alter egos of Cohen. Moreover, the tax shelter litigation involving Cohen referenced by the Plaintiff resulted in no findings that Cohen ever laundered money through tax shelters or any other method.

Windsor II claims that no evidence has been adduced in discovery to show any money laundering by Cohen or Windsor II. Thus, it is an improper assertion of unsubstantiated character evidence against Windsor

32

II and is inadmissible under Rule 404(a). Moreover, Windsor II alleges such evidence is not relevant to whether it is the alter ego or nominee of Cohen and any probative value is substantially outweighed by the danger of unfair prejudice.

The Plaintiff contends that its evidence at trial will show that Cohen diverted from TI&M to Cohen's own pocket through a series of intermediaries, including Wainright, which the Plaintiff claims was Cohen's company. Moreover, the Plaintiff asserts that Cohen used his Wainright American Express card to pay for travel to Springfield, Illinois in 2002, 2003, 2006 and 2008. This is potentially relevant to the Plaintiff's claims and the Defendants' defenses.

The Plaintiff further asserts that Cohen created and controlled at least four nominee companies without attaching his name to any of them. These include Windsor II, AEHC, Aeromet, and Wainright. The Plaintiff claims that for some time, each of these entities was headed by long-time friends of Cohen. According to the Plaintiff, Cohen's ability to run these companies without attaching his name demonstrates a certain

sophistication on this part.  Moreover, the evidence regarding Cohen's alleged use of AEHC, Aeromet, and Wainright supports its contention that Cohen used Windsor II as his nominee in the same manner.  The Plaintiff contends it is admissible under Rule 404(b).

The Plaintiff further alleges that Cohen's alleged filtering of funds through nominee companies is evidence of the benefit he received from the Springfield Property.  Specifically, its evidence regarding Cohen's alleged use of AEHC, Aeromet and Wainright to divert money will rebut Windsor II's defense that there is no evidence he benefitted from the Springfield Property.  The Plaintiff states that the evidence at trial will show that Cohen laundered money through TI&M, Windsor II's purported owner, to himself.  Moreover, to the extent that Wainright is Cohen's company and he used Wainright's funds for business travel on Windsor II's behalf, the Plaintiff claims that Cohen improperly commingled his money with Windsor II's money.

The Court concludes that this evidence is at least potentially relevant and may be admissible under Rule 404(b) or other Rules of Evidence.  It is

premature to determine whether the evidence should be excluded pursuant to Rule 403.

(C)

Next, Windsor II notes that Plaintiff proposes to introduce portions of the deposition of Randy Youngswick, the President of R&Y Industries and Wainright, taken on October 19, 2010.  In the entire deposition, Windsor II is not mentioned.  His testimony is directed solely to the operation of Wainright Marketing and its relation to Aeromet and the operation of R&Y Industries.  Windsor II alleges that Plaintiff can produce no evidence that Aeromet is related to Windsor II in any way.  Rhonda Scott, Windsor II's tax preparer deposed by the Plaintiff, testified that there is no interrelationship between Aeromet and Windsor II.

The Plaintiff contends that Youngswick's testimony is devastating to the defenses of Cohen and Windsor II.  The Plaintiff claims that Youngswick's deposition testimony will establish the following facts: (1) at Cohen's direction, Youngswick prepared invoices from R&Y to Aeromet, though R&Y never provided services to Aeromet; (2) Cohen would tell

35

Youngswick what to write on the invoices and how much to charge; (3) after preparing the invoices, Youngswick would not send them to Aeromet but would give them to Cohen; (4) Youngswick received payments from Aeromet on the invoices he prepared, and he would deposit those checks into R&Y's bank account; (5) Youngswick and Cohen had an arrangement whereby R&Y would keep ten percent of the money that Aeromet sent to R&Y and the balance went to Wainright; and (6) Cohen determined the ten percent amount.

The Plaintiff contends this evidence will confirm that Cohen filtered money though intermediaries to Wainright. Although the evidence is powerful, that does not make it prejudicial. The Plaintiff requests that the Court first hear its evidence before determining its admissibility or weight.

The Court concludes that it is premature to determine whether the testimony should be excluded due to unfair prejudice or admitted into evidence. The evidence is potentially relevant, even if Youngswick's testimony does not mention Windsor II. His testimony discusses Cohen. Given the nature of the claim, Cohen's connection to other companies is

potentially relevant evidence.

Windsor II further asserts that Asset Protection Group, Inc.'s (APG) marketing materials are inadmissible.  Specifically, its book, <u>Bullet Proof A$$et Protection</u>, the APG consultant manual, brochure and DVD entitled "The Litigation Explosion" is inadmissible because it is irrelevant. Alternatively, Windsor II claims that any probative value of such evidence is outweighed by the danger of unfair prejudice.

Windsor II alleges that the Plaintiff has presented no evidence that the book and other marketing materials are relevant to any issues before the Court.  The book and marketing materials were only marketing tools designed to encourage people to buy into and purchase William Reed's APG program.

The Plaintiff claims that Cohen's use of the APG's nominee services to create Windsor II is relevant to its claim that Windsor II is Cohen's nominee.  The Plaintiff alleges that after Reed's company was hired to incorporate Windsor II in Nevada, Reed served as Windsor II's nominee President.  According to Reed, being a "nominee officer or director" meant

37

that APG served as the registered agent, and the Nevada Secretary of State would see Reed's name as officer and director.  Reed sold "privacy" as a benefit and testified that clients who wanted "total privacy" would ask him to serve as a "nominee."  The Plaintiff notes that Reed testified "privacy" meant that only his name would appear on corporate documents.

Because this case concerns whether Windsor II holds the Springfield Property as Cohen's nominee, the Plaintiff contends that evidence regarding Cohen's decision to hire a "nominee president" as the figurehead of Windsor II is directly relevant to its claims.  Presumably, Cohen's decision to use APG's services was informed by the entity's promotional materials.  The Plaintiff further claims that after attending one of Reed's seminars, Cohen became an APG "consultant," whereby he would receive a commission for a portion of the fees paid by clients who purchased APG's services through him.  The Plaintiff asserts that as a consultant, Cohen received certain "training materials," all of which would be relevant to his understanding of and decision to use APG's "nominee services" in conjunction with Windsor II.

Like much of the evidence that is the subject of this motion, the evidence relating to APG's marketing material may be relevant to the Plaintiff's claim that Windsor II is Cohen's nominee.  It is premature to determine whether it should be excluded under Rule 403.

(D)

Windsor II next alleges that the June 8, 2000, deposition testimony of Randy Youngswick is inadmissible under Federal Rule of Civil Procedure 32 because it was not a party in that tax refund litigation.  In fact, Windsor II had not yet been incorporated.  Rule 32(a)(1)(A) authorizes the use of a deposition against a party if that "party was present or represented at the taking of the deposition or had reasonable notice of it."  See Fed. R. Civ. P. 32(a)(1)(A).  Rule 32(a)(8) provides in part that a deposition taken in an earlier action "may be used in a later action involving the same subject matter between the same parties."

Alternatively, Windsor II claims that the testimony should be excluded because its probative value is outweighed by the danger of unfair prejudice.

39

Youngswick's deposition was taken in connection with <u>Cohen v.</u> <u>United States</u>, 87-265-CIV (S.D. Fla.).  That action involved Irving Cohen and the United States, both parties to this action.  It appears that action involved at least the same general subject matter as this one.

The Plaintiff alleges that at the time of the deposition, Cohen was the only employee of Wainright.  Youngswick was President of Wainright, though the Plaintiff claims he did not have any official duties and did not receive any compensation.  Moreover, he did not maintain an office.  The Plaintiff claims Youngswick testified that although he was President of the company, he did not know what Cohen did for Wainright.

The Plaintiff contends that the deposition transcript is admissible against Cohen, who was the plaintiff in that action and was represented by counsel.  The Plaintiff states that it intends to use this evidence as further proof that Wainright was solely Cohen's company.

Because the previous action involved two of the parties in this case and involved the same general matter, Youngswick's deposition testimony is not subject to exclusion pursuant to Federal Rule of Civil Procedure 32.

40

It appears to at least potentially be relevant.  Given the nature of the Plaintiff's claim, Cohen's businesses practices with other companies may be relevant.  Based on the information in the record, the Court is unable to conclude at this time whether the testimony should be excluded pursuant to Federal Rule of Evidence 403.

(E)

The Court concludes it is premature to determine that any of this evidence will be excluded at trial.  Based on the nature of the Plaintiff's claim, it appears that most of the evidence which is the subject of Windsor II's motion is at least potentially relevant.  It is uncertain as to whether it may be relevant for any defenses asserted by Cohen or Windsor II.  Although Youngswick's 2000 deposition testimony is not subject to exclusion under Rule 32, it is premature to determine whether it or any other evidence should be excluded under Rue 403.  Accordingly, the Court will defer consideration of this motion in limine.

<u>IV. Windsor II's Second Motion in Limine</u>

Windsor II next moves in limine for an Order excluding the Plaintiff's

41

proposed evidence regarding <u>Morley v. Cohen, et al.</u>, 610 F. Supp. 798 (D. Md. 1985), on the basis that it is inadmissible because it is irrelevant and/or because it constitutes inadmissible character evidence with minimal probative value which is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the trier of fact.  Windsor II also claims that Plaintiff's proposed exhibits related to <u>Morley</u> constitute improper character evidence and inadmissible impeachment evidence.

<u>Morley</u> is a lawsuit wherein Irving Cohen, Marvin Rosenbaum, and Herman Schwartzman were named as defendants.  In another motion in limine, the Plaintiff asked the Court to take judicial notice of that lawsuit and the jury verdict entered against Cohen therein.  <u>See</u> <u>Morley v. Cohen</u>, 888 F.2d 1006, 1008 (4th Cir. 1989).

The Plaintiff claims that the evidence is relevant to Cohen's motive to hide his assets in Windsor II's name.  Moreover, it is relevant to show Cohen's level of sophistication.  Additionally, the Plaintiff claims it is relevant to show bias on the part of Schwartzman, a potential witness.

In its previous Order, the Court determined that it was premature to

42

take judicial notice of the lawsuit and jury verdict.  The Court concluded that it could not rule on whether the information was admissible before some evidence had been presented.  After the presentation of some evidence, the Court presumably will be in position to consider the relevance of the evidence and any applicable Rules of Evidence in assessing admissibility.  Therefore, the Court deferred ruling on the Plaintiff's request.  <u>See</u> Dkt. No. 210.

For the reasons given when considering the Plaintiff's motion for judicial notice, the Court will defer ruling on Windsor II's second motion in limine.

<u>V. Windsor II's Third Motion in Limine</u>

Windsor II moves in limine for an Order determining that: (1) Plaintiff's proposed demonstrative exhibits 3 through 69 are inadmissible because any probative value is substantially outweighed by the considerations of undue delay, waste of time, and needless presentation of evidence; and (2) Plaintiff's proposed supplemental designations of Randy Youngswick's 2010 deposition transcript (Youngswick 2010 Tr. 38:21-39:5;

Tr. 39:13-18; Tr. 43:15-44:3; Tr. 45:12-46:18; Tr. 47:5-13; Tr. 48:22-49:2;

Tr. 50:25-51:5; Tr. 51:13-24; and Tr. 52:12-21) are inadmissible because

they were untimely disclosed subsequent to the final pretrial conference

held on October 31, 2011.

(A)

In support of the motion, in its first motion in limine, Windsor II

argued that evidence related to the operations of APG, Aeromet, American

Equities, Wainright and R&Y, and the Plaintiff's allegations of money

laundering was irrelevant.  Windsor II incorporates those arguments in

moving to bar the admission of the Plaintiff's proposed demonstrative

exhibit numbers 24 through 64, 65, 67 and 69 as irrelevant.

Having determined that it was premature to rule on the portion of

Windsor II's first motion in limine that relates to those exhibits, the Court

concludes it is premature to rule on the relevancy objection.

Additionally, Windsor II claims that the Plaintiff's demonstrative

exhibits 2 through 69 should be excluded because any probative value is

substantially outweighed by considerations of undue delay, waste of time,

44

and needless presentation of cumulative evidence.  Specifically, Exhibit 2 is the same as Exhibit 1.  Moreover, Exhibits 3 through 15, 21 through 31, 39 through 43, and 68 cut and paste exhibits marked in this case.

Windsor II further asserts that Exhibits 21 and 32 through 38 lack foundation and are irrelevant.  Exhibits 45 through 60 are repetitive of Exhibit 44.  Moreover, Exhibits 16 through 20 and 61 through 67 merely contain excerpts of deposition transcripts which will be presented at trial as the parties stipulated.  Thus, Windsor II alleges Exhibits 61 through 67 should be excluded because those exhibits add no probative value and are a needless presentation of evidence already submitted to the Court through stipulations.  Additionally, Windsor II claims that Exhibit 69 is incomplete and depicts information that is irrelevant.

In response, the Plaintiff notes that the use of demonstrative exhibits is "increasingly common."  See United States v. Burt, 495 F.3d 733, 740 (7th Cir. 2007) (citation omitted).  The Plaintiff states that it does not intend to use all of these demonstrative exhibits.  It notes that the admissibility of some exhibits may depend on the testimony of certain

45

witnesses.  Thus, the Plaintiff claims that the Court should determine admissibility of demonstrative exhibits at trial.

The Court will consider the admissibility of demonstrative exhibits at trial.  The admissibility of some will depend in part on other evidentiary rulings and/or the testimony of witnesses.  Obviously, any objections on relevancy, foundation or other grounds may be made at trial.  The Court trusts that the parties will not waste time by presenting needlessly cumulative evidence.

(B)

Windsor II also moves to exclude portions of Randy Youngswick's deposition testimony on the basis that they were not timely disclosed. Federal Rule of Civil Procedure 26(a)(3)(ii) provides that parties must designate the witnesses they intend to present by deposition.  The Final Pretrial Order must contain a list of all witnesses who are expected to testify; failure to include a witness may result in that witness being barred from offering testimony at trial.  See CDIL-LR 16.1(F)(6).  "Any issue not contained in the final pretrial order will not be tried." CDIL-LR 16.1(F)(9).

In its first motion in limine, Windsor II objected to the testimony of Randy Youngswick as a whole. The Court deferred ruling on that portion of the motion. Windsor II contends that the untimely designations should be excluded pursuant to Rule 26(a)(3) and the Final Pretrial Order. Windsor II alleges that Plaintiff improperly labeled the designations set forth in the Supplemental Designations disclosed on December 13, 2011, as Counter-Designations to Windsor II's Deposition Designations, in an attempt to mislead the Court and circumvent the disclosure requirements of Rule 26(a)(3) and this Court's Final Pretrial Order entered on November 1, 2011.

Windsor II notes that in its disclosures, it did not designate any portion of Youngswick's testimony, as it claims such testimony is irrelevant. Without waiving its objections, in its Objections to Plaintiff's Second Amended Pretrial Disclosures and Amended Pretrial Disclosures, Windsor II counter-designates portions of Youngswick's testimony which should be considered in addition to the to the testimony designated by Windsor II. Windsor II alleges that the testimony that Plaintiff designated on

47

December 13, 2011, is not counter-testimony to the testimony designated by Windsor II. Even if the Court considered the testimony as counter-designations, the Plaintiff failed to disclose the counter-designations within the required 14 days. Moreover, the Plaintiff failed to supplement its designations prior to the final pretrial conference on October 31, 2011. Thus, Windsor II contends that Plaintiff is barred from presenting Youngswick's untimely designated deposition designations.

In its response, the Plaintiff states that on November 15, 2011, it sent Windsor II's attorneys a copy of the proposed deposition designations, which included the deposition excerpts to which Windsor II now objects. The Plaintiff claims that Windsor II waited nearly a month before informing Plaintiff that the proposed submission to the Court included designations of some of Youngswick's testimony that had not previously been disclosed.

After reviewing both parties' pretrial disclosures, the Plaintiff states it determined that portions of Youngswick's deposition had been counter-designated in response to Windsor II's amended disclosures. However, the

48

Plaintiff forgot to formally disclose those counter-designations. The Plaintiff now claims it immediately rectified its error and, on December 13, 2011, it formally served Windsor II with supplemental counter-designations for Youngswick's deposition.

The Plaintiff alleges that Windsor II has failed to establish prejudice from this late disclosure. Eight of the ten excerpts which are the subject of the motion are from Windsor II's examination of Youngswick. Moreover, the Plaintiff claims much of the subject matter consists of mostly innocuous background information.

The Plaintiff further alleges that not only did it immediately act upon learning of its oversight, but the Plaintiff also timely disclosed that it would call Youngswick to testify at trial by video designation. Moreover, Windsor II knew that Plaintiff intended to play portions of Youngswick's deposition at trial.

The Plaintiff further notes that pursuant to Rule 32(a)(6), both parties have a right to counter-designate deposition testimony at trial to ensure that any portion of a deposition designation can be fairly read with

other parts.  The rule provides:

> If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts.

Fed. R. Civ. P. 32(a)(6).  The Plaintiff claims that Windsor II cannot establish any undue prejudice when the designations were disclosed three months before trial.

It appears to the Court that Plaintiff's failure to timely disclose the designations was an honest mistake.  Given that Windsor II was aware of the untimely disclosure almost three months before trial, the Court does not believe that it would be prejudiced in any way.  Moreover, despite the language of the local rule, the language of Rule 32(a)(6) arguably authorizes the Plaintiff's late disclosure.  Obviously, Windsor II will be permitted to make any additionally counter-designations.

Of course, the Court has not yet determined that Randy Youngswick's deposition testimony is admissible.  The admission of these deposition designations depends on the Court finding that Youngswick's testimony is not subject to exclusion.

50

The Court at this time will Deny Windsor II's third motion in limine based on the grounds that are asserted.  Windsor II may raise any objections to the exhibits at trial.  Moreover, the Court recognizes that some of the information that Windsor II seeks to exclude may be subject to exclusion based on its rulings on other motions in limine.

## VI. CONCLUSION

Based on the foregoing, the Court is unable to rule on several of the pending motions until evidence is presented.  Although there are some concerns with Paul Presney, Jr.'s proposed expert testimony, the Court will Defer ruling on the Plaintiff's motion in limine to exclude Presney's testimony until after he testifies.

The Court will Defer ruling on the Plaintiff's motion in limine pertaining to the admissibility of evidence regarding Irving Cohen's alleged tax penalties, and the scheme that gave rise to those penalties.

The Court will Defer ruling on Windsor II's first motion in limine. Although the evidence appears to potentially be relevant, the Court is unable to conclude whether any evidence is subject to exclusion under

Federal Rule of Evidence 403.  Randy Youngswick's 2000 deposition testimony is not subject to exclusion under Federal Rule of Civil Procedure 32.

The Court will Defer consideration of Windsor II's second motion in limine, for the same reason it deferred consideration of the Plaintiff's motion for judicial notice.  Specifically, the Court will be in a better position to consider relevance and admissibility after the presentation of some evidence.

The Court will Deny Windsor II's third motion in limine, based on the grounds asserted therein.  Windsor II may raise any objections to the exhibits at trial.  Moreover, the Court recognizes that some of the exhibits and/or Youngswick's deposition designations may be excluded, based on other rulings.

Ergo, the Court hereby DEFERS consideration of the Plaintiff's Motion in limine as to the admissibility of evidence regarding Irving Cohen's alleged tax shelter penalties [d/e 161], as provided in this Order.

The Court DEFERS consideration of the Plaintiff's Motion in limine

to exclude the expert testimony of Paul Presney, Jr. [d/e 162], until the conclusion of Mr. Presney's testimony.

The Court DEFERS consideration of Defendant The Windsor Organization's first Motion in limine [d/e 175], as provided in this Order.

The Court DEFERS consideration of Defendant The Windsor Organization's second Motion in limine [d/e 185], as provided in this Order.

The Court DENIES Defendant Windsor Organization's third Motion in limine [d/e 204], as provided in this Order.

ENTER: February 27, 2012

FOR THE COURT:


s/Richard Mills
United States District Judge