IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.   08-3282 |
| | ) | |
| IRVING COHEN, THE WINDSOR | ) | |
| ORGANIZATION, INC., and 3-B | ) | |
| STORES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

The Complaint in this case was filed on December 2, 2008, but its origins date to the early 1980s.

The bench trial in this case took nine days, heard from twelve witnesses, and the record amounts to thousands of pages.

Judgment for the United States.

## I. INTRODUCTION

This is an action for foreclosure of federal tax liens, wherein the Court has jurisdiction pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. §§

7401 and 7403.  Venue is proper in this Court pursuant to 28 U.S.C. § 1396 because the real property which is the subject of this suit is located in Sangamon County, Illinois 62702.

In this action, Plaintiff United States of America seeks to obtain a determination that Defendant The Windsor Organization, Inc. (Windsor II), a Nevada Corporation incorporated on February 8, 2002, is holding certain property as the nominee or alter ego of Defendant Irving Cohen, and to foreclose upon the property located at 719 (also known as 709) West Jefferson, Springfield, Sangamon County, Illinois 62702.  The United States seeks to apply the proceeds of the sale of the property in partial satisfaction of Cohen's outstanding tax debt.

The Parties have stipulated and agreed as follows:

1.      That the real estate which is the subject matter of this proceeding is commonly known as 719 (also known as 709) West Jefferson, Springfield, Sangamon County, Illinois, 62702 and is legally described as set forth on Exhibit "A" attached to Joint Exhibit 166 ("the Springfield Property" or "the Property").

2

2.     That 3-B Stores, Inc. is a Delaware Corporation authorized to do business in the State of Illinois with its principal place of business at 2809 North Main Street, Decatur, Macon County, Illinois, 62526.

3.     That on or about May 19, 2005, 3-B Stores, Inc. conveyed its interest in the Property to Windsor II.  The special warranty deed was filed as document number 2005R19832 with the Sangamon County Recorder of Deeds on May 19, 2005.

4.     That 3-B Stores, Inc. is the owner of a mortgage lien against the Property, said mortgage being dated May 3, 2005 and having been recorded on May 19, 2005 in the office of the Recorder of Deeds of Sangamon County, Illinois, as document number 2005R19833 (the Mortgage).

5.     That the Mortgage secures a note in the principal amount of $500,000 evidencing indebtedness of Windsor II to 3-B Stores, Inc. (the Note).

6.     That the current outstanding balance secured by said mortgage is $145,787.26.

7.     That in the event the Court finds that Windsor II holds

3

ownership and title to the Property merely as a nominee for Irving Cohen, the Court should further find that the interest of 3-B Stores, Inc. arising from its Note and Mortgage is prior to, and superior to, the Government's lien against the Property arising by virtue of the April 30, 1999 judgment and the tax liens recorded on May 23, 2008.

## II. FINDINGS OF FACT[1]

### A. Tax assessment against Irving Cohen

The IRS assessed penalties under I.R.C. § 6700 for the years 1982 and 1983 against Irving Cohen in the amount of $3,687,000 on June 23, 1986. In July 1986, Cohen brought suit for refund of a portion of the penalty assessed. On April 30, 1999, the United States obtained a judgment against Cohen for I.R.C. § 6700 penalties totaling $2,921,508, plus interest accruing from June 23, 1986, the date of the I.R.C. § 6700

---

[1]Most of these findings of fact are taken from the Joint Stipulations of Fact, which is attached as Exhibit A-1 to the Final Pretrial Order [d/e 190]. Other facts are supported with reference to the record. Any facts which are contested are noted. "Tr" refers to the trial transcript. "Ex" refers to the exhibits in the record. "Stip" refers to the Joint Stipulations of Fact. "Dep. Tr" refers to the deposition transcripts in the record.

4

penalty assessment.  On May 23, 2008, the IRS filed notices of federal tax lien for I.R.C. § 6700 penalties for years 1982 and 1983 with the Register of Deeds for Sangamon County, Illinois, against Irving Cohen (as document number 2008R21012) and against Windsor II as alter ego, nominee and/or transferee of Cohen (as document number 2008 R21013).  As of June 28, 2011, Cohen's outstanding balance owed for the 1982 I.R.C. § 6700 penalty and interest was $1,138,980.91.  As of June 28, 2011, Cohen's outstanding balance for the 1983 I.R.C. § 6700 penalty and interest was $3,185, 325.47.

On May 2, 2008, Irving Cohen contacted the IRS directly when the Service re-filed the notice of the lien against him.  On November 4, 2008, Herman Schwartzman, Cohen's friend and lawyer, petitioned the IRS to have the IRS liens against Windsor II released.  *See* Joint Ex. 214.

B. Windsor Holding Corporation and Windsor I

Windsor Realty and Management Corp. was incorporated in Nevada on May 4, 1981.  Irving Cohen was listed as President and Director of Windsor Realty and Management Corp. on the company's incorporation

paperwork.  On August 3, 1981, Windsor Realty and Management Corp. changed its name to Windsor Holding Corp.  Cohen was listed as the president of Windsor Holding Corp. between 1981 and 1989 on the company's annual list of officers and directors filed with the State of Nevada.  On May 15, 1990, Windsor Holding Corp. filed its list of officers and directors with the State of Nevada, on which it listed Mark Virag as President.  Windsor Realty and Management Corp., now known as Windsor Holding Corporation, owns all the outstanding stock of The Windsor Organization, Inc. ("Windsor I").  Cohen and Windsor II allege it is contested whether the three Lillian Rosen Trusts own all the capital stock of Windsor Holding Corp., the sole shareholder of Windsor I.

Windsor I was also incorporated in Nevada on May 4, 1981.  Irving Cohen was listed as President and Director of Windsor I on the company's incorporation paperwork.  On April 30, 1982, Windsor I filed its list of officers and directors with the State of Nevada, on which it listed Stanley Levine as President, Treasurer, and Director.  On April 25, 1983, Windsor I filed its annual list of officers and directors with the State of Nevada,

6

listing Irving Cohen as President, Treasurer and Director.

Irving Cohen was listed as President of Windsor I between 1983 and 1989 on the company's annual list of officers and directors filed with the State of Nevada.  Mark Virag was listed as President of Windsor I from 1990 through 1993 on the company's list of officers and directors filed with the State of Nevada.  On October 16, 1991, Irving Cohen signed the Environmental Disclosure Document for Transfer of Real Property as "Managing Agent" of Windsor I.  Cohen holds himself as the current President of Windsor I.  The agreement between Windsor I and Windsor II for the transfer of the Property to Windsor II was not reduced to writing.

The United States alleges that neither Windsor I nor Windsor II exists apart from Irving Cohen.  According to the United States, Cohen makes every decision, signs every contract, and pulls every string.  Cohen and Windsor II dispute the assertion as to Windsor II.  They further claim that it is contested as to whether he took actions with regard to the Property as the Trustee of the three Lillian Rosen Trusts.  Thus, they allege that any close relationship between Windsor II and Cohen is as a fiduciary

for a third party.

C. Windsor I's purchase of the Property

The purpose of Windsor I was to go into the real estate business. In furtherance thereof, Irving Cohen and Stan Levine decided that Windsor I should purchase the Property from National Super Markets, Inc., and accept a lease back for the Property's rental. Cohen found the Property on behalf of Windsor I in 1981. Cohen and Levine were involved in the negotiation over the purchase price and lease back of the Property. Cohen had a role in negotiating the mortgage that Windsor I took on the Property. He was a signatory on Windsor I's bank account. Cohen and Levine signed checks for anything related to Windsor I's operations.

The 1981 Collateral Assignment of Lessee's Interest in Lease, Document No. 881093, required notices to Windsor I to be sent to Irving Cohen's attention and to the law firm of Sonnenschein, Carlin, Nath & Rosenthal, in Chicago, Illinois. The Settlement and Deed-in-Lieu Agreement dated February 2002 between American National Bank and Trust Company of Chicago, as Trustee of Trust No. 53586, Windsor

Income Properties partnership as borrower and Windsor I as Lender, required notices to Windsor I to be sent to Irving Cohen with copy to its attorneys at the Sonnenschein firm in Chicago.

### D. Windsor Income Properties

Windsor Income Properties was created as a New York limited partnership specifically to buy and operate the Property from Windsor I and to provide a return on investments to its partners.  Irving Cohen negotiated the sale between Windsor I and Windsor Income Properties on behalf of Windsor I.  Cohen also negotiated the mortgage payment plan between the two companies on behalf of Windsor I.  The December 10, 1981, Junior Collateral Assignment of Lessee's Interests in Lease, Document No. 890221, required notices to Windsor Income Properties to be sent to Paul Belloff, general partner of Barrister's Associates, which was the general partner of Windsor Income Properties.  From December 1981 through 2001, during the time period Windsor Income Properties operated the Property, Irving Cohen had no involvement in the day-to-day operations of the Property.  Windsor Income Properties was offered to

9

investors as "Real Estate designed to yield substantial immediate income and tax benefits." *See* Joint Ex. 22.

The Offering Memorandum entitled "Windsor Income Properties Private Placement Memorandum" indicated that a purchase of a partnership interest involved a high degree of risk and the description of the tax consequences of investment were based on legal counsel's interpretation of the Internal Revenue Code, regulations and case law. It further said that the investment was available to investors whose net worth was at least $250,000 (exclusive of home, furnishings, and autos) and who anticipated income during the year which would be subject to fifty percent federal income tax.

The General Partner of Windsor Income Properties was Barrister Associates. *See* Joint Ex. 21. Irving Cohen testified that he was not a partner in either entity.[2] *See* Tr. 283-284; Gov't Ex. 405, at 36. Windsor Income Properties' 2001 federal tax return shows both Geoffrey Townsend, Ltd. and Barrister Associates were partners in Windsor Income Properties.

---

[2]Cohen was a partner in an entity called Barrister Equipment Associates. *See* Gov't Ex. 248, at 7.

*See* Joint Ex. 24, at 32, 35.

In correspondence to The DESCO Group, agent for Schnuck's Market, Inc., Robert Gold authorized Irving Cohen, who represented the mortgagee on the Property, to act on behalf of Windsor Income Properties related to negotiations concerning Schnuck's lease of the Property and its payment of real estate taxes for the Property in 2001. On October 15, 2001, Barrister's Associates, general partner of Windsor Income Properties, sent the limited partners of Windsor Income Properties notice regarding the status of the Property and search for a new lessee or purchaser after Schnuck's termination of its lease. After Schnuck's elected to terminate its lease, Windsor Income Properties hired a broker, Harry Stern, to sell the Property. In correspondence to Harry Stern dated October 22, 2001, Robert Gold, on behalf of Windsor Income Properties, rejected as too low a $1,000,000 offer to purchase the Property tendered by Blackstone Group.

On May 2, 2002, Robert Fernandez of the Sonnenschein law firm sent Robert Gold a letter enclosing two copies of the Settlement Agreement for Gold's signature and a Direction to Convey and Letter of Direction

required to be executed to authorize the Trustee of the Illinois Land Trust to issue a Trustee's Deed and execute the Settlement Agreement. The letter lists Irving Cohen and Scott A. Linquist, Esq., as receiving copies of the letter.

When Irving Cohen, agent for the mortgagee, Windsor I, was notified that Windsor Income Properties could no longer sustain the operation of the Property, Cohen became actively involved with the Property. He spoke with local people, including Harry Stern, regarding their opinions on possible tenants. Cohen contacted banks regarding borrowing money on the vacant building. He also contacted potential investors.

E. Windsor II

Windsor II was incorporated in the State of Nevada on February 8, 2002. On February 12, 2002, Irving Cohen wrote Asset Protection Group, Inc. a letter, in which he asked to have William Reed arrange for a federal ID number for Windsor II "in addition to his serving as sole officer and director at this time." On July 31, 2003, Windsor II filed its Application for Authority to Transact Business in Illinois with the Sangamon County

12

Recorder, wherein it stated that it began to transact business in Illinois on January 2, 2003.

Irving Cohen acted as President and Managing Director of Windsor. *See* Joint Ex. 68, 69, 72, 77, 79. Cohen, acting on behalf of Windsor II, hired Harry Stern as the property manager and negotiated Stern's pay as an independent contractor. Stern reported to Cohen regarding matters relating to the Springfield Property until July 25, 2008, when he began reporting to Robert Gold. Stern handled management and day-to-day operations of the Property from 2002 through the present date. Until 2007, Cohen was the only person from Windsor II with whom Stern dealt. Windsor II did not have any employees until Robert Gold assumed the presidency on July 1, 2008.

Irving Cohen, acting on behalf of Windsor II, retained Greg Kienzler to appraise the Property on behalf of Windsor II for the purpose of appealing the Sangamon County, Illinois real estate assessment on the Property. In correspondence to Cohen and Windsor II dated October 21, 2004, Kienzler valued the Property at $1,000,000 as of September 22,

13

2004, based on his Summary Appraisal Report which noted the tenant vacancy, the division of lots held in title and other lots held by lease with the improvements spanning both, and the declining neighborhood. The information contained in the appraisal report was specific to the needs of the client and for the intended use stated in the report which was to appeal the real estate tax assessment.

At Irving Cohen's request, Kienzler attended the Sangamon County Real Estate Property Tax Appeal Hearing on behalf of Windsor II. The Board adopted Kienzler's valuation of $1,000,000 for the Property. On November 22, 2004, Kienzler submitted his invoice to Cohen on behalf of Windsor II for Kienzler's time preparing for his testimony before the Sangamon County Real Estate Board of Review. *See* Joint Ex. 90. Kienzler charged Windsor II $4,700 for the preparation of the Appraisal Report and preparation for and testimony before the property tax appeal board.

On October 15, 2002, Irving Cohen, acting on behalf of Windsor II, signed as its President a contract with Springfield Area Wide Charities d/b/a Avenue Thrift Shop. In correspondence dated November 22, 2002 from

14

Evan Lloyd Associates, Inc. to Harry Stern, architect Timothy Smith recommended awarding the project to remodel Springfield Area Wide Charities d/b/a Avenue Thrift Shop to Evans Construction. On January 31, 2003, Don Evans of Evans Construction sent Cohen and Windsor II four copies of the contract for the remodel of the Avenue Thrift Shop for review and signature, on behalf of Windsor II, to be returned to Evans Construction for distribution to Tim Smith and Harry Stern. On March 3, 2003, Irving Cohen, as President of Windsor II, signed an agreement with Evans Construction Co.

On March 3, 2003, Irving Cohen, as President of Windsor II, approved deductions to the contract price for tenant improvements. Windsor II paid Evans Construction $394,584.04 for the Avenue Thrift Shop remodel with checks issued from Windsor II's Bank of America checking account. On February 7, 2008, Irving Cohen sent Judy Smith, President of Avenue Thrift Shop, a letter regarding discussions to amend Windsor II's lease with Avenue Thrift. Cohen signed the letter as "Managing Director" of Windsor II.

15

Irving Cohen negotiated a lease with Harbor Freight Tools USA, Inc. (Harbor Freight) on behalf of Windsor II.  On March 13, 2003, Irving Cohen signed a Certificate Confirming Lease Commence Date with Harbor Freight.  Cohen signed the Certificate as "Managing Director" of Windsor II, but signed the lease with Harbor Freight as "President."  On May 2, 2003, Cohen spoke with Don Evans of Evans Construction regarding proceeding with the Harbor Freight project.

Irving Cohen authorized Harry Stern to negotiate on behalf of Windsor II the lease terms for a Bank of Springfield ATM.  On April 10, 2004, Cohen signed as President of Windsor II an ATM Lease Agreement with Bank of Springfield.

As part of his service, William Reed set up bank accounts for Windsor II and pre-signed books of Windsor II checks for others to issue, as part of his customary arrangement with corporate clients.  Irving Cohen wrote an undated letter to Asset Protection Group, in which he enclosed checks that Bank of America had sent directly to him.  Cohen asked Asset Protection Group to have William Reed sign the checks and retain one for Asset

16

Protection Group's fee, while returning the remaining pre-signed checks to Cohen. Cohen filled out checks that were pre-signed by William Reed and issued them on behalf of Windsor II for its expenses. Cohen completed a series of checks paid to the order of Evans Construction which had been pre-signed by William Reed for Windsor II remodeling costs for the Property. Cohen issued these checks at his discretion and without prior authorization from Reed. *See* Reed Dep. Tr. 86, 89-90, 105-106.

Windsor II maintained an account with Bank of America from February 26, 2002, to August 7, 2007. Windsor II's Bank of America statements were mailed to 20423 State Road 7 PMB 469, Boca Raton, FL 33498. Windsor II's Bank of Springfield statements were mailed to Harry Stern at 123 South 7th Street, Suite 401, Springfield, Illinois from 2002 through the present date. The statements were also sent to 20423 State Road 7, PMB 469, Boca Raton, FL 33498 until July 31, 2008, at which time they were mailed to 100 N. Centre Ave Suite 400, Rockville Centre, NY 11570.

Windsor II's Wachovia bank statements were mailed to 20423 State

17

Road 7 PMB 469, Boca Raton, FL 33498 from January 2007 until August 2007 at which time the statements were mailed to 100 N. Centre Ave., Suite 400, Rockville Centre, NY 11570.   On December 2, 2005, Irving Cohen, on behalf of Windsor II, authorized Bank of Springfield to directly credit Windsor II's bank account for payment of Bank of Springfield's monthly rental payments under its lease dated May 10, 2004.   In an October 28, 2008 letter to the IRS, Cohen listed his address as: 7400 West Palmetto Park Road #4, PMB 540, Boca Raton, FL 33433.  *See* Gov't Ex. 353.

F. 3-B Stores, Inc.

Irving Cohen negotiated the purchase of a parcel of property from 3-B Stores, Inc. on behalf of Windsor II.  Cohen contacted Stephen Daniels to work a deal regarding the Property whereby Windsor II would purchase 3-B Stores, Inc.'s right to the Property.  Cohen hired Attorney Paul Presney, Sr. to handle several matters for Windsor II, including the purchase from 3-B Stores, Inc.  On January 9, 2003, Stephen Daniels sent Cohen a letter regarding a potential deal between 3-B Stores, Inc. and Windsor II.  On

January 12, 2003, Cohen contacted Daniels regarding their meeting the following day.  On March 24, 2003, Daniels again contacted Cohen to ask for an update on the Property.  On August 5, 2003, Daniels sent Cohen a term sheet regarding a possible transaction in which Windsor II would acquire 3-B Stores, Inc.'s interest in the Property.

On June 9, 2004, Irving Cohen emailed Stephen Daniels regarding proceeding to closing on the September 2003 terms.  In an April 27, 2005 letter, Paul Presney, Sr. stated that Cohen would deposit the funds in escrow to proceed with the closing on the 3-B Stores, Inc. deal.  Cohen signed papers on behalf of Windsor II related to the 3-B Stores, Inc. purchase, including the Mortgage and Security Agreement, the Assignment of Rents and Leases, and the Release of Second Mortgage and Assignment of Rents.  On May 18, 2005, Lincoln Land Title sent Irving Cohen the seller's closing statement.  Between July 17, 2003 and May 27, 2005, the Presney firm billed over 110.3 hours to completing the 3-B Stores, Inc. deal on behalf of Windsor II.  *See* Joint Ex. 93.

G. Asset Protection Group and its Nominee Entities

William Reed served as Asset Protection Group's President from 2000 until 2006. *See* Reed Dep. Tr. 11-12. Asset Protection Group's asset protection services included creating Nevada corporations and forming offshore corporations with foreign brokerage accounts. *See* Reed Dep. Tr. 12, 14-15. Reed wrote a book entitled <u>Bulletproof A$$et Protection</u>. *See* Reed Dep. Tr. 12-13; Gov't Ex. 49. In his book, Reed discusses methods by which customers can hide their assets from potential creditors, the government, and the courts. *See* Reed Dep. Tr. 13-17. The book also advised readers to set up Nevada corporations with nominee directors and officers and to set up offshore corporations. *See* Reed Dep. Tr. 13-14. Reed also filmed "The Litigation Explosion," featuring Robert Wagner, to promote Asset Protection Group's services. *See* Reed Dep. Tr. 25-26; Gov't Ex. 52.

Asset Protection Group offered customers the opportunity to become asset protection consultants. *See* Reed Dep. Tr. 17-21, 27. Many consultants set up their own corporations, in addition to selling Asset Protection Group's services to others. *See* Reed Dep. Tr. 26-27. Irving

Cohen was an asset protection consultant for Asset Protection Group.  *See* Reed Dep. Tr. 47-48, 102-103.

William Reed sold privacy as one of the benefits of a Nevada corporation.  Clients who wanted "total privacy" would ask Reed to serve as the nominee officer or director.  *See* Reed Dep. Tr. 29-30.  Reed's role as nominee officer or director meant that Asset Protection served as the registered agent and that the Nevada Secretary of State would only see Reed's name as officer and director.  *See* Reed Dep. Tr. 29-30, 51-52.  The actual operations of the corporations were left to the clients.  The clients, not Reed, were responsible for ensuring that a corporation was following its bylaws.  *See* Reed Dep. Tr. 30-31.  A customary practice of Asset Protection Group was to send blank checks with Reed's signature to clients.  Reed did not place any restrictions on the completion or issuance of the checks or on any other matter with respect to the corporations.  *See* Reed Dep. Tr. 105-107.  Asset Protection Group did not keep records that would allow an outsider to determine the true ownership of the nominee corporations that Reed established.  *See* Reed Dep. Tr. 116.

In addition to Windsor II, Irving Cohen used Asset Protection Group to create other nominee entities. Cohen formed American Equities Holding Corporation ("American Equities") in 2002, and used Asset Protection Group's services to incorporate in Nevada. *See* Gov't Ex. 358, at 2, 16, 33, 36-37. TI&M Services, Ltd. ("TI&M") is purportedly the sole shareholder of American Equities and Windsor II. *See* Joint Ex. 175. However, American Equities did not indicate on its tax returns that it is wholly-owned by TI&M or any other foreign entity. *See* Gov't Ex. 156-160. On February 5, 2003, Cohen sent Wendell Waite, CPA, a letter as "managing coordinator" of both Windsor II and American Equities. In the letter, Cohen listed the same address for both Windsor II and American Equities: PMB 469, 20423 State Road 7, Boca Raton, FL 33498. *See* Gov't Ex. 173.

In April 2004, Irving Cohen formed Aeromet Supply, Inc. (Aeromet), another Nevada corporation, through Asset Protection Group. *See* Gov't Ex. 154, 170-171. Aeromet was a subsidiary of American Equities. Although American Equities was the source of capital for Aeromet, no shares of stock ever officially issued. *See* Gov't Ex. 170-171.

Randy Youngswick was President of Wainright Marketing and Management Systems ("Wainright").  *See* Youngswick Dep. Tr. 9. Youngswick was introduced to Irving Cohen through Youngswick's stepfather, Leonard Tarr.  He set up Wainright as a favor to Cohen and Tarr.  *See* Youngswick Dep. Tr. 8.  Youngswick did not have any official duties at Wainright, he did not receive any compensation as President, and did not maintain an office at Wainright.  *See* Youngswick Dep. Tr. 11-14. Wainright was "basically" Cohen's company–Cohen told Youngswick what to do, and Youngswick did as he was told.  *See* Youngswick Dep. Tr. 16-17. Youngswick did not know what Cohen did for Wainright.  *See* Youngswick Dep. Tr. 14.

Irving Cohen's February 5, 2003 letter to Wendell Waite, CPA, was written on Wainright stationery.  At the top of the stationery, below the company name, is written "Members of Asset Protection Group, Inc."  *See* Gov't Ex. 173.  Cohen's April 12, 2004 letter to Asset Protection Group was written on Wainright stationery.  At the bottom of the stationery is written "Members of Asset Protection Group, Inc."  *See* Gov't Ex. 154.

On August 20, 2007, the Department of Justice sued to enjoin William Reed from promoting fraudulent tax schemes that helped his customers evade the assessment and collection of federal tax liens.  *See United States v. Reed*, No. 07-1471 (E.D. Mo. Aug. 20, 2007), Doc. No. 1. On October 11, 2007, Reed stipulated to an order of permanent injunction barring him from promoting tax fraud schemes.  *See id.*, Doc. No. 5.

On July 5, 2011, a grand jury in the United States District Court for the District of Nevada indicted William Reed, Richard Neiswonger, and Wendell Waite for their involvement in the "APG scheme" to conceal assets and income through disguised corporate ownership services.   The indictment contained 32 counts.  *See United States v. Reed*, No. 11-cr-247 (D. Nev. July 15, 2011), Doc. No. 1.  On February 13, 2012, pursuant to a plea agreement, Reed pled guilty to Counts 1 and 31 of the Indictment and Count 1 of the Information.  Count 1 of the Indictment charged Reed with conspiracy to defraud the United States.  Count 31 charged him with aggravated identity theft.  Count 1 of the Information charged Reed with attempt to evade or defeat tax.  *See id.*, Doc. No. 57.  According to the

24

docket report, Reed awaits sentencing.

H. Windsor II's presidents

The United States alleges that Irving Cohen consistently used officers and directors to obscure his ownership interest in the Property. Irving Cohen and Windsor II claim it is contested whether Windsor II's past presidents effectively authorized Cohen to act on behalf of Windsor II in negotiating leases and the purchase of Lots 1 through 10 of the Property from 3-B Stores.

(1)

On February 8, 2002, William Reed filed Articles of Incorporation for Windsor II with the State of Nevada. William Reed served as the President of Windsor II until Kelly Neely's appointment in 2007. On February 8, 2002, Asset Protection Group prepared a resolution adopted by the Sole Director of Windsor II, appointing Reed as its President, Secretary and Treasurer. Reed issued corporate by-laws for Windsor II on February 8, 2002. Article VI, Section III of Windsor II's corporate bylaws required all contracts to be "signed by the President and the Secretary in the name of

25

and on behalf of the Corporation," unless otherwise provided by the Board of Directors.  On February 8, 2002, Asset Protection Group filed Windsor II's Initial List of Officers and Directors with the State of Nevada, on which William Reed was listed in each position.  Asset Protection Group prepared a blank Resignation of Sole Officer and Director for Windsor II, which was pre-signed by William Reed.  William Reed, listed with the Nevada Secretary of State as the sole director of Windsor II from February 8, 2002, through January 29, 2007, testified he never heard of Markus Kolzoff or TI&M, and was unaware of any agreement between Windsor II and its foreign investor.  Reed did not have knowledge of any leases or contracts entered into by Windsor II.

On June 15, 2006, Asset Protection Group wrote a letter to Windsor II in which it stated that clients were responsible for any activity and/or debts owed by the corporation and that if Asset Protection Group received any further notifications while acting as Windsor II's registered agent, William Reed would resign as Officer and Director of the company.

On January 16, 2007, a resignation of sole officer and director of

Windsor II was executed, in which William Reed purportedly appointed Kelly Neely as the President and Director of Windsor II.  *See* Joint Ex. 44.

(2)

Kelly Neely has known Irving Cohen for over twenty years.  Cohen approached Kelly Neely and told her that he needed an interim president for Windsor II.  Although Neely did not want to be President of Windsor II, she agreed to that role as a favor to Cohen.  Neely chose not to be compensated for her time serving as President of Windsor II.

Kelly Neely opened a bank account at Wachovia Bank for Windsor II.  On January 29, 2007, Kelly Neely, as President of Windsor II, appointed CHQ Incorporated as Windsor II's resident agent.  Neely signed a few checks and documents on behalf of Windsor II as requested by Irving Cohen to pay for Windsor II's expenses.  Cohen went to Neely's house to have her sign checks as necessary.  Cohen did not explain to Neely the purpose of the checks she signed on behalf of Windsor II.

Irving Cohen did not discuss the Evans Construction Company contract with Kelly Neely.  Neely did not keep any files as President of

27

Windsor II.  Neely did not authorize Cohen to act on behalf of Windsor II.
Cohen told Neely that he would take care of everything and all Neely
would have to do is sign.  *See* Kelly Neely Dep. Tr. 33.

On July 25, 2008, Neely resigned as President.  On July 26, 2008, as
Sole Director of Windsor II, Neely adopted the resolution appointing
Robert Gold as President of Windsor II.  On July 27, 2008, Neely resigned
as Secretary, Treasurer and Sole Director of Windsor II.

Windsor II's Application for Authority to Transact Business in Illinois
lists James Neely as Vice-President of Windsor II and Kelly Neely as
Secretary and Treasurer of Windsor II.  James Neely is the son of Kelly
Neely.  James Neely did not know that he had ever been the officer or
director of any corporation, let alone appointed Vice-President of Windsor
II.  No one ever told James Neely that he was an officer or director of
Windsor II, and James Neely was unaware of whether he had signed any
documents to that effect.  James Neely has never heard of an entity named
Windsor, and knows nothing about the Property in Springfield, Illinois.

(3)

28

Irving Cohen's attorney, Herman Schwartzman, asked Robert Gold to become President of Windsor II.  On September 15, 2008, Cohen wrote a letter to Harbor Freight Tools confirming that Windsor II had a new president and address.  Cohen wrote that he was continuing to serve as a consultant to Windsor II, and provided his phone number in case Harbor Freight was unable to contact Robert Gold.

I. Foreign ownership

Between tax years 2002 and 2010, Windsor II's tax preparer did not report on its federal tax returns that it was owned by TI&M, a British Virgin Islands cooperation.  Irving Cohen and Windsor II claim it is contested whether TI&M is the sole shareholder of Windsor II.  The same is true whether TI&M, as sole shareholder of Windsor II, has contributed capital to Windsor II.  However, there was little, if any, credible evidence presented at trial with respect to an arrangement with TI&M.

Between 2002 and 2010, Windsor II has reported a mortgage in the amount of $1.4 million on the company's corporate federal tax returns.  On September 13, 2010, the IRS notified Windsor II that it had failed to file

IRS Form 5472 ("Information Return of a 25% Foreign Owned U.S. Corporation") for tax years 2007 and 2008. On April 11, 2011, the IRS assessed penalties against Windsor II for its failure to file an IRS form 5472 for tax years 2007 and 2008.

On June 7, 2011, Windsor II amended its federal tax returns for tax years 2008-2010 to reflect ownership by TI&M. On June 15, 2011, Windsor II amended its federal tax return for tax year 2007 to reflect ownership by TI&M. Windsor II also filed IRS Forms 5472 for tax years 2007-2010 to disclose foreign ownership by TI&M. On its IRS Forms 5472, filed with amended returns for tax years 2007-2010, Windsor II claimed there were no reportable transactions between TI&M and Windsor II.

Windsor II did not provide its accountant with a physical address for TI&M in the British Virgin Islands, urging instead that Waite and Associates list Max Auer in Switzerland as TI&M's representative. Robert Gold has never had any dealings with TI&M. Gold was not aware of any meetings, discussions, agreements or other communication with Markus

Kolzoff.

The United States contends that Irving Cohen used Asset Protection Group to create additional nominee entities, which he used to filter money from TI&M through several intermediaries and ultimately to Cohen's company, Wainright Marketing and Management Systems, Inc. It further asserts Cohen funneled additional funds away from TI&M, through intermediaries, to his son's business, Halco Properties, Inc. Cohen and Windsor II allege it is contested whether he is an owner, director, or officer of TI&M. It is also disputed whether Cohen ever deposited any money with TI&M.

## J. History of the Property

On June 1, 1976, Tolly's Market, Inc. and National Super Markets, Inc., a Michigan Corporation ("National") entered into a Lease Agreement for property situated at 709 West Jefferson, Springfield, Illinois, legally described as:

> Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, except the East 80 feet of Lot 10 all in Block 1 of Henry Davis', Jr. Addition to the City of Springfield, Illinois situated in the County of Sangamon and State of Illinois and all improvements thereon including a

31

building of approximately 16,608 square feet in size (hereinafter referred to as "Lots 1-10").

On July 12, 1981, Windsor I purchased National's interest in the Springfield Property, including its leasehold interest in Lots 1-10, title to the remaining portion of the Property and the building and improvements located upon the Property.

On July 13, 1981, Windsor I issued a mortgage to National Tea Co. in the amount of $1,300,000.00. Windsor I assigned its rents to National Tea Co. as security for the payment of the $1,300,000.00 note held by National Tea Co. As additional security for its payment of the $1,300,000.00 note, Windsor I also assigned its lease interest in its lease with Tolly's Market, Inc. to National Tea Co. On July 23, 1981, Windsor I signed a lease agreement with National Super Markets, Inc. for National's use of the Property, under which National Super Market, Inc. would pay rents to Windsor I.

On or about August 20, 1981, Windsor I transferred its interest in the buildings and improvements located on the Property and its leasehold interest in Lots 1-10 to American National Bank and Trust Company of

32

Chicago, Trustee of Land Trust No. 53586, for the benefit of Windsor Income Properties, a New York limited partnership.

On or about December 10, 1981, Windsor Income Properties and Windsor I executed a "Second Mortgage and Assignment of Rents" ("the Second Mortgage"), which secured two "Junior Notes" in the amount of $1,525,500.00 and $2,560,000.00, respectively, against the Property. Windsor Income Properties, as Mortgagor, issued the Second Mortgage to Windsor I, as mortgagee, to purchase the Property from Windsor I.

On December 10, 1981, Windsor I executed a Memorandum of Lease with the American National Bank and Trust Company of Chicago as Trustee to Trust No. 53586 dated August 20, 1980. On December 22, 1981, American National Bank and Trust Company of Chicago as Trustee to Trust No. 53586 dated August 20, 1980, assigned its interest in the July 23, 1981, lease with National Super Markets, Inc. to Windsor I as security for the Second Mortgage.

On June 9, 1995, National Tea Co. released its mortgage against Windsor I. On June 12, 1995, National Super Markets, Inc. assigned its

33

lease to Schnuck Markets, Inc. On January 29, 2001, Schnuck Markets, Inc. notified Windsor Income Properties that it was terminating its lease on September 30, 2001.

Sometime in 2000 or 2001, Windsor Income Properties defaulted on its obligations under the Second Mortgage and Assignment of Rents (recorded as Document No. 890224) held by Windsor I. When Windsor Income Properties defaulted on its obligations to pay Windsor I under the Second Mortgage, the parties agreed to divest Windsor Income Properties of its ownership interest in the Property in lieu of foreclosure.

When Windsor Income Properties defaulted on the Second Mortgage, title to the Property was passed by Trustee's Deed from Windsor Income Properties to Windsor II through agreement with Windsor I. LaSalle Bank National Association, successor Trustee of Land Trust No. 53586, and Windsor Income Properties, beneficiary of said Land Trust, transferred its leasehold interest and the building and improvements on the Property to Windsor II pursuant to a Settlement and Deed in Lieu Agreement dated as of January 1, 2002, between Windsor I, LaSalle Bank National Association,

34

and Windsor Income Properties.  Windsor Income Properties, Windsor I, and LaSalle Bank National Association (as successor Trustee of Land Trust No. 53586), executed the Settlement and Deed-In-Lieu Agreement, dated as of January 1, 2002.

On June 21, 2002, LaSalle Bank National Association executed a Trustee's Deed in favor of Windsor II, which quit claimed the Trust's interest in the Property to Windsor II.  The Trustee's Deed was recorded in the Sangamon County Recorder's office on November 27, 2002.

On May 3, 2005, Windsor II purchased Lots 1-10 from 3-B Stores, Inc., successor in interest to Tolly's Market, Inc.

Scott & Scott, P.C., as attorneys for Windsor II, were directed by Robert Gold to send its billing statements for legal service fees and costs incurred to represent Windsor II in this case to TI&M.  Following Gold's direction, Scott & Scott sent its legal bills for Windsor II to TI&M and was subsequently paid by direct wire to Scott & Scott's Client Trust Account by TI&M, as disclosed in Joint Exhibit No. 250.  Scott & Scott applied such payments to the Windsor II bill for legal service fees and costs

incurred to represent Windsor II in this case.

The United States alleges that there is no credible evidence of any agreement between TI&M and either Windsor I or Windsor II regarding the Property.  Moreover, there is no credible evidence of any agreement regarding the purported loans from Windsor I to Windsor II relating to the Property at issue in this case.

Irving Cohen and Windsor II claim it is contested as to whether Windsor I holds a valid mortgage on the Property.  The United States asserts there is no credible evidence that Windsor I holds a valid mortgage against the Property at issue in this case.  Cohen and Windsor II claim it is contested whether the three Lillian Rosen Trusts own all the capital stock of Windsor Holding Corp., the sole shareholder of Windsor I.  Moreover, it is disputed as to whether Cohen took actions with regard to the Property as the Trustee of the three Lillian Rosen Trusts.    The United States asserts there is no credible evidence that the Lillian Rosen Trusts have any interest in the Property at issue in this case, or that Cohen is the trustee of the Lillian Rosen Trusts.

36

Irving Cohen and Windsor II claim it is contested whether the Release of Mortgage issued on May 19, 2005, by Windsor II was effective to release the mortgage held by Windsor I as an encumbrance against persons with knowledge, including the United States. They further assert it is disputed whether Windsor I's mortgage was subordinated to the 3-B Stores, Inc. mortgage dated May 3, 2005.

## III. CONCLUSIONS OF LAW

### A. Windsor I and Compliance with 26 U.S.C. § 7403

Windsor II alleges that the United States failed to name certain necessary parties to this action. In a Motion filed on January 7, 2011, Windsor II moved to join as necessary parties Windsor I and the Lillian Rosen Trusts for the benefit of Hal S. Cohen, Laurence S. Cohen and Jennifer P. Cohen. *See* Doc. No. 98. In an Order entered on February 23, 2011, the Court denied Windsor II's motion on the basis that it was untimely. *See* Doc. No. 105, at 5-6. The Court further found that it was not aware of any reason why Windsor II could not adequately protect the interests of Windsor I and the Lillian Rosen Trusts at trial. *See id*. at 6.

37

Section 7403(b) provides, "All persons having liens or claiming any interest in the property involved in such action shall be made parties thereto." 28 U.S.C. § 7403(b). Windsor II alleges that the evidence at trial showed that Windsor I and tenants of the Property such as Harbor Freight Tools, USA, Inc., Avenue Thrift Shop, Bank of Springfield and Downtown Parking each have an interest in the title, to a lien or encumbrance, or in possession of the Property. Accordingly, Windsor II asserts these entities must be named as parties.

The Court finds no basis to revisit its earlier decision. Upon considering the evidence presented at trial and the parties' post-trial submissions, the Court finds that Windsor I's interests were adequately represented at trial by Windsor II and Irving Cohen. At the end of the day, for the reasons that follow, the Court concludes that Windsor I does not have any interest in the Springfield Property.

B. Windsor II as Irving Cohen's Nominee

(1)

"A nominee is one who holds bare legal title to property for the

38

benefit of another." *Scoville v. United States*, 250 F.3d 1198, 1203 (8th Cir. 2001) (citing <u>Black's Law Dictionary</u> (7th ed. 1999)).  Federal tax liens attach to equitable interests owned for the benefit of a taxpayer in property that is titled in the name of the nominee.  *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977).  The inquiry concerns "whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership."  *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007).

Because the Property at issue is located in Springfield, Illinois, it is Illinois law that applies to the determination of nominee possession.  *See United States v. Northern States Investments, Inc.*, 670 F. Supp.2d 778, 785 (N.D. Ill. 2009).  "Illinois law does not provide a clear standard for whether the nominal property holder is merely a nominee of another, but Illinois courts employ a realistic approach to property ownership that is consistent with the nominee doctrine."  *Id.* at 788 (internal quotation marks and citation omitted).  The court in *Northern States* observed that because

Illinois law does not adequately explain the nominee test, it would follow "the federal common law to the extent that federal law adds flesh to the state law bones." *Id.*

Courts consider a number of factors in determining whether a corporation is the nominee of a taxpayer: (1) whether the putative nominee paid adequate consideration for the property; (2) whether the property was placed in the name of the putative nominee in anticipation of a lawsuit or occurrence of liabilities while the transferor continues to exercise control over the property; (3) whether there is a close relationship between the putative nominee and the taxpayer; (4) the failure to record the conveyance; (5) whether the transferor retained possession of the property; and (6) whether the transferor continued to enjoy the benefits of the transferred property. *See id*. at 788-89.

Additional considerations include"whether the taxpayer used the putative nominee's funds to satisfy his personal expenses" and "whether the putative nominee interfered in any way with the taxpayer's use of the property." *Id*. at 789.  Applying these factors, the Court concludes that the

United States presented substantial evidence that Windsor II is Irving Cohen's nominee.

(2)

The evidence supports the United States' assertion that Windsor II did not pay adequate consideration for the Property. Windsor II claims the evidence is undisputed that it paid adequate consideration to 3-B Stores to purchase Lots 1 through 10 of the Property. The purchase price of $650,000 was arrived at through arms-length negotiation with Irving Cohen, as agent of Windsor II, and Stephen Daniel, on behalf of 3-B Stores. A $150,000 down payment was made by Windsor II in 2005. The balance of the purchase price was to be paid through the execution of a promissory note secured by a mortgage to 3-B Stores. No evidence was presented regarding an arm's length negotiation for Windsor II's acquisition of the Property. There is evidence which suggests that Irving Cohen negotiated on behalf of Windsor I and Windsor II. Cohen testified at trial that he offered the long-term ground lease on behalf of Windsor I and accepted it on behalf of Windsor II. *See* Tr. 462.

41

At trial, Irving Cohen was asked about his answers to the interrogatories served by the United States. According to his interrogatory answers, Cohen and Markus Kolzoff were the only individuals who had knowledge of the alleged deal between Windsor I, Windsor II and TI&M. *See* Tr. 421-424; Joint Ex. 197, at 2-3. Neither Kolzoff nor any other representative of TI&M testified at trial.[3] Moreover, when asked about his purported negotiations with Kolzoff or the alleged deal with TI&M, Cohen asserted his Fifth Amendment privilege against self-incrimination. *See* Tr. 356-365. The only evidence in the record pertaining to the purported negotiation over TI&M's acquisition of the Property is Cohen's unsubstantiated deposition testimony. *See* Gov't Ex. 405, at 56-61. There is no documentation which shows that Cohen traveled to Liechtenstein to meet with Kolzoff in late 2001 or January 2002, or at any other time. No credible evidence of this meeting or of any agreement with TI&M was presented.

---

[3]In a pre-trial Order [Doc. No. 206], the Court concluded that prior sworn testimony made by Markus Kolzoff in the Principality of Liechtenstein constituted inadmissible hearsay and excluded it.

Although the prior sworn statement of Markus Kolzoff was excluded, Windsor II or Irving Cohen could have called Kolzoff or another TI&M member or officer to testify at trial about the purported deal. The fact that no witness testified about any such a deal casts doubt on Windsor II and Cohen's assertion that TI&M has a financial interest in the Property. Although Cohen's post-trial Argument [Doc. No. 228] contains information about the purported deal, the Court declines to consider that unsworn submission because a party is not permitted to use the Fifth Amendment privilege as both a sword and a shield. *See United States v. Bonner*, 302 F.3d 776, 783-84 (7th Cir. 2002).

Irving Cohen and Windsor II allege that, in dealing with TI&M, Cohen was acting solely as a trustee of the trusts held for the benefit of his children. The record does not support that argument. There is no evidence of an arm's length negotiation wherein Cohen attempted to obtain a favorable deal for Windsor I for the sale of the Springfield Property. Cohen's agreement with TI&M was not reduced to writing. There are no contracts between any of the entities–Windsor I and TI&M, Windsor II

43

and TI&M, and/or Windsor I and Windsor II.  *See* Tr. 419-421, 492-493, 758-759.  Cohen testified that no mortgage between Windsor I and Windsor II or TI&M was ever recorded with the Sangamon County Clerk's Office.  *See* Tr. 420.  He stated that the $1.4 million dollar deal involved a "very serious handshake."  *See* Tr. 493.  Given Cohen's alleged obligation as a trustee to protect the corpus of his children's trust, this testimony simply is not credible.  The Court concludes that no credible evidence exists tending to show an obligation between Windsor I and Windsor II or Windsor II and/or TI&M.

The Court next concludes there is no evidence that Irving Cohen bargained for the best possible deal for Windsor I.  His agreement to lower the outstanding balance of the Second Mortgage purportedly held by Windsor I would have served to lower the purchase price for the Property, thus reducing the profit to Windsor I.  According to Cohen's testimony, he agreed to a deal whereby Windsor II would not make any payments on Windsor I's purported mortgage and a deal under which Windsor I and Windsor II would later "at a proper time" negotiate over the accrual of

44

interest on the purported mortgage.  *See* Tr. 470-471.

The Court further concludes that even if Windsor II could establish that it acquired the Property after an arm's length negotiation, the record shows that Windsor II has not paid any valuable consideration for the Springfield Property.  The purported consideration for the transaction was Windsor II's alleged promise to assume the Second Mortgage held by Windsor I.  *See* Tr. 353-354, 467, 476.  However, Windsor II has made no payments to the mortgage purportedly held by Windsor I.  Based on the "Mortgage Payable" entries on Windsor II's 2002 Trial Balance and its 2010 Balance Sheet, no interest accrued on the purportedly outstanding mortgage between 2002 and 2010.  *See* Joint Ex. 112, 144.

For the foregoing reasons, the Court concludes the record establishes that Windsor II did not pay adequate consideration for the Property.

(3)

The Court can only conclude that the Springfield Property was placed in Windsor II's name by Irving Cohen in anticipation of a lawsuit or other liability.  Cohen was aware that the IRS assessed tax penalties against him

45

in 1986 and filed suit to challenge those penalties. *See* Tr. 267-269. Cohen testified that he was aware of the judgment entered against him in that case. *See* Tr. 276-278. Moreover, Cohen acknowledged that he testified at a deposition in May of 2000 that there were at least two other outstanding judgments against him. *See* Tr. 246-249; Gov't Ex. 7, 311 (Cohen Dep. at 11-13).

Because Windsor I, Windsor Holding Corp. and the Lillian Rosen Trusts were all formed prior to the assessment of any penalties against Irving Cohen in 1986, Windsor II and Cohen assert that the United States cannot legitimately claim that the Property was transferred to Windsor I in anticipation of a lawsuit or other liability. However, the issue is whether Cohen transferred the Property to Windsor II in order to evade his tax debt. Cohen stated it was in 2001 that he became "actively involved" with the Property. *See* Tr. 342. Cohen also admitted that since the IRS levied his bank account to collect on a judgment, he has kept limited accounts at his bank. *See* Tr. 581-82.

Although Cohen testified that he has no assets in his name, there is

evidence which shows that he was familiar with how to use complex corporate structures and trusts in order to keep his name off of assets. *See* Tr. 581-582. He testified that he has set up countless corporations in his lifetime. *See* Tr. 141-42. Cohen was president of a number of corporations, including Madison Library, Inc., Universal Publishing, Inc., and Geoffrey Townsend, Ltd. He stated that each of those entities was owned by a trust held for the benefit of Cohen's children. *See* Tr. 284-286. There is evidence in the record which establishes that Cohen promoted his tax shelter through these corporations for which he was assessed penalties. *See* Tr. 368-370; Gov't Ex. 1-2.

Windsor II claims the United States ignores the fact that Irving Cohen never held an interest in the Property. Thus, it contends Cohen could not have transferred the Property to Windsor I, which already held an interest in the Property, or to Windsor II, which it alleges acquired its interest through Windsor I's efforts or its own purchase.

Based on the record, however, the Court concludes that Irving Cohen went to significant lengths to keep his name off of the public records

47

relating to the Property.   Cohen testified that when Windsor Income Properties surrendered the deed in 2001, he had the ultimate authority to transfer the Springfield Property to any name he wanted–including his own. *See* Tr. 349-351.   He could have deeded the Property to another corporation or to the Lillian Rosen Trusts if he so desired.  *See* Tr. 350. Only Cohen had that authority.   *See* Tr. 350-351.   Thus, the Court concludes Cohen had complete and total control over the Property.

Instead of transferring the deed to himself or to TI&M, Irving Cohen used Asset Protection Group to create another corporation to hold the Springfield Property.  *See* Joint Ex. 64-66.  Although William Reed was appointed by Cohen to serve as Windsor II's sole corporate officer, Reed had no actual control or influence over the corporation.  *See* Joint Ex. 65-66; Reed Dep. Tr. 13-14, 30-31, 82, 105-107.  Reed was just a figurehead who knew nothing about Cohen or Windsor II.  *See* Joint Stip. 94; Reed Dep. Tr. 85-86, 105-107.  The client always ran the daily operations of the corporations formed by Reed.  *See* Reed Dep. Tr. 30, 107.  As the trial exhibits showed, Cohen signed the leases, contracts, and checks.  *See* Joint

48

Ex. 68-69, 72, 76-77, 79.  Reed testified that he sold "privacy," explaining that the true owner's name was not on the public records filed with the State of Nevada.  *See* Reed Dep. Tr. 29-30.

The record shows that Irving Cohen was acting as the President of Windsor II.  *See* Joint Ex. 77-79.  He was listed on documents as the president.  *See* Joint Ex. 77, 79.  There does not appear to be any rational reason why Cohen did not simply list himself as Windsor II's corporate officer with the State of Nevada.  No explanation was presented at trial. The only reasonable conclusion for the Court to draw is that Cohen was trying to hide his interest in the Property.

William Reed eventually encountered legal problems and was no longer able to serve as President of Windsor II.  *See* Tr. 296.  Irving Cohen testified that everyone who has served as President of Windsor II has done so at his request.  *See* Tr. 317.  At his deposition and at trial, Cohen testified that he "begged and pleaded" with his friend, Kelly Neely, to take over as president on an interim basis.  *See* Gov't Trial Ex. 405 at 80-81; Tr. 298.  No explanation was presented as to why Cohen went to such

49

extraordinary lengths to find a president rather than simply listing himself as Windsor II's corporate officer. The only logical conclusion is that Cohen was trying to conceal his ownership interest in Windsor II.

The record establishes that Kelly Neely, like William Reed, was a figurehead president. She did not know what checks to write. Irving Cohen testified that he would tell Kelly Neely what checks to write and she would sign them. *See* Tr. 300-301. At her deposition, Kelly Neely testified that she did nothing as president and that Cohen told her he would take care of everything. *See* Kelly Neely Dep. Tr. 21.

Irving Cohen also testified that James Neely was listed as Vice President of Windsor II without his knowledge or consent. *See* Tr. 305-306. Because Cohen needed more than one name for the list of Windsor II's corporate officers on its application to transact business in the State of Illinois, Kelly Neely reluctantly allowed him to list her son as vice president. *See* Tr. 301-302. At his deposition, James Neely testified that he did not know he had ever been listed as Vice President of Windsor II and was never told that he was an officer of Windsor II and never signed any documents

50

to that effect. *See* James Neely Dep. Tr. 13-15. Cohen testified that he also listed Kelly Neely as Secretary on Windsor II's application to transact business in the State of Illinois, even though she was not the Secretary of Windsor II as of July of 2003. *See* Tr. 295-296. Accordingly, the record demonstrates that Cohen's obvious intent was to keep his name off of public records relating to the Property.

The Court further concludes the record shows that Irving Cohen used a similar pattern in setting up other corporations. Cohen used Asset Protection Group to set up American Equities Holding Corporation and Aeromet Supply, Inc. Cohen controlled a third corporation, Wainright Marketing and Management Systems, Inc. *See* Tr. 564-565, 568-569, 783-784, 816-817; Youngswick Dep. Tr. 4, 8; Windsor II Ex. 193, Gov't Ex. 154, 170-171, 177, 183-184. Randy Youngswick testified that although he was listed as the president, Cohen told him what to do and ran the company. *See* Youngswick Dep. Tr. 11-13, 16. Moreover, Robert Gold was not sure why he was selected as the corporate designee for Aeromet and American Equities, though it may have been because he was the last known

president of the entities.  Gold testified Cohen was the manager of the companies and asked him to serve as president.  *See* Tr. 968, 970-971.  As with Windsor II, Cohen set up Aeromet, American Equities and Wainright and made all the decisions after asking someone else to serve as president.

Based on the foregoing, the Court concludes there is ample evidence which shows that Irving Cohen placed the Springfield Property in Windsor II's name in order to evade his tax debt.

(4)

Another factor that courts examine is whether the conveyance was properly recorded.  The deeds to Windsor II from Windsor Income Properties in 2002 and from 3-B Stores in 2005 were recorded.  *See* Joint Ex. 3, 171.  Windsor II further notes that the original mortgage to Windsor I (to which Windsor II took its interest in the building and improvements on the Property subject to) was properly recorded in 1981.  *See* Joint Ex. 7. The United States alleges that, in examining this factor, the Court should not focus solely on the legal technicality of whether the transfer was recorded, but instead should consider the level of formality with which

Irving Cohen, Windsor I and Windsor II regarded the conveyance. Although the Trustee's Deed transferring the Springfield Property to Windsor II was dated June 21, 2002, the Court recognizes that it was not recorded by Windsor II until November 27, 2002, more than five months later. *See* Joint Ex. 31.

Of course, Windsor II maintains that the Windsor I mortgage has never been properly released and secures the renegotiated balance remaining on the underlying indebtedness, as agreed by Windsor II. The United States claims that Windsor II owned the entirety of the Property, contrary to the Defendants' assertion that Windsor I held legal title to Lots 11-18 of that Property and that Windsor II was operating on a ground lease with Windsor I. The Court concludes that the evidence does not support the Defendants' theory.

Assuming the parties were operating pursuant to a ground lease, the Court notes the evidence at trial showed that there was no formality surrounding any such lease. There was no evidence that Windsor I and Windsor II recorded a ground lease for Windsor II's use of Lots 11-18 of

the Property.  Irving Cohen initially testified that Windsor II assumed the ground lease from Windsor Income Properties, pursuant to the Settlement Deed in Lieu of Foreclosure.  *See* Tr. 461.  However, after being presented with the exhibit, Cohen later acknowledged that the ground lease between Windsor I and Windsor Income Properties had expired on September 30, 2001.  *See* Joint Ex. 21A at 83, 88; Tr. 749-750.  This was five months before Windsor II was created.  Cohen and Robert Gold both testified that the ground lease was never extended.  *See* Tr. 750-751, 1078-1079.  Cohen acknowledged that Windsor II was using the entirety of the Springfield Property without an effective ground lease in place.  *See* Tr. 751.

Based on the testimony of Irving Cohen and Robert Gold, the Court further concludes that Windsor II has never made any payments to Windsor I for its use of Lots 11-18.  *See* Tr. 462, 1079.  Despite this non-payment, Gold testified that Windsor I never sought to evict Windsor II or filed any legal action based on this failure to make payments.  *See* Tr. 1079-1080, 1401.

The assumption of mortgage or new terms about which Irving Cohen

54

testified was never reduced to writing or recorded with the Sangamon County Clerk. *See* Tr. 420, 1080-1081, 1085. The evidence presented at trial was consistent with the United States' theory that Windsor II acquired legal title to the entirety of the Property, subject to Windsor II's assumption of Windsor Income Properties obligation as mortgagor on Windsor I's Second Mortgage. No formal assumption of the mortgage was ever executed. *See* Tr. 1080-1081, 1085. Cohen's testimony was inconsistent on the issue. Although Cohen seemed confused at times, he testified both that Windsor II assumed the Windsor Income Properties mortgage held by Windsor I, and that he negotiated new terms for the mortgage. *Compare* Tr. 353-354, 1083-1084 *with* 409, 420, 466-467, 475-476, 1085. The record establishes that Windsor I and Windsor II never reduced to writing an assumption of mortgage or the renegotiated mortgage or filed either with the Sangamon County Clerk. *See* Tr. 420, 1080-1081, 1085. Moreover, Windsor II has not made any mortgage payments to Windsor I. *See* Tr. 468.

Based on the failure to record these purported interests in the

55

Property, the evidence demonstrated a lack of formality between Windsor I and Windsor II that was never explained by Irving Cohen or Windsor II at trial.

(5)

Another factor to consider is whether Irving Cohen retained possession of the Springfield Property.  The Property has always been occupied by tenants which paid fair rental value.  *See* Joint Ex. 4, 13, 69, 77, 79.  Windsor II asserts that because Cohen never retained possession of the Property and never used the Property for his own personal benefit, there can be no interference by Windsor II in Cohen's non-use of the Property.  Given the nature of the Property, however, this factor does not strongly support Windsor II or Cohen's argument.

Windsor II further alleges that when Windsor Income Properties managed the Property, it collected rents and paid rent to 3-B Stores and its predecessor, Tolly's Market, Inc., as well as debt service payments to Windsor I.  *See* Joint Ex. 5, 9.  Moreover, rental payments are now made to Windsor II by the current tenants of the Property and none have ever been

56

paid to Irving Cohen or distributed for his benefit.  *See* Joint Ex. 166, 116, 117, 124, 128, 136, 142, 143; Windsor II Ex. 33, 35, 43, 72-73.

Windsor II further claims that Counsel for the United States acknowledged that Irving Cohen did not receive funds directly from Windsor II.  *See* Tr. 549; Windsor II Ex. 197.  It contends that to the extent the United States focuses on Windsor II's purported owner, TI&M, and other corporations, there is no relevancy as to TI&M's funding of unrelated corporation activities.

Because the Property is commercial real estate, not tangible personal property, the Court concludes that the appropriate test when analyzing whether Irving Cohen enjoyed the benefits of the Property concerns the degree of control Cohen exercised.  The evidence established that Cohen exercised a significant amount of control over the Property.  *See* Tr. 97-98, 1448-1449.  Cohen signed the leases and remodeling agreements for the commercial space and hired Harry Stern as day-to-day manager of the Property.  *See* Joint Ex. 68, 71-72, 77, 79; Tr. 98-102, 104-108, 111-112.  Cohen also spoke to Joe O'Neill, President of Springfield Sign Company,

to ask him to expedite the making of a sign for Avenue Thrift.  *See* Joint Ex. 69; Tr. 104.

Irving Cohen testified that in 2003, he flew to Springfield to inspect the Property to determine what renovations would be necessary in order to get a new tenant.  *See* Tr. 104.  On a few occasions, Cohen flew from his home in Florida to Springfield to check on the Property and meet with prospective tenants and individuals regarding work that needed to be done on the Property.  *See* Tr. 98, 135-136, 566-567.  Thus, although he lived in Florida, Cohen exercised a significant degree of control over the Property.

The record further establishes that Irving Cohen negotiated the purchase of a parcel of land from 3-B Stores and signed the sale and mortgage documents relating to that transaction.  *See* Tr. 129-133, 539-540; Joint Ex. 166-167, 172-174; Gov't Demonstrative Ex. 3-7.  Cohen acknowledged that he made all of the major decisions pertaining to the Property.  *See* Tr. 140.  In connection with this case, there are no written documents concerning the Property that Cohen did not sign.  *See* Tr. 138-139.

58

Based on the foregoing, the Court concludes there is ample evidence in support of the United States' assertion that Irving Cohen retained possession over the Springfield Property.

(6)

Another factor to consider is whether Irving Cohen continues to enjoy the benefits of the Property. Because the Property is commercial real estate, the Court will consider whether Cohen has profited or may profit from his relationship to the Property.

The United States presented evidence which appeared to show that Irving Cohen profited to some extent from his relationship to the Property, based on commissions earned through Asset Protection Group. Cohen earned at least $2,550 in commissions for renewing Windsor II's corporate registration through Asset Protection Group. *See* Tr. 181-188, Gov't Ex. 18. Former IRS Revenue Officer Christine Footit testified that Cohen benefitted directly from his relationship with Windsor II's purported corporate parent, TI&M. She explained how between March 2003 and February 2008, $329,883.59 flowed from TI&M to Herman

59

Schwartzman's law firm, through various other companies associated with Cohen and ultimately to Cohen's company, Wainright. *See* Tr. 800-805; Gov't Demonstrative Exs. 45, 46.

Windsor II contends the United States failed to connect Wainright charges to any Windsor II business. There is no evidence that Windsor II ever paid anything to Wainright or paid any personal expense of Irving Cohen. Moreover, there is nothing to suggest the commingling of funds among Wainright, Cohen, and Windsor II. The fact that Wainright expended funds for business conducted on its own behalf which may have also benefitted Windsor II is not improper.

Since 2006, the Property has generated over $150,000 per year in rental income and has appreciated significantly since 2002. *See* Joint Ex. 100-110. If not for the federal tax liens encumbering the Property, Irving Cohen could sell the Property and retain proceeds from the sale.

Windsor II acknowledges that Irving Cohen had a close relationship and exerted influence over the Property. However, it claims he never enjoyed any benefits incident to ownership of the Property. Rather,

Cohen's actions resulted from his role as trustee of the Lillian Rosen Trusts, the effective shareholder of Windsor I and which, according to Windsor II, has a significant stake in the Property. Based on the evidence in the record and presented at trial, however, it is not clear that the Lillian Rosen Trusts are still in existence. For the reasons that follow later in this Opinion, the Court concludes that the Lillian Rosen Trusts have no interest in the Property.

Based on the foregoing, the Court concludes that Irving Cohen has profited from his relationship to the Property. Moreover, if he were permitted to sell the Property, it appears that Cohen would profit significantly.

(7)

Other considerations in the nominee analysis involve whether the taxpayer or putative nominee pays real estate taxes and other maintenance charges. *See United States v. Northern States Investments, Inc.*, 670 F. Supp.2d 778, 789 (N.D. Ill. 2009). In contending it is not Irving Cohen's nominee, Windsor II claims that Cohen has never paid its maintenance charges and

61

real estate taxes.  All expenses of Windsor II, including maintenance and real estate taxes, have been paid either from initial paid in capital from TI&M, loans to Windsor II from Windsor I, or from rental income of Windsor II obtained from Avenue Thrift Shop, Harbor Freight, Bank of Springfield, or Downtown Parking.  Cohen has never personally paid for any maintenance of the Property or taxes associated with the Property. *See* Joint Ex. 124-125, 129, 142, 143, 158; Windsor II Ex. 34, 43, 54, 65, 72-73, 78-79, 85, 88-89.

(8)

Applying all of the relevant factors, the Court concludes that Windsor II holds the Property as Irving Cohen's nominee.  Although all of the factors may not support that conclusion, most of the considerations point directly to it.  It is apparent that Windsor II held legal title to the Property in order to prevent the United States from collecting a portion of the amount Cohen owed in tax penalties.  Cohen went to significant lengths so as not to be associated with Windsor II in any official capacity.  However, regardless of who was listed as Windsor II's President or Vice President,

Cohen was in total control and called all the shots.

Based on the foregoing, it cannot be disputed that there was a close relationship between Irving Cohen and Windsor II.  Moreover, there is no question but that Cohen was aware of his tax debt to the United States at the time Windsor II was formed.  Cohen was familiar with how to use complex corporate structures to keep his name off of assets.  Even though Cohen had total authority when it came to the Property, it was Windsor II's name that was on the records.  These factors, in particular, support the Court's conclusion that Windsor II is Cohen's nominee.

Other factors are also probative.  The record does not show that Windsor II paid adequate consideration for the Property.  Based on the degree of control that Irving Cohen exerted over the Property, the Court concludes that for all practical purposes, he retained possession.  Cohen has enjoyed the benefits of the Property and would stand to profit significantly if it were sold.

For all of these reasons, the Court concludes that Windsor II holds the Property as Irving Cohen's nominee.

## B. Windsor II as Irving Cohen's Alter Ego

### (1)

Although related concepts, the "nominee" and "alter ego" doctrines are alternate, independent theories of liability. "The 'essence' of the alter ego doctrine is to 'do justice' whenever it appears that the protections provided by the corporate form are being abused." *LFC Marketing Group, Inc. v. Loomis*, 116 Nev. 896, 903 (Nev. 2000) (citation omitted). The alter ego theory focuses more on facts which suggest that the corporate form is being disregarded and that "piercing the corporate veil" may be appropriate–specifically "reverse piercing." *See id*. at 903-04. However, it is worth emphasizing that "the corporate cloak is not lightly thrown aside and the alter ego doctrine is an exception to the general rule recognizing corporate independence." *Id*. (internal quotation marks and citation omitted). Because Illinois law provides that efforts to pierce the corporate veil are governed by the law of the state of incorporation, *see Westmeyer v. Flynn*, 382 Ill. App.3d 952, 957 (2008), Nevada law applies to the alter ego analysis.

The following elements are used under Nevada law in establishing an alter ego relationship:

> (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice.

*Loomis*, 116 Nev. at 904 (citation omitted).  Although not conclusive, the following factors may indicate the existence of an alter ego relationship: "(1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities."  *Id*.  However, no litmus test is used to determine when the corporate fiction should be disregarded–the inquiry is based on the particular circumstances of the case. *See id*.

(2)

The Court concludes that although the evidence as to alter ego may not be quite as strong, much of the same evidence that supported the determination that Windsor II is Irving Cohen's nominee also supports the

65

conclusion that Windsor II is Cohen's alter ego.

As previously discussed, there is no question that Irving Cohen has exerted almost complete control over Windsor II. Although Windsor II claims the evidence showed that multiple parties participated in its management, Cohen admitted that he made all of the major decisions for Windsor II until 2008 and it never acted against his wishes. *See* Tr. 140. Moreover, Robert Gold testified that there was never any disharmony between Cohen and Windsor II and it never acted against Cohen's wishes. *See* Tr. 1372-1373. Cohen was not aware of any written agreements regarding the Property that he did not sign. *See* Tr. 139-140. Although others such as Harry Stern may have handled the day-to-day operations, *see* Tr. 111-112; Joint Stip. 48; the record establishes that Cohen made all of the major decisions and Windsor II moved as he directed.

The record also established that Windsor II did not follow most corporate formalities. Although the Court recognizes that is not an uncommon practice among closely held corporations, the evidence also showed that Windsor II did not always follow its own bylaws. Section 2 of

Article 6 of Windsor II's bylaws provides that no agreements involving the payment of monies or the credit of Windsor II (over $500) could be made without the authority of the board of directors.  Section 3 of Article 6 of Windsor II's bylaws required all agreements and contracts to be signed by the president and secretary of the corporation.  Robert Gold testified that these bylaws were often not followed.  *See* Tr. 1091-1094, 1278.  Windsor II notes that its Presidents, William Reed and Kelly Neely, did not want to be involved with operating the business.  However, that serves to only emphasize the degree of control that Irving Cohen exercised.

Although the record is somewhat murky, there is also some evidence that Windsor II was undercapitalized.  The United States notes that Windsor II received only one infusion of capital between February 2002 and the end of 2008.  On March 14, 2003, Windsor II received a single payment of $275,000 from its purported owner, TI&M.  *See* Joint Ex. 181; Gov't Ex. 212.  Robert Gold testified Windsor II did not have significant funds from rent or any other source, which is the primary reason it did not make any mortgage payments to Windsor I.  *See* Tr. 1085, 1403, 1429-

1430.  In addition to the $275,000, Windsor II states that TI&M has paid in excess of $500,000 to defend it and its Property interests in this action. *See* Windsor II Ex. 104; Joint Stip. 147-148; Joint Ex. 250.

Windsor II received additional funds in the form of loans from Windsor I.  Cohen testified approximately $450,000 that was transferred from Windsor I to Windsor II were loans and not capital.  *See* Tr. 477-482, Gov't Ex. 212.  The loans were not recorded against the Property with the Sangamon County Clerk and were not secured by a promissory note or otherwise reduced to writing.  *See* Tr. 419-420, 482-483, 1402-1403. According to Windsor II, the loans from Windsor I served to protect the Lillian Rosen Trusts' investment in the mortgage secured by the Property. It further asserts that the capitalization from TI&M and new loans from Windsor I have enabled Windsor II to obtain new tenants for the Property, collect rents and pay all its costs of operations, file income tax returns, and pay its income tax.  *See* Joint Ex. 68, 77, 79, 18.

(3)

There is evidence in the record that Irving Cohen diverted funds from

68

Windsor II without authorization.  The United States points out that there are no written corporate resolutions authorizing Cohen to take any action on behalf of Windsor II.  As previously noted, figurehead presidents such as William Reed and Kelly Neely never authorized Cohen to act on Windsor II's behalf.  Reed testified at his deposition that he was not familiar with Cohen or his corporations.  *See* Reed Dep. Tr. 62.

At his deposition, Irving Cohen also testified that TI&M never authorized him to represent it in any way.  *See* Gov't Ex. 405, at 188. However, Windsor II and Cohen claim that he was authorized.  Moreover, William Reed and Kelly Neely testified that they did not want to be involved in the daily operations of Windsor II.  *See* Kelly Neely Dep. Tr. 21-25; Reed Dep. Tr. 32-33, 90-91.  While true, that is just further evidence that Cohen was in total control.  It was Cohen who picked Windsor II's Presidents.

The United States established that Irving Cohen received fees from Asset Protection Group for renewing Windsor II and American Equities as Nevada Corporations.  *See* Gov't Ex. 20.  Cohen filled out pre-signed

69

checks, which were drawn on Windsor II's bank account, to Asset Protection Group for "renewals." *See* Gov't Ex. 357, at 45. Cohen sent the checks to Asset Protection Group to renew Windsor II's corporate status for 2003 through 2006. *See* Tr. 181-188; Gov't Ex. 357, 18. Asset Protection Group would then send Cohen a check for his cut of the corporate renewal fees. *See* Gov't Ex. 357. From 2003 through 2006, Cohen received over $2,500 in fees by this method. *See* Tr. 181-188; Gov't Ex. 357, at 8,9, 21, 23, 44, 45, 54, 55; 18. Thus, Cohen would send Windsor II's money to Asset Protection Group. Asset Protection Group would then send a portion of the money back to Cohen. Windsor II contends any suggestion that this constitutes the diversion of assets is absurd. Rather, Cohen paid $9,800 to become a consultant for Asset Protection Group. *See* Gov't Trial Ex. 405, at 76, Tr. 780. Consultants would receive a commission based on the business they generated. *See* Tr. 780. The Court recognizes that the fees Cohen received are insignificant when compared to his initial investment.

The United States also presented evidence that Irving Cohen diverted significant funds to himself by using several entities. Former IRS Agent

Christine Footit's testimony was probative in that regard. Footit testified that by analyzing bank records, she was able to trace the flow of money from TI&M to Herman Schwartzman's law firm to American Equities to Aeromet to R&Y Industries to Wainright. *See* Tr. 799-805, Gov't Summary Ex. 44, Gov't Ex. 45, 46. Footit identified fourteen transactions which involved money being transferred through American Equities and Aeromet to be deposited with Wainright. *See* Tr. 803.

There was also testimony from Herman Schwartzman and Irving Cohen that TI&M wired money to the Schwartzman firm's escrow account. *See* Tr. 1124-1127, 1129-1131, 484-490, 543-544, Gov't Ex. 212. Christine Footit testified that between 2002 and 2008, TI&M transferred $1,709,811 to the Schwartzman firm. *See* Tr. 841-842. Schwartzman testified that a sum much less than the aggregate amount went to Windsor II–specifically $275,000. *See* Tr. 1128, Gov't Ex. 212. The balance was either wired to American Equities' Bank of Nevada Account or transferred to American Equities' trust account with the Schwartzman firm. *See* Tr. 990, 1128-1129.

3:08-cv-03282-RM-BGC   # 238   Page 72 of 103

There was testimony from Robert Gold and Herman Schwartzman which confirmed that Irving Cohen was the manager of American Equities and Aeromet. *See* Tr. 971-972, 978-979, 982, 1131. Gold signed checks for Cohen to issue from American Equities' and Aeromet's bank accounts. *See* Tr. 978-979, 982, 1043-1045. For the most part, Cohen asserted his Fifth Amendment privilege when questioned about American Equities and Aeromet. However, he admitted that the writing on some of the checks was his. *See* Tr. 196, 213, 216, 220-224.

The United States presented excerpts from the videotaped deposition of Randy Youngswick, who testified that Wainright was "basically" Irving Cohen's company. Cohen would tell Youngswick what to do and Youngswick did as he was instructed. *See* Youngswick Dep. Tr. 16-17. Youngswick set up Wainright as a favor to his stepfather, Leonard Tarr, and Cohen. *See* Youngswick Dep. Tr. 8. Although listed as President, Youngswick had no official duties at Wainright; he did not receive compensation and did not maintain an office. *See* Youngswick Dep. Tr. 11-12.

72

Randy Youngswick also testified regarding Wainright's dealings with Aeromet. Specifically, at Irving Cohen's direction, Youngswick prepared invoices from his company, R&Y Industries, to Aeromet. *See* Youngswick Dep. Tr. 19-20, Gov't Ex. 207, 236-240. However, Youngswick testified that R&Y never provided any services to Aeromet. Cohen told Youngswick what to write on the invoices, and Cohen determined how much to charge. *See* Youngswick Dep. Tr. 19-20, Gov't Ex. 207, 236-240.

Randy Youngswick further testified that when he received payments from Aeromet on the invoices he prepared, he would then deposit the payments into R&Y's bank account. *See* Youngswick Dep. Tr. 22. Youngswick would then transfer a percentage of the money paid to R&Y into Wainright's bank account. *See* Youngswick Dep. Tr. 23, 33. As determined by Cohen, the arrangement between Cohen and Wainright as to the money paid by Aeromet was that R&Y kept ten percent and the balance went to Wainright. *See* Youngswick Dep. Tr. 23, 35.

Irving Cohen testified that Windsor II never paid any of his personal expenses and he denied ever making any unauthorized payments from

73

Windsor II accounts.  *See* Tr. 542-543.  However, the United States presented evidence that Irving Cohen used Wainright as a nominee entity in order to pay his personal living expenses.   Cohen, who was the only employee at Wainright, set his own salary.  *See* Youngswick Dep. Tr. 15, 31-32, 35.  Wainright paid for Cohen's car and his apartment, which Youngswick testified Cohen used as his office.  It was Cohen who decided, on behalf of Wainright, that he could use his apartment as an office.  *See* Youngswick Dep. Tr. 31-32.  Cohen testified that he used his Wainright American Express card for personal expenses, such as to pay for cigars, Miami Dolphin tickets, Florida Marlins tickets, Florida Panthers tickets and trips to Disney World.  *See* Tr. 564-566.  Cohen also used his Wainright American Express card to pay for trips to Springfield, Illinois to conduct Windsor II business, which Cohen stated was in addition to other business. *See* Tr. 566-572.  However, Youngswick testified he was not aware of any business reason for Cohen to travel to Springfield.  *See* Youngswick Dep. Tr. 26-27.  In 2002, Cohen also used his Wainright credit card to pay for his hotel room at the Rio in Las Vegas while attending an Asset Protection

Group seminar and conducting Windsor II business.  *See* Youngswick Dep.
Tr. 25-26, Joint Trial Ex. 64, Gov't Trial Ex. 177.  Youngswick was unaware
of any business reason Cohen would have traveled to Las Vegas on behalf
of Wainright.  *See* Youngswick Dep. Tr. 25-26.

The United States also presented evidence regarding payments from
American Equities to Halco Properties, which was owned by Irving Cohen's
son, Hal Cohen.  *See* Tr. 576-578, 580.  When preparing Robert Gold for
his Rule 30(b)(6) deposition, Irving Cohen told him that substantial
payments made by American Equities were for Jeff Little, and did not tell
Gold that the payments were actually for his son's company, Halco
Properties.  *Compare* Tr. 576-578 *with* 991-993 and 1026-1028.  Irving
Cohen hired Halco to investigate "business opportunities" for American
Equities.  *See* Tr. 578.  Between 2004 and 2008, although $820,000 was
spent for these purposes, Halco did not find any business opportunities for
American Equities.  *See* Tr. 579-580, 993, 1002-1003; *see also* Little Dep.
Tr. 64.

Based on the foregoing, the Court concludes that the United States

established that Irving Cohen diverted funds from Windsor II without authorization. The funds went from Windsor II's purported owner, TI&M, through a host of other entities, including Aeromet, and ultimately to Wainright, which was controlled by Cohen. The record establishes that Cohen used these entities to divert money to his family and friends. Jeff Little retained more than half of the consulting fees diverted to Halco Properties. *See* Little Dep. Tr. 151-152. Moreover, Hal Cohen drew a salary from Halco. *See* Little Dep. Tr. 67, 152. Irving Cohen also used American Equities funds to pay Robert Gold $40,000 to research acquisition targets. *See* Tr. 1028-1030. Accordingly, the Court concludes that substantial evidence was presented establishing that Cohen diverted funds through a number of entities in order to enrich himself or others.

(4)

Another factor to consider in the alter ego analysis is whether Irving Cohen treated Windsor II's assets as his own. Windsor II points to Cohen's testimony that he had no contact or involvement with the Property for approximately twenty years when it was operated by Windsor Income

76

Properties.  *See* Tr. 339-340.  However, in discussing whether Windsor II is Cohen's nominee, the Court observed that in the last decade which coincides with Windsor II's existence, Cohen has exercised total control over the Property.  Because Windsor II's only significant asset was the Springfield Property, there is no question that Cohen treated Windsor II's assets as his own.

Another factor is whether there was any commingling of funds between Irving Cohen and Windsor II.  "Commingling" is defined as "a mixing together; esp., a fiduciary's mixing of personal funds with those of a beneficiary or client."  Black's Law Dict., 264 (7th Ed. 1999).  This factor is not particularly probative, perhaps because Cohen testified he has not had significant assets in recent years.  *See* Tr. 581-582.  Windsor II claims Cohen never contributed any of his personal funds to it and never received any funds from Windsor II.  Moreover, Cohen has always negotiated in Windsor II's name and its bank accounts were placed in Windsor II's name.

However, there was evidence that Cohen used Wainright funds to visit the Springfield Property for Windsor II business on four occasions

77

between 2003 and 2008. *See* Tr. 566-572; Gov't Ex. 178, 180-182, 202. Although the amounts expended were relatively insignificant, the Court concludes that it is consistent with commingling. As the Court earlier noted, Randy Youngswick testified he was not aware of any business reason on behalf of Wainright for Cohen to travel to Springfield. *See* Youngswick Dep. Tr. 26-27. Therefore, Cohen's testimony that he visited Springfield to conduct the business of Wainright or some other entity was not credible. *See* Tr. 566-570.

(5)

The final part of the inquiry in the alter ego analysis involves whether "adherence to the corporate entity would sanction a fraud or promote injustice." *See Loomis*, 116 Nev. at 905. Upon reviewing the evidence, the Court concludes that permitting Irving Cohen to use Windsor II's corporate form to evade his tax debt is unjust and would sanction a fraud and promote injustice.

Irving Cohen has owed the Government millions of dollars in tax-related penalties which date to the early 1980s. *See* Gov't Ex. 1-2. The

78

judgment obtained by the Government in 1999 has not been satisfied.  *See* Joint Ex. 1-2; Gov't Ex. 2.  As of June 28, 2011, Cohen owed $4,324,306.38 in penalties to the Government.  *See* Joint Stip. 5-6; Joint Ex. 1-2.  The Court recognizes the mere fact that an individual owes the Government money is not enough to satisfy this prong.  It requires "something less than an affirmative showing of fraud," but "something more than the mere prospect of an unsatisfied judgment."  *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 756 (7th Cir. 2012) (citation omitted).  Thus, the fact that a judgment remains unsatisfied is not sufficient to establish that Cohen's activities sanction fraud and promote injustice.

The evidence presented by the United States did more than establish that it was seeking to collect on an unsatisfied judgment from more than a decade ago.  The record shows that Irving Cohen has for years used a number of corporate entities to evade payment of his tax liabilities.  Cohen exerted total control over Windsor II, regardless of who was listed as President or Vice-President.  Accordingly, Cohen had total control over the

Property.  Based on a number of factors which show that Windsor II is Cohen's alter ego, the Court concludes that it would sanction fraud and promote injustice to allow Cohen to use Windsor II's corporate form to avoid paying his outstanding tax liability.

### C. Windsor II's Assertion of Irving Cohen's Role as Trustee

At trial, Windsor II and Irving Cohen alleged that Cohen exerted control over Windsor II based on his duties as trustee of the Lillian Rosen Trusts.  The Lillian Rosen Trusts, which consist of separate trust agreements for the benefit of Irving Cohen's children, were created and funded by Cohen's mother in 1983.  *See* Tr. 665-667, 531-532; Windsor II Ex. 111.

Windsor II asserts that Irving Cohen is the Acting President/Director of Windsor I, a mortgagee on the Property, which is effectively owned by the Lillian Rosen Trusts.  It claims that in 1983, the Lillian Rosen Trusts purchased Windsor Holding Corp., Windsor I and other corporations from the Cohen No. 2 Trusts.  *See* Windsor II Ex. 112; Tr. 1162-1164.  The Cohen No. 2 Trusts had previously been established by Irving Cohen for

the benefit of his children and were funded $3,000 from Cohen.  *See* Windsor II Ex. 113, Tr. 592-594.

The record evidence concerning Irving Cohen's role as trustee of the Lillian Rosen Trusts is somewhat murky.  Cohen testified that he stepped down as trustee in 1989 due to health reasons, though he said he became trustee again in 2001 or 2002.  *See* Tr. 532, 754-755.  However, Cohen acknowledged that he does not have any documents which show that he was ever formally reappointed as trustee.  *See* Tr. 754-755, 759.  Windsor II's expert, Herman Schwartzman, was not aware that Cohen had stepped down as trustee of the Lillian Rosen Trusts and never saw any paperwork which served to re-appoint Cohen as trustee.  *See* Tr. 1145-1146.

The Court further notes that when Irving Cohen was asked during discovery about his role in forming the Lillian Rosen Trusts, he used the past tense to describe his role: "I played no role in the creation of the Lillian Rosen Trusts.  I did serve as trustee of the trusts."  *See* Joint Ex. 196, at 2.  At the time of his deposition in May 2010, Cohen stated he did not know if the Lillian Rosen Trusts still existed.  *See* Tr. 537; Gov't Trial Ex. 405,

at 141-142, 219.

Based on the foregoing and notwithstanding whether Windsor I holds a valid mortgage against the Springfield Property, the Court concludes that the Lillian Rosen Trusts have no interest in the Property.

### D. Windsor I's Purported Mortgage on the Property

(1)

"A mortgage is any conveyance of an estate to secure a debt or the performance of some act, such as, the payment of money, or the furnishing of indemnity, subject to be defeated by the performance of the act agreed to be done." *Town & Country Bank of Quincy v. E. & D. Bancshares, Inc.*, 172 Ill. App.3d 1066, 1073 (4th Dist. 1988) (internal quotation marks and citation omitted).  Recording a mortgage perfects the lien.  *See Federal National Mortgage Ass'n v. Kuipers*, 314 Ill. App.3d 631, 634 (2d Dist. 2000).

Windsor II alleges that Windsor I holds a mortgage on the Property dating to 1981 which has never been released.  *See* Joint Stip. 133; Joint Ex. 7; Gov't Ex. 405, at 18-19; Tr. 540.  Since it was formed, Windsor II has always recognized the existence of an outstanding mortgage to Windsor I

82

on its income tax returns.  *See* Joint Ex. 100-110.

As the United States asserts, however, Windsor II has never made a mortgage payment to Windsor I.  Moreover, neither Windsor I nor Windsor II recorded an assumption of mortgage or a new mortgage against the Property since 2002.  Significantly, the evidence established that Irving Cohen released the only mortgage that Windsor I ever recorded against the Property.  *See* Tr. 539-542; Joint Ex. 174; Gov't Demonstrative Ex. 3.  The Court concludes the Defendants' assertion that Cohen was mistaken in executing the release is self-serving and not persuasive.

One of the documents signed by Irving Cohen on May 3, 2005, in connection with a real estate purchase agreement between Windsor II and 3-B Stores was a "Release of Second Mortgage and Assignment of Rents," which provides in relevant part:

> Know all men by these presents, that THE WINDSOR ORGANIZATION, INC. a corporation organized and doing business under the laws of the State of Nevada, of the County of Sangamon and State of Illinois, does hereby certify that a certain Mortgage and Assignment of Rents bearing date the 10th day of December, A.D. 1981, made and executed by AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, AS TRUSTEE UNDER TRUST AGREEMENT

83

> DATED AUGUST 20, 1981 AND KNOWN AS TRUST NO.
> 53586, and recorded in the Recorder's Office of Sangamon
> County, Illinois, as Document No. 890224, is hereby released,
> relative to the following described property

*See* Joint Ex. 174.

Cohen testified that he mistakenly signed the Release as Windsor II's representative, as part of the purchase of Lots 1 through 10 from 3-B Stores. *See* Tr. 540-541. Moreover, Cohen testified that he did not realize he had executed a release of the Windsor I mortgage, but rather thought he was signing a subornation agreement subordinating the Windsor I mortgage to the new mortgage given to 3-B Stores, which Cohen said was negotiated in the parties' Real Estate Agreement. *See* Tr. 540. Windsor II alleges that as Cohen testified at his deposition, the Real Estate Sale Agreement related to Windsor II's purchase of Lots 1 through 10 in May 2005 and expresses the intention of the parties that the first mortgage (Windsor I's 1981 Second Mortgage being first priority at the time of the transaction after National's Release of its 1981 Mortgage in 1995) recorded against the Property was to be subordinated to 3-B Stores' mortgage to be placed against the Property in 2005. *See* Gov't Ex. 405, at 20.

Irving Cohen's testimony regarding the Release throughout these proceedings has been somewhat confusing. At trial, Cohen testified he believed he was signing a subordination agreement. *See* Tr. 539-540. When questioned whether the word "subordination" appears anywhere in the Release, Cohen claimed he found out during his deposition that it did not and he did not read the document prior to signing it. *See* Tr. 540-541. At his deposition in 2010, Cohen claimed that he did not remember signing the Release, and did not then claim he signed it by mistake. *See* Gov't Ex. 405, at 173-174, 229.

In an Opinion and Order dated February 27, 2012, the Court noted that Illinois law governs the meaning of the Release. *See* Doc. No. 213, at 14. Illinois interprets documents under the "four corners" rule, whereby an ambiguity exists only if the language contained in the document is subject to more than one interpretation. *See River's Edge Homeowners' Ass'n v. City of Naperville*, 353 Ill. App.3d 874, 878 (2d Dist. 2004). As quoted above, the language of the Release is unambiguous. *See* Joint Ex. 214, Gov't Demonstrative Ex. 3. The Release identifies the Second Mortgage and

85

Assignment of Rents by name, date and document number recorded with the Sangamon County Clerk.  *See id*.

The Defendants invoked the "mistake" exception to the parol evidence rule.  When a party alleges that an unambiguous written instrument does not express the parties' intent due to mistake, the party may show by clear and convincing evidence that the written instrument does not express the actual agreement.  *See Brady v. Prairie Material Sales, Inc.*, 190 Ill. App.3d 571, 578 (2d Dist. 1989).  The Court concludes that Windsor II and Irving Cohen have not established mutual mistake or that Cohen was mistaken in executing the Release.

Windsor II alleges its Real Estate Sale Agreement with 3-B Stores relates to Windsor II's purchase of Lots 1 through 10 in May 2005 and clearly expresses the parties' intention that the first mortgage recorded against the Property was to be subordinated to 3-B Stores' mortgage to be placed against the Property in 2005.  *See* Joint Ex. 166; Gov't Ex. 405, at 20.  The Real Estate Sale Agreement contains language which refers to an existing mortgage.  *See* Joint Ex. 166, at 11.  However, Section 3.7 of the

Mortgage and Security Agreement states in part that, "any current mortgage on the property may remain provided it is subordinated to the lien of this mortgage." *See* Joint Ex. 166, at 36.

The Court concludes that the unambiguous Release establishes the parties did not intend to subordinate the 1981 Windsor I mortgage. Rather, the parties agreed to release Windsor I's mortgage on the Property. Significantly, there was no testimony or evidence from 3-B Stores which supported Windsor II's and Cohen's assertion that the Release was based on a mutual mistake and not supposed to be executed as part of the deal. The Defendants did not call Attorney Paul Presney, Sr., who Cohen hired to represent Windsor II in the 3-B Stores deal, *see* Tr. 122-123., to testify that he mistakenly drafted the Release instead of a subordination agreement. Cohen testified that he was the only person from Windsor II with whom Mr. Presney, Sr. worked on that deal. *See id*. Therefore, no one else could have instructed Mr. Presney, Sr. to draft a release of the second mortgage. Cohen further testified that he did not file any type of complaint against Mr. Presney, Sr. regarding his work on the 3-B Stores deal. *See* Tr.

539.   The Court concludes that Cohen's inconsistent and self-serving testimony was not enough to establish that Release was anything other than what it appears to be.

Based on the foregoing, the Court concludes that Windsor I does not hold a valid mortgage against the Springfield Property.

(2)

The Court further concludes that, even if Windsor II and Irving Cohen could establish that Cohen mistakenly released Windsor I's mortgage, the Internal Revenue Service's liens and judgments are superior to any claim Cohen or Windsor II has on the Property.

The priority of federal tax liens is governed by federal law, not state law. *See J.D. Court, Inc. v. United States*, 712 F.2f 258, 261 (7th Cir. 1983). "Federal tax liens do not automatically have priority over all liens. *United States v. McDermott*, 507 U.S. 447, 449 (1993). "Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that the first in time is the first in right." *Id*. (internal quotation marks and citations omitted).

88

The United States filed its tax liens against the Springfield Property on May 23, 2008.  *See* Joint Ex. 3.  The only recorded encumbrance against the Property was the mortgage held by 3-B Stores.  Based on the "first in time" doctrine, the federal tax liens have priority over any state law liens that subsequently attach to the Property.  When the Release of Second Mortgage was executed by Irving Cohen on May 3, 2005, in considering the priority of liens, Windsor I moved behind any other entity that had properly recorded its security interest.  *See* Joint Ex. 174.  Therefore, the Court concludes that even if Cohen mistakenly released Windsor I's mortgage, the IRS's liens and judgments are superior to any claim Cohen or Windsor I has on the Springfield Property.

The Court further concludes that the same result would be required pursuant to Illinois state law.  All deeds and mortgages take effect and are in force as to all creditors and subsequent purchasers, without notice, from and after the time of recording the document.  *See* 765 ILCS 5/30.  Windsor II's expert, Paul Presney, Jr., explained:

> Q.  And what is - - just for the record, what does a [race-notice] jurisdiction mean?

89

A. [Race-notice] is the party who gets the document to the Recorder's Office first has priority subject to the actual knowledge of the individual of the obligation. So if you and I know that there is a junior lien or you have a junior lien and you beat me to the - - to the - - to the Recorder's Office, but intend or know that you're suppose to be second, you're second regardless of what time you record. In relation to my priority.

*See* Tr. 1541. Mr. Presney, Jr. further explained that a third party with no knowledge of the facts would be authorized to rely on the public record, as recorded with the Sangamon County Recorder. *See* Tr. 1564-1567. Thus, third parties, such as the United States, that had no actual knowledge of any non-recorded agreements among Windsor I, Windsor II, TI&M, and 3-B Stores are entitled to rely on the public record. *See* Tr. 1540-1541, 1564-1568. When asked whether the United States would have had actual knowledge outside of the land records, Presney, Jr. stated that he did not know. However, he assumed the United States would have conducted some investigation. *See* Tr. 1567.

"[A]n organization shall be deemed for purposes of a particular transaction to have actual notice or knowledge of any fact from the time such fact is brought to the attention of the individual conducting such

90

transaction, and in any event from the time such fact would have been brought to such individual's attention if the organization had exercised due diligence."  26 U.S.C. § 6323(i)(1).  The Court has no basis to conclude that the United States was aware of any non-recorded agreements or arrangements involving Windsor I, Windsor II and other entities at the time the IRS recorded the liens and abstract of judgment.  There was testimony from former IRS revenue officer Christine Footit that when the IRS investigated Irving Cohen's ownership of the Springfield Property, it obtained a copy of the public record that was recorded with Sangamon County.  *See* Tr. 785-788.  Significantly, none of the public records involving the Springfield Property differentiate between "Windsor I" and "Windsor II."   All of the documents simply name "The Windsor Organization, Inc." *See, e.g.*, Joint Ex. 6-18.  Ms. Footit testified that, when the IRS recorded the liens and abstract of judgment against the Springfield Property, she did not know that Windsor I and Windsor II were, in fact, separate entities.  *See* Tr. 785-788.

The Court recognizes that the State of Nevada allows a later formed

corporation to use the name of a defaulted organization. *See* Nev. Rev. Stat. § 78.185(1). Moreover, a defaulted corporation may revive its charter and maintain a separate existence under a new name from the later incorporated corporation. *See id.* The decision to file a tax lien against Windsor II was a joint decision made by Christine Footit and counsel. *See* Tr. 791. Because counsel was involved, Windsor II alleges that if the IRS had exercised due diligence, it would have been on notice that Windsor I and Windsor II were separate entities. A diligent search of public records of the Nevada Secretary of State reveals the fact that the two are separate and distinct corporations. *See* Joint Ex. 54; Windsor II Ex. 106; Joint Stip. 13, 43.

The Court recognizes that a particularly thorough review of public records could have revealed that there were two separate organizations with the same name that were both incorporated in Nevada twenty-one years apart. However, the Court is unable to conclude that agents of the United States did not exercise due diligence in failing to discover that there were two separate Windsor Organizations. It is worth noting that Paul Presney,

Jr., one of Windsor II's expert witnesses whose title company did a title commitment for the 3-B Stores transaction, was not aware that there was a Windsor I and Windsor II until this litigation commenced. *See* Tr. 1570-1573.

Based on the foregoing, the Court concludes that the same result would occur under federal law or Illinois state law. Even if Windsor I's mortgage against the Property were reinstated based on a finding of mistake, the IRS's liens and abstract of judgment would take priority over the reinstated mortgage.

E. Title to Lots 11 through 18

Prior to trial, the Parties stipulated that Windsor II obtained title to the building and improvements located upon the Springfield Property by a Trustee's Deed dated January 21, 2002. *See* Joint Stip. 142-145. Windsor II holds legal title to Lots 1-10 of the Property, having purchased Lots 1-10 on May 3, 2005 from Defendant 3-B Stores, Inc., successor in interest to Tolly's Market, Inc. *See* Joint Stip. 146. Windsor II claims that Windsor I holds fee simple title to Lots 11 through 18. The United States

alleges that Windsor II owns the entirety of the Springfield Property.

Windsor II claims that in 1981 Stanley Levine and Irving Cohen, on behalf of Windsor I, negotiated a sale and leaseback agreement with National Super Markets, Inc. and its parent, National Tea Co. (collectively, "National"), for the purchase of National's interest in the buildings and improvements, title to Lots 11 through 18, and a leasehold interest in Lots 1 through 10.  *See* Joint Stip. 22-24, 127-131; Tr. 456; Joint Ex. 6-10; Pl. Ex. 405, at 24-25.  Windsor I paid $2.3 million with a $1 million down payment and issuance of a $1.3 million mortgage for the purchase.  *See* Joint Stip. 127; Joint Ex. 6; Tr. 330, 525-528.  The National mortgage was paid in 1984 and formally released in 1995, at the time of National's assignment of its lease to Schnuck Markets, Inc.  *See* Tr. 331; Joint Ex. 18, 19.

In December 1981, Windsor I conveyed its interest in the buildings and improvements located on the Property and its leasehold interest in Lots 1-10 to Windsor Income Properties.  *See* Joint Stip. 132.  Windsor II emphasizes that Windsor I did not convey its fee simple interest in Lots 11

94

through 18. *See* Joint Ex. 21, at 31 ("The seller is retaining ownership of the Fee Parcel which, encumbered by the first mortgage in favor of the Tenant, the Seller will lease to the Trustee under the Ground Lease"). Windsor II rejects any assertion by the United States that Windsor I impliedly conveyed its interest in Lots 11 through 18. The United States acknowledges that there is no signed deed or executed agreement between Windsor I and Windsor II (or TI&M), wherein Windsor I transferred Lots 11-18 to Windsor II.

Upon considering the evidence, the Court concludes that although there is no recorded transfer, Windsor I transferred legal title to the Springfield Property to Windsor II after the deed-in-lieu of foreclosure. Irving Cohen and Robert Gold testified that Windsor I did not renew Windsor Income Properties' ground lease when it expired in 2001, and both acknowledged that no written ground lease had ever been executed between Windsor I and Windsor II. *See* Tr. 749-751, 1078-1079. Windsor II has never made any payments to Windsor I on the purported ground lease and Windsor I has never moved to evict Windsor II based on the non-

payment of rent.  *See* Tr. 462, 1079, 1401-1402.  This supports the conclusion that Windsor II owns the entirety of the Property, and is not a lessee of Lots 11-18 from Windsor I.

The Court further notes that on two separate occasions, Paul Presney, Jr.'s title company issued title commitments which provided that Windsor II holds fee simple title to the entirety of the Property.  *See* Joint Ex. 166, at 76-78; Gov't Ex. 145, at 4.  In his expert report, although he opines that the Release of Second Mortgage was issued in error, Presney, Jr. states that Windsor I and Windsor II "apparently intended" to transfer legal title to Lots 11-18 from Windsor I to Windsor II.  *See* Doc. No. 162-1, at 3-4; Tr. 1582-1584.

At his deposition, Irving Cohen appeared to suggest that Windsor II was the owner of the entirety of the Property:

> Q.  Well, I'm not asking you about the document.  I'm just asking you, on the date that this was executed, who you thought owned the property?
> A.  I would say the owner of the property in February of 2002 was Windsor II.  The lender and the mortgagee would be Windsor I.

*See* Gov't Ex. 405, at 153.

Cohen further testified:

> Q.  Okay.  All right.  So, is it your position, then, that Windsor
> II became the - - the - - title owner of the property, then, when
> the Deed had been transferred from Windsor Income Properties
> to Windsor I, and then - -
> A.  Well, then it never made it to Windsor I.
> Q.  Okay.
> A.  It went directly to Windsor II.
> Q.  It went directly to Windsor II?
> A.  That is my testimony.

*See* Gov't Ex. 405, at 65-66.  Although Cohen testified that the United

States never defined the term "Property" in its interrogatories or

depositions, Cohen did not in responding to discovery requests or

depositions offer any clarification or suggest that different entities owned

portions of the Property.  *See* Tr. 457-460.

Based on the foregoing, there is substantial evidence that Windsor II

holds title to all of the Springfield Property, including Lots 11-18.  The

evidence showed that Irving Cohen, on behalf of Windsor II, exerted

complete control over the Property, without regard for any purported

interest held by Windsor I.  Even if Windsor I continues to have an interest

in a portion of the Property in spite of the lack of evidence in support

97

thereof, Windsor II has enjoyed rights which are tantamount to total ownership–the right to use the entirety of the Springfield Property in perpetuity without payment to the title holder. Such a leasehold interest is "equivalent for all practical purposes to absolute ownership." *See Pierce v. Pierce*, 351 Ill. App. 336, 343 (1st Dist. 1953). Accordingly, the Court concludes that Windsor II holds title to all of the Property, including Lots 11-18.

## F. Windsor I's Transfer of Title to Third Party

While awaiting the decision in this case, the United States filed a Motion for an Expedited Hearing on Windsor I's Transfer of Title to a Third Party without Leave of Court. *See* Doc. No. 234. The Motion provides that on September 28, 2012, Windsor I quitclaimed any interest in the Springfield Property to Irving Cohen, as purported Trustee of the Lillian Rosen Trusts, and Cohen then quitclaimed the Property to a newly-formed Delaware corporation, Olympic Associates, LLC. Olympic Associates was formed three weeks before the transfer. The quitclaim deed lists Cohen as the "manager" of Olympic Associates.

98

As directed, Irving Cohen filed a Response to the motion.  *See* Doc. No. 237.  Windsor II also filed a Response.  *See* Doc. No. 236.  Cohen claimed that his actions were taken in order to simply the ownership of the Property, based on Windsor I's status as an inactive corporation, the assets of which belong to the Lillian Rosen Trusts.  Cohen further stated he took these actions as the Trustee of the Lillian Rosen Trusts and did not believe he was doing anything inappropriate.  Moreover, he does not believe that the Court's authority to adjudicate this matter has been compromised in any way.

Having determined Windsor I no longer has any interest in the Property, the Court concludes that Windsor I's abandonment of its purported interest does not affect the Court's ability to adjudicate this matter.  Obviously, a quitclaim deed can transfer only the title which then exists in the grantor.  *See* 765 ILCS 5/10.  Because Windsor I no longer has any interest in the Property, the quitclaim deeds have no legal effect.

## IV. CONCLUSION

Upon considering the testimony and exhibits offered at trial and the

joint stipulations of fact, in addition to the Parties' post-trial arguments, the Court concludes that Windsor II holds title to the Springfield Property as Irving Cohen's nominee and alter ego. Accordingly, the Court finds that the federal tax liens and judgment attach to the Property.

The Court further finds that the interest of 3-B Stores, Inc. arising from its Note and Mortgage is prior to, and superior to, the United States' liens against the Property arising by virtue of the April 30, 1999 judgment and the tax liens recorded on May 23, 2008.

The IRS assessed I.R.C. § 6700 penalties against Irving Cohen on June 23, 1986, in the amount of $3,387,000. The assessment of penalties against Cohen creates a "lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." *See* I.R.C. § 6321. The lien against Cohen's property arose "at the time the assessment [was] made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." *See* I.R.C. § 6322.

100

On April 30, 1999, the United States obtained a judgment from the United States District Court for the Southern District of Florida against Irving Cohen for I.R.C. § 6700 penalties totaling $2,921,508, plus interest accruing from June 23, 1986, the date of the assessment.  On November 11, 2008, the United States filed an Abstract of the April 30, 1999, Judgment with the Clerk of Sangamon County against Irving Cohen.

The IRS also filed notices of federal tax lien for I.R.C. § 6700 penalties for the years 1982 and 1983 with the Register of Deeds for Sangamon County, Illinois, against Irving Cohen (as document number 2008R21012) and against Windsor II as nominee of Cohen (as document number 2008R21013) on May 23, 2008.

The record demonstrates that Windsor II, as Cohen's nominee, holds title to the entirety of the Property.  Having released the only mortgage it ever recorded against the Property on May 3, 2005, Windsor I does not hold a valid mortgage and has no ownership interest.  No agreement between Windsor I and Windsor II was ever recorded.  Thus, the United States' liens have priority over any such agreement.  Because Windsor I has

no ownership interest, the Court concludes that the Lillian Rosen Trusts likewise have no interest in the Property.

The Court further concludes that Irving Cohen owes $4,324,306.38 for I.R.C. § 6700 penalties, plus statutory interest accruing from June 28, 2011.  Pursuant to I.R.C. § 7403, the United States may foreclose upon the Property, and apply the proceeds of sale of the Property to Cohen's outstanding tax debt.

<u>Ergo</u>, the Court concludes that The Windsor Organization, Inc. holds the Springfield Property as Irving Cohen's nominee, and is Cohen's alter ego.

The Clerk shall enter Judgment in favor of Plaintiff United States of America.  The United States is permitted to foreclose upon the Property pursuant to the federal tax liens and judgment which attach to the Property.

Upon disbursing the proceeds of any sale of the Property accordingly, the United States shall apply the balance to Irving Cohen's outstanding income tax debt.

102

Any pending motions are DISMISSED as Moot.

IT IS SO ORDERED.

ENTER: March 8, 2013

FOR THE COURT:

*s/Richard Mills*
Richard Mills
United States District Judge